**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:16-cv-00107 |
| ) | |
| RHODE ISLAND COMMERCE ) | |
| CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**WELLS FARGO SECURITIES, LLC'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

SUMMARY OF ALLEGATIONS ....................................................................................... 2

STANDARD OF REVIEW .................................................................................................. 5

LEGAL ARGUMENT .......................................................................................................... 6

I.      The SEC Fails To Plausibly Allege that the Purportedly Omitted Information
        Rendered Any Statements in the Bond PPM Misleading .................................................. 8

        A.      The Omission of Information Regarding 38 Studios' Financial
                Requirements To Complete *Project Copernicus* Does Not Render Any
                Statements in the Bond PPM Misleading ............................................................... 9

        B.      The Omission of Alternative Financing Fees Does Not Render the
                Disclosure of the Placement Agents' Fees Misleading........................................ 13

II.     In Light of the "Total Mix" of Information Available in the Bond PPM, the
        Alleged Omissions Are Not Material to a Reasonable Investor as a Matter of
        Law ................................................................................................................................... 15

        A.      Any Potential "Funding Gap" Is Not Material In Light of the Bond
                PPM's Extensive Disclosures ............................................................................... 16

        B.      The Alternative Financing Fees Are Not Material in Light of the Total
                Amount of the Bond Offering and the Fees Disclosed in the Bond PPM .......... 19

III.    The SEC Fails To Allege That Wells Fargo Acted Recklessly, Negligently or
        Breached Any Relevant Standard of Care ....................................................................... 22

IV.     The SEC Fails To Plead Any Allegations Sufficient To Sustain Its Claim that
        Wells Fargo Violated MSRB Rule G-32 ........................................................................ 23

CONCLUSION .................................................................................................................... 24

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Aaron v. SEC,*
   446 U.S. 680 (1980)......................................................................................................9, 22

*Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,*
   267 F.3d 30 (1st Cir. 2001)..................................................................................................3

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..............................................................................................................5

*Backman v. Polaroid Corp.,*
   910 F.2d 10 (1st Cir. 1990)...................................................................................9, 13, 14

*Banca Cremi, S.A. v. Alex Brown & Sons, Inc.,*
   132 F.3d 1017 (4th Cir. 1997) ...........................................................................................16

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988)...........................................................................................15, 16, 18, 21

*Beddall v. State St. Bank & Trust Co.,*
   137 F.3d 12 (1st Cir. 1998)..............................................................................................3, 15

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)..............................................................................................................5

*Benzon v. Morgan Stanley Distributors, Inc.,*
   420 F.3d 598 (6th Cir. 2005) .............................................................................................13

*Carney v. Cambridge Tech. Partners, Inc.,*
   135 F. Supp. 2d 235 (D. Mass. 2001) ...............................................................................10

*Charter House, Inc. v. First Tennessee Bank, N.A.,*
   693 F. Supp. 593 (M.D. Tenn. 1988)..................................................................................7

*Chiarella v. United States,*
   445 U.S. 222 (1980)..............................................................................................................9

*City of Roseville Employees' Ret. Sys. v. Textron, Inc.,*
   810 F. Supp. 2d 434 (D.R.I. 2011).....................................................................................10

*Dean v. Gen. Motors Corp.,*
   301 F. Supp. 187 (E.D. La. 1969) ......................................................................................23

*Flannery v. SEC*,
    810 F.3d 1 (1st Cir. 2015) ............................................................................. *passim*

*Fletcher v. Zellmer*,
    909 F. Supp. 678 (D. Minn. 1995) .................................................................23

*Freedman v. Value Health, Inc.*,
    135 F. Supp. 2d 317 (D. Conn. 2001) .......................................................16, 17

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996) ........................................................................20, 23

*In the Matter of Anthony Fields, CPA d/b/a Anthony Fields & Associates & d/b/a Platinum Sec.*,
    SEC Release No. 4028, 2015 WL 728005 (Feb. 20, 2015) ............................8

*In the Matter of John P. Flannery & John D. Hopkins*,
    SEC Release No. 438, 2011 WL 5130058 (Oct. 28, 2011) ........................2, 8

*In the Matter of John P. Flannery & John D. Hopkins*,
    SEC Release No. 3981, 2014 WL 7145625 (Dec. 15, 2014).......................2, 8

*In re Boston Scientific Corp. Securities Litigation*,
    686 F.3d 21 (1st Cir. 2012) ............................................................................9

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
    7 F.3d 357 (3d Cir. 1993) .............................................................................18

*In re Duke Energy Corp. Sec. Litig.*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................20, 21

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ...........................................................12

*In re Lions Gate Entm't Corp. Sec. Litig.*,
    No. 14-CV-5197 (JGK), 2016 WL 297722 (S.D.N.Y. Jan. 22, 2016) ...................................10

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008)...........................................................11

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)................................................................................13

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) ........................................................................10

*Parnes v. Gateway 2000, Inc.*,
    122 F.3d 539 (8th Cir. 1997) ...................................................................16, 20

*Pavlidis v. New England Patriots Football Club, Inc.*,
    675 F. Supp. 688 (D. Mass. 1986) ......................................................................20

*Pemental v. Sedgwick Claims Mgmt. Sys.*,
    CA 14-45-M, 2014 WL 2048279 (D.R.I. May 19, 2014).........................................3

*Roeder v. Alpha Industries, Inc.*,
    814 F.2d 22 (1st Cir. 1987)................................................................................9, 10

*Romani v. Shearson Lehman Hutton*,
    929 F.2d 875 (1st Cir. 1991)..................................................................................18

*Salster v. Singer Sewing Machine Co.*,
    361 F. Supp. 1056 (D. Miss. 1973)........................................................................23

*SEC v. Blackburn*,
    No. 15-2451, 2015 WL 5307424 (E.D. La. Sept. 10, 2015)....................................9

*SEC v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) .............................................................................8, 22

*SEC v. Morris*,
    No. CIV.A. H-04-3096, 2007 WL 614210 (S.D. Tex. Feb. 26, 2007) ..............22, 23

*SEC v. Patel*,
    No. CIV. 07-CV-39-SM, 2008 WL 781912 (D.N.H. Mar. 24, 2008) ...............16, 19

*SEC v. St. Anselm Expl. Co.*,
    936 F. Supp. 2d 1281 (D. Colo. 2013)................................................................22, 23

*SEC v. Shanahan*,
    646 F.3d 536, 545-46 (8th Cir. 2011) ...................................................................23

*SEC v. Tambone*,
    417 F. Supp. 2d 127 (D. Mass. 2006) .....................................................................8

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,
    167 F. Supp. 2d 639 (S.D.N.Y. 2001)....................................................................11

*United States v. Crop Growers Corp.*,
    954 F. Supp. 335 (D.D.C. 1997) .............................................................................8

STATUTES

Securities Exchange Act of 1934, § 15B(c)(1), 15 U.S.C. § 78o-4(c)(1) ............................. *passim*

Securities Act of 1934, § 17(a), 15 U.S.C. § 77q(a) ............................................................ *passim*

RULES

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 3, 5

MSRB Rule G-17, reprinted in MSRB RULE BOOK 140 (2013) ........................................... *passim*

MSRB Rule G-32, reprinted in MSRB RULE BOOK 250 (2013) ........................................ 7, 23, 24

OTHER AUTHORITIES

*Guidance on Disclosure and Other Sales Practice Obligations to Individuals and
    Other Retail Investors in Municipal Securities* (July 14, 2009),
    reprinted in MSRB RULE BOOK 164 (2013) .................................................................... 15, 16

*Interpretative Notice Concerning the Application of MSRB Rule G-17 to
    Underwriters of Municipal Securities* (Aug. 2, 2012),
    reprinted in MSRB Rule Book 177 (2013) ...................................................................... 21

*Notice Regarding the Disclosure Obligations of Brokers, Dealers and Municipal
    Securities Dealers in Connection with New Issue Municipal Securities Under
    Rule G-32* (Nov. 19, 1998),
    reprinted in MSRB RULE BOOK 254 (2013) ...................................................................... 24

Defendant Wells Fargo Securities, LLC ("Wells Fargo") submits this Memorandum of Law in support of its Motion to Dismiss the Complaint filed by plaintiff Securities and Exchange Commission ("SEC").

## **INTRODUCTION**

Simply put, this is a case that should never have been filed.  It arises from a bond offering where, as the SEC admits, no investors have been harmed.  *See* Compl. (Dkt. No. 1) ¶ 76 ("[t]o date, bondholders have been paid principal and interest … when those payments were due").  It is a case where, despite the SEC's inflammatory characterization of the conduct as "fraud," even the SEC admits that no one—neither Wells Fargo nor anyone else—intended to mislead investors.  *See, e.g., id.* ¶¶ 80, 84 (alleging negligent or reckless, as opposed to intentional, violations).  It is also a case where, as the SEC tacitly admits (because it makes no allegations to the contrary despite interviewing the bondholders during its investigation), no investors were in fact misled and no investors actually considered the alleged omissions to be material.

In the absence of actual harm, actual intent to deceive, and actual deception, the SEC presses a case that is thin on its face and that ultimately falls apart in light of the facts and the disclosures made to investors.  The SEC selectively cites specific facts and certain disclosures while ignoring the larger context of the offering and the significant additional disclosures to investors.  Based on this constrained reading of the disclosures, the SEC claims that Wells Fargo made material omissions regarding (1) the financial condition of 38 Studios, LLC ("38 Studios"), the company that was to receive the proceeds of the bond offering—even though the offering document extensively describes the company's business plan and warns of future risks, and (2) the fees that Wells Fargo received as placement agent in the bond offering—even though the offering document discloses the material compensation received by Wells Fargo.  As set forth

below, an objective review of the disclosures establishes that there were no misleading

omissions.  Further, even if the SEC could manufacture an omission (which it cannot), such an

omission would not have been material to the investors in the bonds, whose investment was

guaranteed and/or protected not by 38 Studios, but by the State of Rhode Island and insurance.

In short, the material facts regarding the financial condition of 38 Studios and Wells Fargo's fee

were fully disclosed.

For these reasons, this case should never have been filed and it should now be promptly

dismissed with prejudice.[1]  *See Flannery v. SEC,* 810 F.3d 1, 15 (1st Cir. 2015) (vacating

findings by the SEC on ground that it had failed to provide evidence to support allegations of

misrepresentations, materiality, and recklessness).[2]

## SUMMARY OF ALLEGATIONS

For purposes of this Motion to Dismiss, the SEC's allegations[3] are summarized as

follows:  In early 2010, 38 Studios, a pre-revenue, start-up videogame company, approached

Wells Fargo's corporate investment banking group for assistance in raising equity.  Compl.

¶¶ 39-40.  On May 20, 2010, 38 Studios formally retained Wells Fargo to serve as the placement

agent for 38 Studios "in connection with the proposed offer and private placement … by [38

Studios]" of equity.  The Engagement Letter defined this proposed equity raise as the

---

[1]       Because the SEC cannot sustain its primary violation against Wells Fargo, its claims against Peter Cannava,
a Wells Fargo employee, should also be dismissed.  *See* Motion to Dismiss filed by defendant Peter Cannava
(articulating numerous bases why the SEC's claims against Mr. Cannava fail).  Moreover, the SEC's suggestion that
Mr. Cannava somehow *knowingly* assisted in conduct that was at best reckless or negligent makes little sense.  The
SEC's claims against Mr. Cannava are simply unsupported by the allegations and contradicted by the facts.

[2]       *See also In the Matter of John P. Flannery & John D. Hopkins*, SEC Release No. 438, 2011 WL 5130058,
at *48 (Oct. 28, 2011) (initial decision by Administrative Law Judge finding no evidence of "materially false or
misleading statements or omissions"), *rev'd* SEC Release No. 3981, 2014 WL 7145625 (Dec. 15, 2014), *rev'd* 810
F.3d 1 (1st Cir. 2015).

[3]       Wells Fargo recites the SEC's allegations solely for the purposes of its Motion to Dismiss.  Wells Fargo
does not admit that any of the allegations in the Complaint are true and expressly reserves all rights to deny the
SEC's allegations should the Court not grant Wells Fargo's Motion to Dismiss.

"Transaction." Engagement Letter dated May 20, 2010 (the "Engagement Letter"), attached as

Exhibit 1 to Appendix,[4] at 1; *see also* Compl. ¶ 40. The fees relating to the equity raise included

a $50,000 "Market Entrance Fee" and a "Transaction Fee" equal to 5.0% of the aggregate gross

proceeds raised in a Transaction. Engagement Letter at 2.

In recognition of the fact that 38 Studios was also contemplating financing other than an

equity raise, the Engagement Letter expressly included certain "Alternative Financing Fees" to

offset the risk that Wells Fargo would not earn a Transaction Fee if 38 Studios decided to cease

its attempts to raise equity. Engagement Letter at 2-3; *see also* Compl. ¶ 40. The Alternative

Financing Fees included:

> (1)   a "Consulting Fee" of $25,000 "earned on the day after the first meeting
>        among" the Rhode Island Economic Development Corporation (the
>        "EDC"), Wells Fargo, and 38 Studios related to an Alternative Financing
>        Transaction;
>
> (2)   a "Structuring Fee" of $75,000 "earned upon the decision by [38 Studios]
>        … to actively pursue" an Alternative Financing Transaction; and
>
> (3)   a "Alternative Financing Option Closing Fee" of $300,000 "payable upon
>        the closing by [38 Studios] of an Alternative Financing Transaction."

Engagement Letter at 2-3; *see also* Compl. ¶ 40. An "Alternative Financing Transaction" was

defined to include not only a potential bond offering but *any* financing transaction other than the

equity raise. Engagement Letter at 3 (emphasis added). The "Consulting Fee" was the only fee

specifically tied to an Alternative Financing Transaction involving the EDC. *Id.* at 2.

---

[4]      The Engagement Letter and other documents referenced in and integral to the allegations in the Complaint
are included in the Appendix of Exhibits ("Appendix") accompanying the Motion. *See Pemental v. Sedgwick
Claims Mgmt. Sys.*, CA 14-45-M, 2014 WL 2048279, at *2 (D.R.I. May 19, 2014) (McConnell, J.) ("'[w]hen ... a
complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the
authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can
review it in deciding a motion to dismiss under Rule 12(b)(6)'") (quoting *Beddall v. State St. Bank & Trust Co.*, 137
F.3d 12, 16-17 (1st Cir.1998)); *see Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st
Cir. 2001) ("documents central to plaintiffs' claim[ or] … sufficiently referred to in the complaint" can be relied
upon by the Court in deciding a motion to dismiss without converting the motion into one for summary judgment)
(internal quotation marks omitted).

3

Ultimately, rather than an equity raise, 38 Studios decided to pursue an Alternative Financing Transaction with the EDC.  *See* Compl. ¶ 43.  On June 11, 2010, the Rhode Island General Assembly passed a law authorizing the EDC to provide credit enhancement on its conduit bonds in the form of a guaranty of the payment of debt service under a new program named the Jobs Creation Guaranty Act (the "Act").  *Id.* ¶ 25.  Under the Act, the EDC was authorized to issue up to $125,000,000 in bonds at any time.  *Id.*

Pursuant to this new authority, on November 2, 2010, the EDC issued $75,000,000 of Job Creation Guaranty Program Taxable Revenue Bonds (38 Studios, LLC Project), Series 2010 (the "Bonds"), in a limited, private offering (the "Bond Offering").  Compl. ¶ 28; *see generally* Bond Private Placement Memorandum dated October 22, 2010 (the "Bond PPM"), attached as Exhibit 2 to Appendix.  38 Studios was to receive approximately $50 million of the $75 million in proceeds from the Bond Offering, which would be used, among other things, to relocate 38 Studios to Rhode Island and to finance the development of 38 Studios' massively multiplayer videogame, code-named *Project Copernicus*.  Compl. ¶ 28; Bond PPM at 1-3.  The remainder of the proceeds was used to pay expenses related to the Bond Offering and to establish a reserve fund that could be used to make future payments to investors and a capitalized interest fund to pay interest on the Bonds for the first year.  *Id.*

The material terms of the Bond Offering were set forth in the Bond PPM, a 300-plus page disclosure to prospective investors in the Bonds.  The Bond PPM provided detailed disclosures regarding, among other things, the Act, the Bonds, the EDC, 38 Studios, and "the Project," in which the proceeds of the loan would be used.  *See generally* Bond PPM.  Specifically, the Bond PPM made clear that 38 Studios was a pre-revenue, development-stage videogame company, one as to which its auditor had issued a "going concern" opinion (*i.e.*, raising "substantial doubt

4

about [38 Studios'] ability to continue as a going concern"), and one as to which "no guarantee [could] be made … that [it would] continue to be in business now or in the future." *See id.* at 26, 29. The Bond PPM detailed who was responsible for payments to the bondholders and what protections the bondholders had in the event of default. *See id.* at 1-14. The Bond PPM also informed investors that Wells Fargo could receive an amount up to $684,065 in connection with the Bond Offering, consisting of the Placement Agent's Discount of up to $634,065 and $50,000 paid to Wells Fargo from 38 Studios. *See id.* at 34.

Wells Fargo's public finance group was involved in the Bond Offering as placement agent. *See* Compl. ¶¶ 38, 44-45. Wells Fargo's role in the Bond Offering was governed by a separate agreement, entered into on October 22, 2010 between and among Wells Fargo (as placement agent), EDC (as issuer of the Bonds), and 38 Studios (as the conduit borrower). *See generally* Bond Placement Agreement (the "BPA"), attached as <u>Exhibit 3</u> to Appendix.

## STANDARD OF REVIEW

In deciding a Rule 12(b)(6) motion, the Court need not accept "legal conclusion[s]," "naked assertion[s]" without "factual enhancement[s]," "conclusory statement[s]," or implausible inferences. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557, 561 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Rather, the complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where the plaintiff "[has] not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 678.

## **LEGAL ARGUMENT**

As the basis of its Complaint, the SEC has fabricated two purported "omissions" from the Bond PPM and, based on those supposed omissions, has accused Wells Fargo of recklessly or negligently misleading prospective investors with respect to the financial condition of 38 Studios and the fees it earned as placement agent in the Bond Offering.

As its first purported omission, the SEC alleges that Wells Fargo knew that 38 Studios "would only receive about $50 million from the Bond Offering when it needed at least $75 million to complete Project Copernicus … [and] failed to disclose this significant funding gap." Compl. ¶ 58.  Therefore, according to the SEC, certain statements in the Bond PPM as to 38 Studios' financial condition were rendered misleading by the omission of 38 Studios' need for additional funding.  *See*, *e.g.*, *id.* ¶ 62.

As its second purported omission, the SEC alleges that the disclosure in the Bond PPM regarding the compensation it would receive in its role as placement agent was misleading because it omitted the $400,000 Wells Fargo earned in Alternative Financing Fees pursuant to the Engagement Letter.  *See id.* ¶¶ 68-69.  The SEC further alleges that "the fact that Wells Fargo was receiving compensation in this transaction both as a result of its role as a placement agent hired by the EDC[5] and a result of its work as an agent for 38 Studios created a potential conflict of interest that should have been disclosed to potential investors."  *Id.* ¶ 72.

Specifically, based on these allegations, the SEC claims that Wells Fargo violated Section 17(a)(2) and 17(a)(3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a)(2)-(3) , Section 15B(c)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

---

[5]     The SEC's allegation that Wells Fargo was "hired by the EDC" as placement agent is one of many examples of the SEC playing fast and loose with the facts.  Wells Fargo served as placement agent by agreement of <u>both</u> the EDC <u>and</u> 38 Studios.  *See* BPA at 1.  *Compare also*, *e.g.*, Compl. ¶ 67 (alleging that the BPA was referenced in the Bond PPM), *with generally* Bond PPM (providing no reference to the BPA).

§ 78o-4(c)(1),[6] and Municipal Securities Rulemaking Board ("MSRB") Rule G-17.[7]  These

claims, however, are fundamentally flawed and must be dismissed, with prejudice, for the

following reasons:

*First*, the SEC fails to allege facts that set forth a plausible basis to find that any

purported omissions render specific statements in the Bond PPM misleading.  Any supposed

misrepresentation in the Bond PPM is directly attributable to the SEC's efforts to read statements

out of context and contrary to their plain meaning.  *See* Section I, *infra.*

*Second*, the omissions in the Bond PPM alleged by the SEC are as a matter of law, not

material.  As described herein, the alleged omissions in the Bond PPM would not have

significantly altered the "total mix" of information available to reasonable investors in the Bond

PPM.  The Bond PPM makes more than adequate disclosure of the risks attendant to 38 Studios'

financial condition and of the fees Wells Fargo was to receive.  To the extent the SEC contends

additional disclosures should have been made, the additional information would not have been

material to investors, who were protected by the EDC's responsibility to make payment, the

State of Rhode Island's moral obligation, and the insurance provided them.  *See* Section II, *infra.*

*Third*, other than threadbare, conclusory statements that Wells Fargo acted recklessly or

negligently, the SEC fails to allege any specific conduct that supports its allegations.  The SEC's

unsupported assertions simply cannot sustain claims that Wells Fargo acted recklessly or

negligently.  *See* Section III, *infra.*

---

[6]     Section 15B(c)(1) of the Exchange Act ("Section 15B(c)(1)") prohibits any broker, dealer, or municipal securities dealer "to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security … in contravention of any rule of the [MSRB]."  15 U.S.C. § 78o-4(c)(1).  Thus, liability under Section 15B(c)(1) is directly dependent upon an independent finding of a violation of an MSRB rule.  *See, e.g.*, *Charter House, Inc. v. First Tennessee Bank, N.A.*, 693 F. Supp. 593, 594 (M.D. Tenn. 1988).

[7]     The SEC also alleges that Wells Fargo violated MSRB Rule G-32.  However, as discussed below in Section IV, the SEC does not and cannot provide any basis for this purported violation and, therefore, the MSRB G-32 claim fails as a matter of law.

For these reasons, and those discussed below, Wells Fargo respectfully requests that the

Court grant its Motion to Dismiss and dismiss with prejudice all claims asserted against Wells

Fargo in the Complaint.

I.   **The SEC Fails To Plausibly Allege that the Purportedly Omitted Information
     Rendered Any Statements in the Bond PPM Misleading**

To succeed under Section 17(a)(2), or Section 15B(c)(1) and MSRB Rule G-17, the SEC

must identify either an affirmative misrepresentation or an omission that renders other statements

misleading.[8]  15 U.S.C. § 77q(a)(2) (prohibiting an "untrue statement" or an "omission …

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading); *Flannery*, 810 F.3d at 12-15 (under Section 17(a), statements must

be misleading to be actionable); *SEC. v. Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001)

(applying same requirements to MSRB Rule G-17 claim).

The federal securities laws do not create a general duty to disclose all material

information to investors.[9]  *In re Boston Scientific Corp. Securities Litigation*, 686 F.3d 21, 27

---

[8]     Significantly, under Section 17(a)(3), simply pleading a misrepresentation or omission is not enough to make out a claim.  Section 17(a)(3) requires a pattern of misconduct.  *See* 15 U.S.C. § 77q(a)(3) (prohibiting engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."); *Flannery*, 810 F.3d at 14 (stating that "not every isolated act will qualify" as a violation of Section 17(a)(3)) (internal quotation marks omitted); *In the Matter of Anthony Fields, CPA d/b/a Anthony Fields & Associates & d/b/a Platinum Sec.*, SEC Release No. 4028, 2015 WL 728005, at *11 (Feb. 20, 2015) (a Section 17(a)(3) claim must be grounded in "recurrent and systematic misconduct.").  Even the SEC has admitted that "an isolated, negligent misstatement" cannot form the basis of a Section 17(a)(3) claim.  *In the Matter of John P. Flannery & John D. Hopkins*, SEC Release No. 3981, 2014 WL 7145625, at *19 (Dec. 15, 2014), *rev'd on other grounds* 810 F.3d 1 (1st Cir. 2015).  At a minimum, even assuming that a Section 17(a)(3) violation could be premised solely on misstatements or omissions, which Wells Fargo disputes, the SEC would still have to allege that those misstatements or omissions were "repeatedly ma[de] or draft[ed] … <u>over a period of time</u>."  *Id.* at *18-19 (emphasis added) (finding Rule 17(a)(3) violation where "conduct spanned … two week period … and encompassed more than one materially misleading communication").  Here, because the SEC's allegations relate solely to two alleged omissions made in a single disclosure document and do not reflect the type of recurrent and systematic misconduct over a period of time necessary to support a Section 17(a)(3) claim, the SEC's claim against Wells Fargo for violation of Section 17(a)(3) fails for this independent reason.

[9]     In analyzing the requirements of Section 17(a), the Court may appropriately look to jurisprudence on Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See, e.g.*, *SEC v. Tambone*, 417 F. Supp. 2d 127, 131-32, 134 (D. Mass. 2006) (discussing misrepresentations and omissions "as defined by the securities laws," including Section 10(b) of the Exchange Act, as well as Section 17(a) of the Securities Act); *United States v. Crop Growers Corp.*, 954 F. Supp. 335, 350 (D.D.C. 1997) ("interpretation of Section 17(a) is guided by

(1st Cir. 2012) (the securities laws "do[] not create an affirmative duty to disclose any and all material information") (internal quotation marks omitted); *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990) ("The materiality of the information claimed not to have been disclosed … is not enough to make out a sustainable claim of securities fraud."); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26-27 (1st Cir. 1987) (no affirmative duty to disclose all material information); *see Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").  Instead, the disclosure obligation only extends to those facts "that are needed so that what was revealed would not be so incomplete as to mislead."  *Backman*, 910 F.2d at 16 (internal quotation marks omitted); *see also* 15 U.S.C. § 77q(a)(2) (prohibiting "any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading").  Thus, for an omission to be actionable under federal securities laws, the SEC must point to specific statements that—because of an alleged omission—are so incomplete that they are misleading.

A.    **The Omission of Information Regarding 38 Studios' Financial Requirements To Complete *Project Copernicus* Does Not Render Any Statements in the Bond PPM Misleading**

In the Complaint, the SEC does not allege an affirmative misrepresentation by Wells Fargo.  Instead, the SEC relies solely on perceived omissions in the Bond PPM.  The SEC alleges that Wells Fargo knew that 38 Studios required $75 million to complete *Project Copernicus* but would only receive $50 million through the Bond Offering.  Compl. ¶ 58.  The

---

principles articulated in Rule 10b-5 cases").  Indeed, the elements of Section 10(b) of the Exchange Act are substantially similar to the requirements of Section 17(a) and are regularly analyzed without distinction.  *See, e.g., SEC v. Blackburn*, No. 15-2451, 2015 WL 5307424, at *4 (E.D. La. Sept. 10, 2015) (explaining that the prima facie elements of Section 17(a) of the Securities Act and Section 10(b) are "essentially the same"); *see generally Aaron v. SEC*, 446 U.S. 680 (1980) (discussing the requirements of Section 10(b) of the Exchange Act and Section 17(a) of Securities Act indistinguishably).

SEC further alleges that Wells Fargo omitted 38 Studios' need for additional funding to cover the so-called "funding gap."  *See id.* ¶¶ 48-64.

As a threshold matter, Wells Fargo had no duty to disclose what 38 Studios believed its future funding requirements would be to complete *Project Copernicus*—notwithstanding the SEC's conclusory allegation that such information would be "material" to investors.  *E.g.*, *Roeder* 814 F.2d at 26 ("The materiality of the information claimed not to have been disclosed, however, is not enough to make out a sustainable claim of securities fraud."); *see, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, No. 14-CV-5197 (JGK), 2016 WL 297722, at *6 (S.D.N.Y. Jan. 22, 2016) (recognizing that "corporations are not required to disclose a fact merely because a reasonable investor would very much like to know that fact") (internal quotation marks omitted); *City of Roseville Employees' Ret. Sys. v. Textron, Inc.*, 810 F. Supp. 2d 434, 443-44 (D.R.I. 2011) ("[s]ecurities investors have a voracious appetite for information" and likely want to know "every available fact," but this does not subject securities dealers to liability for each and every perceived omission).[10]  Simply alleging that the "funding gap" was material and that failing to disclose it misled potential bond investors is insufficient to sustain the SEC's claims.  The SEC must identify specific statements in the Bond PPM that were rendered misleading by the alleged omissions.

The SEC can identify only two specific statements in the Bond PPM that it asserts were rendered misleading by the omission of the 38 Studios' future funding requirements.  First, the SEC contends that this omission rendered the following statement in the Bond PPM misleading:

---

[10]  To be clear, financial projections are not among the type of information generally required or expected to be disclosed.  *See, e.g., Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir. 1981) (finding that there is no duty to disclose financial projections); *see also Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 245 (D. Mass. 2001) ("[C]ourts in the First Circuit generally have declined to impose liability for so-called 'forward looking statements'—that is, broad statements that express optimism about a company's future—because these courts regard such statements as unlikely, as a matter of law, to be material to a reasonable investor.").

> 38 Studios "is a development stage video game and entertainment company with no revenues and is dependent on the proceeds of the 2010 Bonds for future the [sic] development of Project Copernicus™."

Compl. ¶ 62a (quoting Bond PPM at 19).  However, as the SEC apparently admits, this statement is 100% accurate.  As of the date of the Bond Offering, 38 Studios *was* "a development stage video game and entertainment company with no revenues" and it *was* "dependent on the proceeds of the 2010 Bonds for [the] future … development of Project Copernicus™."  *Id.*

Unable to assert that the statement is misleading on its face, the SEC alleges that this statement is misleading because it *suggests* that the proceeds of the Bond Offering would be all 38 Studios would need to develop *Project Copernicus*.  *See id.*  A plain reading of the statement, however, belies the SEC's contention.  A reasonable bond investor would understand this statement to mean that 38 Studios would rely on the proceeds of the Bond Offering to develop *Project Copernicus*.  The portion of the Bond PPM quoted above *does not* tell investors that 38 Studios would depend on the Bond Offering proceeds—*and nothing more*—to develop *Project Copernicus*.  *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) ("If … allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true.") (quoting *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 646-47 (S.D.N.Y. 2001)).

Additionally, the Bond PPM never states that the approximately $50 million in proceeds from the Bond Offering, or even the $75 million that the SEC alleges 38 Studios needed to complete *Project Copernicus* based on its own projections, would be sufficient for 38 Studios to complete *Project Copernicus*.  In fact, the Bond PPM includes no representations relating to 38 Studios financial projections or how much money 38 Studios projected it would need to

complete *Project Copernicus*. Instead, the Bond PPM made it abundantly clear that *Project Copernicus* may never be completed. *See*, *e.g.*, Bond PPM at 29 ("There can be no assurance that the games under development by [38 Studios] will be released on schedule, *or ever* …") (emphasis added); *id.* at 31 ("[t]here can be no assurance that the games under development will be released on schedule (*or, indeed, ever released*)") (emphasis added). Quite simply, any information about the "funding gap" would only have confirmed what a reasonable investor already knew from reading the disclosures in the Bond PPM: Even under 38 Studios' then-current business plan, *Project Copernicus* might never be brought to market. These disclosures deprive the SEC's "funding gap" allegations of all plausibility. *See In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 163 (D. Mass. 2009) (indicating that a disclosure claim fails when a defendant "disclosed that which the Complaint alleges it concealed").

Second, the SEC also alleges that this omission rendered a statement concerning an auditor's "going concern" opinion misleading. *See* Compl. ¶ 62b. The allegedly misleading statement reads:

> 38 Studios' auditor [PricewaterhouseCoopers LLP ("PwC")] "issued a 'going concern' opinion in connection with [38 Studios'] most recent audited financial statements stating that the Company will require additional financing to fund future operations and raising substantial doubt about the Company's ability to continue as a going concern."

*Id.* (quoting Bond PPM at 26). However, this statement too is completely accurate: PwC did issue such an opinion stating that 38 Studios would require additional financing to fund future operations and raising substantial doubt about its ability to continue as a going concern.

Again unable to assert that the statement is false on its face, the SEC advances the somewhat bewildering contention that an auditor's cautionary opinion, which is intended to alert investors of potential risks, in fact conveyed the message that the proceeds of the Bond Offering

would cover all of 38 Studios' costs to complete *Project Copernicus*. *Id.* It is hard to imagine

any bond investor—let alone a reasonable one—would read the disclosure of the auditor's going

concern opinion in such an irrational matter. Nowhere in the Bond PPM is there a statement that

the Bond Offering proceeds constituted the "additional financing" referred to by PwC or that the

Bond Offering proceeds would resolve the auditors' "going concern" opinion. To the contrary,

prospective investors were repeatedly warned that "no guarantee can be made … that [38

Studios] will continue to be in business now or in the future." Bond PPM at 29. Thus, the

omission of some alleged future need for funding simply cannot make the above-quoted

statement misleading as to 38 Studios' then-present financial condition. Accordingly, the Bond

PPM's disclosures regarding the financial condition of 38 Studios were not misleading and the

SEC's claims regarding them should be dismissed. *See, e.g.*, *Olkey v. Hyperion 1999 Term

Trust, Inc.*, 98 F.3d 2, 5-9 (2d Cir. 1996) (affirming dismissal where alleged omissions in

disclosures to investors did not make disclosures misleading).

### B.   The Omission of Alternative Financing Fees Does Not Render the Disclosure of the Placement Agents' Fees Misleading

The SEC also alleges that the Bond PPM omitted the $400,000 in Alternative Financing

Fees earned by Wells Fargo pursuant to the Engagement Letter. Compl. ¶¶ 66, 68-69. In the

first instance, Wells Fargo had no obligation to disclose the Alternative Financing Fees. *See,

e.g.*, *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 611-12 (6th Cir. 2005)

(undisclosed fact that brokers could receive higher compensation for the sale of certain mutual

funds, as opposed to the sale of other mutual funds, was not actionable because it did not render

any statements in the prospectus misleading). As explained above, the omission of the

Alternative Financing Fees from the Bond PPM is only actionable if they rendered some other

statement misleading to prospective investors. *See* 15 U.S.C. § 77q(a)(2); *Backman*, 910 F.2d at

16 (explaining that the disclosure obligation only extends to facts "that are needed so that what was revealed would not be so incomplete as to mislead") (internal quotation marks omitted). With respect to this alleged omission, the SEC points to the paragraph in the Bond PPM disclosing the fees earned by the placement agents in the Bond Offering. *See* Compl. ¶ 66.

In a section entitled "Private Placement Agent," with respect to the fees that Wells Fargo, along with co-placement agent Barclays Capital, would receive for the services they were providing as placement agents in the Bond Offering, the Bond PPM stated the following:

> The 2010 Bonds are being privately placed by Wells Fargo Securities, LLC ("Wells Fargo") as representative of Wells Fargo and Barclays Capital at an aggregate purchase price for the 2010 Bonds of par less the Placement Agents' fee of $634,065.00. In addition, Wells Fargo will be paid $50,000 by the Company in connection with their disclosure and due diligence of the Company with respect to this transaction.

*See* Bond PPM at 34. By virtue of this disclosure, potential investors were informed that: (1) Wells Fargo was being compensated contingent upon the successful completion of the Bond Offering; (2) Wells Fargo, in its role as placement agent in the Bond Offering, could receive up to $634,065 in fees; and (3) Wells Fargo would be paid by 38 Studios for additional services provided in connection with the Bond Offering. *See id.*

The omission of the Alternative Financing Fees does not render the Bond PPM's express disclosure of the amount of compensation that Wells Fargo expected to receive as a placement agent *in the Bond Offering* misleading because the Alternative Financing Fees were not earned by Wells Fargo as placement agent in the Bond Offering. While the SEC rhetorically dubs the disclosure in the Bond PPM a "misleading half-truth," Compl. ¶ 68, the SEC does not allege that the Alternative Financing Fees were part of the "'placement agents' fee' of $634,065" or were otherwise earned by Wells Fargo in its role as placement agent in the Bond Offering—nor could

it.  *Cf. id.* ¶¶ 65-66.[11]  Rather, 38 Studios paid Wells Fargo the Alternative Financing Fees for

work performed by its corporate investment banking group prior to the Bond Offering pursuant

to the terms of the Engagement Letter.  *Id.* ¶ 40.

Thus, the Court must dismiss the SEC's claims as they relate to the Alternative Financing

Fees because the omission of such fees from the Bond PPM did not render any statements to

bond investors misleading.[12]

## II.   In Light of the "Total Mix" of Information Available in the Bond PPM, the Alleged Omissions Are Not Material to a Reasonable Investor as a Matter of Law

To sustain its claims, the alleged omissions must also be, as a matter of law, material.

15 U.S.C. § 77q(a)(2) (prohibiting "any untrue statement of a material fact or any omission to

state a material fact"); *Flannery*, 810 F.3d at 12-15 (requiring the SEC to provide proof of

materiality for a Section 17(a) claim).  To satisfy this materiality requirement, "there must be a

substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

available."  *Flannery*, 810 F.3d at 9 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32

(1988)); *Guidance on Disclosure and Other Sales Practice Obligations to Individuals and Other

Retail Investors in Municipal Securities* (July 14, 2009), reprinted in MSRB RULE BOOK 164,

---

[11]   The SEC also alleges that the Alternative Financing Fees were omitted from the BPA entered into between Wells Fargo, the EDC and 38 Studios.  Compl. ¶¶ 67-69.  Because the BPA was not shown to investors, it does not reflect any additional representations made to them.  Further, as in the Bond PPM, the BPA disclosed the fees earned by Wells Fargo as placement agent in the Bond Offering and, therefore, accurately recited the anticipated compensation.  Any argument to the contrary is belied by the SEC's own pleading.  38 Studios was a signatory to the Engagement Letter, as well as the BPA, and 38 Studios' signature on the BPA confirms the understanding of the parties to the BPA that the compensation disclosed was all the remuneration that the placement agents would be receiving in connection with their role as placement agents in the Bond Offering.  *See generally* BPA.

[12]   In an attempt to draw some connection between the BPA and the Bond PPM, the Complaint alleges that the BPA was "referenced in the Bond Placement Memo."  Compl. ¶ 67.  The SEC does not cite to any particular portion or page of the Bond PPM containing this reference, and a thorough review of the Bond PPM reveals there is no such "reference."  *See Beddall*, 137 F.3d at 16-17, 20 (declining to overlook the plain language of documents incorporated by referenced into the pleadings in favor of "bald assertions" or "unsupportable conclusions" in the complaint).

at 165 (2013) (under MSRB Rule G-17, "information is considered 'material' if there is a

substantial likelihood that its disclosure would have been considered important or significant by

a reasonable investor ").[13]  The Court must dismiss the SEC's claims if it finds that "a jury could

not reasonably find … materiality on the evidence presented."  *SEC v. Patel*, No. CIV. 07-CV-

39-SM, 2008 WL 781912, at *7-13 (D.N.H. Mar. 24, 2008) (internal quotation marks omitted)

(dismissing Section 17(a)(2) and (3) claims on materiality grounds).  "[A] complaint that alleges

only immaterial misrepresentations presents an insuperable bar to relief, and dismissal of such a

complaint is proper."  *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (internal

quotation marks and citations omitted).

### A.  Any Potential "Funding Gap" Is Not Material In Light of the Bond PPM's Extensive Disclosures

In assessing the materiality of omitting information about 38 Studios' future "funding

gap," the entirety of the Bond PPM must be examined.  *See Basic Inc.*, 485 U.S. at 231-32

(holding that materiality is determined by looking at the "total mix" of information made

available to a reasonable investor); *Flannery*, 810 F.3d at 11 (stating that "[c]ontext makes a

difference" in a materiality analysis); *see also Freedman v. Value Health, Inc.*, 135 F. Supp. 2d

317, 334 (D. Conn. 2001) ("The determination of materiality is to be made upon all the facts as

---

[13]    In considering whether an omission is material under this standard, the sophistication or investment acumen of the intended recipient cannot be ignored.  *See Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017, 1028-29 (4th Cir. 1997) ("A sophisticated investor requires less information to call a '[mis-]representation into question' than would an unsophisticated investor.  Likewise, when material information is omitted, a sophisticated investor is more likely to 'know[] enough so that the … omission leaves him cognizant of the risk.") (internal quotation marks and citations omitted).  Because the Bonds were issued in reliance upon the exemption in Regulation D of the Securities Act, the Bonds were only marketed and sold to "accredited investors" within the meaning of Rule 501(a) of the Securities Act and, therefore, the prospective investors definitionally had "sufficient[] knowledge[] and experience in financial and business matters so as to be capable of evaluating the merits and risks of the investment represented by the purchase of [the Bonds], and is capable of making its own investigation of the Issuer, the Company and [the Bonds]."  Bond PPM at Cover.  Notably, in the Complaint, the SEC is careful not to identify or name the six purchasers of the Bonds, each of which was a sophisticated institutional investor and each of which executed the "Investor Letter" found at Appendix E of the Bond PPM.  *See* Bond PPM at App'x E.  As importantly, the SEC does not allege that any of these sophisticated institutional investors considered 38 Studios' financial condition as material to their decision to purchaser these Bonds, nor could it.

of the time of the transaction *and not upon a 20-20 hindsight view long after the event.*")
(internal quotation marks omitted) (emphasis added).  Notably, in focusing on two discrete
disclosures contained in the Bond PPM, the SEC seemingly ignores the extensive disclosures in
the Bond PPM warning potential investors that *Project Copernicus* may never be completed, 38
Studios may go out of business, and that any investment involved substantial risk.  For example,
the Bond PPM states:

- 38 Studios is "considered 'pre-revenue' and <u>no guarantee</u> can be made that [it] will meet
  its Loan Payment obligations under the Agreement or that [it] <u>will continue to be in
  business now or in the future</u>."  Bond PPM at 29 (emphasis added).

- 38 Studios "is a development stage video game and entertainment company with no
  revenues from product sales, except those projected by [38 Studios] over the next several
  years." *Id.*

- 38 Studios' auditor, PwC, "issued a 'going concern' opinion in connection with [38
  Studios'] most recent audited financial statements stating that [38 Studios] <u>will require
  additional financing to fund future operations</u> and raising substantial doubt about [its]
  ability to continue as a going concern." *Id.* (emphasis added).

- "There can be no assurance that the games under development by [38 Studios] will be
  released on schedule, or ever, or that if released, they will meet with market acceptance.
  Nor is there any assurance that any products of [38 Studios] will produce significant
  revenues or earnings for the Company." *Id.*

- "The video game, interactive media and entertainment industries, particularly the
  business of producing and distributing proprietary video games, is highly speculative and
  inherently risky." *Id.* at 30.

- "There is no guarantee of the economic success of any video game since the revenue
  derived from production and distribution of a video game depends primarily upon the
  video games acceptance, which cannot be predicted." *Id.*

- "[T]here is a risk that any project undertaken by [38 Studios] will not be commercially
  successful." *Id.*

- "Competitors with greater resources are able to spend more time and money on concept
  and focus testing, game development, product testing and marketing." *Id.*

- "There can be no assurance that the games under development will be released on
  schedule (or, indeed, ever released) or that, if released, they will meet with market
  acceptance." *Id.* at 31.

Despite these disclosures, the SEC alleges that the omission of an additional statement that "38 Studios would need additional financing in order to complete Project Copernicus" was material.  Compl. ¶ 61.  In doing so, the SEC completely forgoes any examination of the Bond PPM's disclosures in favor of conclusory allegations of materiality.  *E.g.*, *id.* ¶ 61.  This disregard for the context of alleged omissions flies in the face of established precedent.  *See Basic Inc.*, 485 U.S. at 231-32; *Flannery*, 810 F.3d at 11; *see also In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 373 (3d Cir. 1993) (stating that "materiality involves a context-specific analysis such that warnings and cautionary language [can] suffice to render the allegedly misleading misrepresentations or omissions immaterial as a matter of law"); *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 (1st Cir. 1991) (emphasizing that there cannot be securities fraud liability where the offering document "unquestionably warned potential investors in a meaningful way").

Moreover, in addition to above-identified risks, and all of the other risks disclosed in the Bond PPM under the heading "INVESTMENT CONSIDERATIONS," the Bond PPM also contained detailed descriptions of the safeguards available to potential investors in the Bonds. *See generally* Bond PPM.  These safeguards—which necessarily and significantly factored into the "total mix" of information considered by prospective investors—included, first and foremost, the State of Rhode Island's pledge that if 38 Studios defaulted and was unable to make its debt service payments, any amount necessary to cover the shortfall in annual debt service would be included in the governor's annual budget recommendation to the legislature, which could, at its discretion, decide to appropriate such amounts.[14]  *See* Compl. ¶¶ 31-32; *see also* Bond PPM at 10-14.  As an added layer of security, the Bonds were insured by Assured Guaranty Municipal

---

[14]     This security mechanism is often colloquially referred to as a "moral obligation pledge."

Corp., which guaranteed payment of debt service on the Bonds if the legislature declined to appropriate the amount required. *See* Compl. ¶ 33; *see also* Bond PPM at 8-10. Without question, Rhode Island's moral obligation pledge and the insurance policy, not the likelihood of *Project Copernicus*' commercial success, were the two most significant factors considered by investors, and the Bond PPM contained more than adequate disclosures on those aspects of the Bond Offering.[15] Not surprisingly, the SEC has not alleged that <u>*any of the investors*</u> considered the alleged omissions or for that matter any information regarding 38 Studios' financial condition, to be material. *See Flannery*, 810 F.3d at 14 (finding insufficient basis for SEC's conclusory assertion of materiality where "the Commission has failed to identify a single witness that supports a finding of materiality.").

In light of the foregoing "total mix" of information available to prospective bond investors, the potential need of 38 Studios for additional funding was an immaterial risk in the context of voluminous disclosures and the overall security available to prospective investors. *See, e.g.*, *Patel*, 2008 WL 781912, at *7-13 (dismissing Section 17(a)(2) and (3) claims because alleged misrepresentations and omissions were immaterial as a matter of law).

### B.    The Alternative Financing Fees Are Not Material in Light of the Total Amount of the Bond Offering and the Fees Disclosed in the Bond PPM

The Complaint alleges that 38 Studios paid Wells Fargo $400,000 in Alternative Financing Fees that were not disclosed in the Bond PPM.[16] Compl. ¶ 69. This amount, however, is *de minimis* in the context of the $75 million Bond Offering and would not have affected the behavior of a reasonable investor in the Bonds. The $400,000 in Alternative

---

[15]    Indeed, the Bond PPM did not contain 38 Studios' financial projections—or any statement related to 38 Studios' future, projected financial needs—and, yet, investors still purchased the entire $75 million issue. This fact, by itself, is indicative of what reasonable investors considered to be material and immaterial.

[16]    The SEC admits that $100,000 of these fees were not contingent on the closing of the Bond Offering. *See* Compl. ¶ 69.

Financing Fees only amounts to approximately 0.53% of the total par value of the Bonds.[17]

Courts routinely hold that such a quantitatively small percentage renders a misrepresentation or

omission immaterial as a matter of law.  *E.g.*, *Parnes*, 122 F.3d at 547 (affirming dismissal

where alleged overstatement of assets was only 2% of total assets and thus immaterial as a matter

of law); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 & n. 26 (1st Cir. 1996) (affirming

dismissal where omitted information was only between 3% and 9% of actual revenues and

therefore immaterial as a matter of law); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d

158, 161 (S.D.N.Y. 2003) (holding that 0.3% was an "immaterial percentage as a matter of

law"); *Pavlidis v. New England Patriots Football Club, Inc.*, 675 F. Supp. 688, 692 (D. Mass.

1986) (holding that an impact on revenue of less than 1% is immaterial).  This is true even if the

amount of undisclosed money amounts to millions of dollars.  *E.g.*, *Parnes*, 122 F.3d at 547

(alleged overstatement of assets was immaterial as a matter of law even though it amounted to

$6.8 million); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d at 161 (nondisclosure of

$217 million inflation in company's revenues was immaterial as a matter of law).

That percentage becomes even smaller when comparing the total compensation Wells

Fargo is alleged to have earned "at closing"—$706,250 (*i.e.,* $406,250 in placement agent fees,

*see* Compl. ¶ 65, and $300,000 in Alternative Financing Fees, *see id.* ¶ 69)—to what the Bond

PPM discloses Wells Fargo *could* have earned—up to $684,065.  In the Bond PPM, prospective

investors were informed that Wells Fargo might receive an amount up to $684,065 in connection

with the Bond Offering (consisting of the Placement Agent's Discount of up to $634,065 and the

$50,000 from 38 Studios).  *See* Bond PPM at 34.  Thus, under this analysis, the total fees Wells

---

[17]     If the Court discounts the $100,000 in fees that were not contingent on the closing of the Bond Offering,
this percentage drops to just 0.4%.

Fargo received "at closing" amounted to just over **_$22,000_** beyond the amounts already disclosed in the Bond PPM, or approximately 0.03% of the total par value of the Bonds.

While the SEC chooses to focus myopically on the amount of the supposed additional fee, the materiality of a purported omission is determined by looking at the "total mix" of information available to a reasonable investor. *See Basic*, 485 U.S. at 232. The "total mix" of information here includes everything disclosed in the Bond PPM. There is no way that any investor would have considered the additional fees to Wells Fargo—whether $22,000 or $300,000, or even $400,000—to be material in the scope of the $75,000,000 Bond Offering, particularly given that investors already knew that Wells Fargo's compensation was contingent upon the successful completion of the Bond Offering (and that it therefore had an incentive to complete that offering); that Wells Fargo could receive up to $684,065 in fees as a result of the Bond Offering; and that a portion of Wells Fargo's fees would be paid by 38 Studios for services rendered in connection with the Bond Offering. *See* Bond PPM at 34. [18] These disclosures as to Wells Fargo's incentives also contradict any suggestion by the SEC that there was an undisclosed conflict of interest. Moreover, not surprisingly, the SEC fails to allege that any actual investor considered Wells Fargo's fees to be material.

---

[18]     It bears noting that on August 2, 2012, the MSRB expanded the existing obligations under MSRB Rule G-17 to require dealers to affirmatively disclose to issuers, among other things, "actual or potential material conflicts of interest," such as "[p]ayments to or from [t]hird-[p]arties." *Interpretative Notice Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012), reprinted in MSRB Rule Book 177 (2013), at 178. While the 2012 expansion has no applicability to the 2010 Bond Offering, the MSRB's guidance as to what should be disclosed supports Wells Fargo's position here. Even under the expanded rule, the emphasis is on the disclosure of "*the existence of payments*" received and the source, *not the amount of those payments*. *See id.* at 180 (emphasis added). The notice goes on to state specifically that MSRB Rule G-17 "does not require that *the amount* of such third-party payments be disclosed." *See id.* (emphasis added). Therefore, by analogy, *only the existence* of compensation that may raise a conflict of interest need be disclosed to investors. In this case, Wells Fargo disclosed that, contingent upon the closing of the Bond Offering, it would receive compensation both from the EDC and 38 Studios. Bond PPM at 34. The specific amount of the additional compensation from 38 Studios was immaterial and did not need to be disclosed.

Because the SEC cannot, as a matter of law, establish that the Alternative Financing Fees were material to reasonable investors in the Bonds, the Court should dismiss the claims regarding the Alternative Financing Fees on this ground as well.

### III. The SEC Fails To Allege That Wells Fargo Acted Recklessly, Negligently or Breached Any Relevant Standard of Care

Sections 17(a)(2) and (3) of the Securities Act, as well as MSRB Rule G-17, require proof that Wells Fargo acted, at a minimum, negligently. *See Aaron*, 446 U.S. at 700-02; *Flannery*, 810 F.3d at 12; *see also Dain Rauscher, Inc.*, 254 F.3d at 856 (applying negligence standard to MSRB Rule G-17 claim). The SEC must show that Wells Fargo failed to "use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation." *SEC v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1293 (D. Colo. 2013); *see SEC v. Morris*, No. CIV.A. H-04-3096, 2007 WL 614210, at *3 (S.D. Tex. Feb. 26, 2007) ("Negligence is not a strict liability standard. Negligence in [the federal securities] context requires the absence of a reasonable basis.").

The SEC never specifically identifies how Wells Fargo failed to exercise the "degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise" in the preparation of the Bond PPM. Nothing in the Complaint indicates that Wells Fargo exercised anything but due care in providing potential investors with truthful disclosures in the Bond PPM. Rather, the SEC asserts in conclusory fashion that Wells Fargo was "negligent" or "reckless." *See, e.g.*, Compl. ¶ 6 ("By recklessly or negligently engaging in the conduct described in the Complaint, defendants EDC and Wells Fargo violated Sections 17(a)(2) and (a)(3) of the Securities Act of 1933."). These conclusory assertions, however, fail to specify how Wells Fargo acted unreasonably in determining the disclosures in the Bond PPM were

22

truthful and complete.[19]  Moreover, the SEC readily admits that Wells Fargo "conducted due diligence on 38 Studios" and that this due diligence was relied upon in the 38 Studios Bond Offering.  *Id.* ¶¶ 42, 47.  The First Circuit has pointed out that "[d]ue diligence is equivalent to non-negligence."  *Glassman*, 90 F.3d at 627 n.12.

The SEC's failure to allege facts sufficient to support its contention that Wells Fargo departed from how a reasonable person in a similar situation would have reviewed the key representations of the Bond PPM is fatal to its claims.  *See SEC v. Shanahan*, 646 F.3d 536, 545-46 (8th Cir. 2011) (affirming judgment for defendant in Section 17(a)(2) and (3) claims because the SEC "fail[ed] to present any evidence that [defendant] … violated an applicable standard of reasonable care"); *St. Anselm Expl. Co.*, 936 F. Supp. 2d at 1298 (granting defendants judgment as a matter of law in part because the SEC failed to present evidence of negligent omissions by defendants in communications with investors); *Morris*, 2007 WL 614210, at *1 ("This memorandum opinion grants the motion to dismiss this case, making it clear that as a matter of law, Morris was neither fraudulent nor negligent as the S.E.C. alleged.").  The SEC's claims should be dismissed because it has not adequately alleged any negligent conduct.

## IV.    The SEC Fails To Plead Any Allegations Sufficient To Sustain Its Claim that Wells Fargo Violated MSRB Rule G-32

MSRB Rule G-32 requires disclosure of "the amount of any fee received by the broker, dealer, or municipal securities dealer *as agent for the issuer* in the distribution of the securities."

---

[19]    The comprehensive nature of the disclosures, in and of themselves, call into question the plausibility of the SEC's conclusory allegations that Wells Fargo acted recklessly or negligently.  The Bond PPM contained fulsome and detailed disclosures regarding the EDC (the issuer and conduit lender), 38 Studios (the conduit borrower), the Bonds and the security for the Bonds, and the risks associated with investing in the Bonds.  *See generally* Bond PPM.  Moreover, merely alleging that the Bond PPM omitted some information is insufficient to establish negligence.  Wells Fargo was obligated to exercise reasonable care, but the reasonableness standard "does not demand perfection."  *Salster v. Singer Sewing Machine Co.*, 361 F. Supp. 1056, 1062 (D. Miss. 1973); *see Fletcher v. Zellmer*, 909 F. Supp. 678, 682 (D. Minn. 1995) ("A mere error in judgment does not create liability if within the bounds of an honest exercise of professional judgment.") (internal quotation marks omitted); *Dean v. Gen. Motors Corp.*, 301 F. Supp. 187, 192 (E.D. La. 1969) (indicating that negligence "does not require prescience" and is not "measured with the benefit of hindsight").

MSRB Rule G-32(a)(iii)(A), reprinted in MSRB RULE BOOK 250 (2013) (emphasis added).[20]  In its Complaint, the SEC fails to allege what fees, if any, Wells Fargo received "as agent for the issuer" that were not disclosed in the Bond PPM.  The only fee that Wells Fargo could even arguably have earned as an agent for the issuer in the distribution of securities was the "placement agents' fee of $643,065," which the SEC concedes _was_ disclosed in the Bond PPM.  Compl. ¶ 65.

Thus, as a matter of law, the SEC's claim that Wells Fargo violated MSRB Rule G-32 is simply untenable and should be dismissed with prejudice.

### CONCLUSION

WHEREFORE, Wells Fargo respectfully requests that the Court (1) grant its Motion to Dismiss; (2) dismiss with prejudice the first, second, fifth, sixth, and seventh claims of the Complaint as alleged against Wells Fargo with prejudice and without leave to amend; and (3) grant any such other relief as the Court deems just and necessary.

---

[20] Wells Fargo expressly denies that it was an agent for the EDC, as issuer or otherwise, or had any duty to disclose the fees it earned as placement agent or otherwise.  *See Notice Regarding the Disclosure Obligations of Brokers, Dealers and Municipal Securities Dealers in Connection with New Issue Municipal Securities Under Rule G-32* (Nov. 19, 1998), reprinted in MSRB RULE BOOK 254, at 258, n.15 (2013) ("If no fee is received by the dealer for acting *as an agent for the issuer* in the distribution of the securities, the dealer need not affirmatively state that no such fee was received but may instead omit any statement regarding such fee.") (emphasis added).

Respectfully submitted,

*/s/ Luke T. Cadigan*
*/s/ Christopher J. Valente (by LTC with permission)*
Luke T. Cadigan (admitted *pro hac vice*)
    luke.cadigan@klgates.com
Christopher J. Valente (Bar No. 8808)
    christopher.valente@klgates.com
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA  02111
Telephone: 617.261.3100
Facsimile: 617.261.3175

*Counsel for Defendant Wells Fargo*
*Securities, LLC*

Dated: May 9, 2016

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2016, the foregoing document was filed electronically and is available for viewing or downloading from the ECF system.  This document was electronically served on the registered participants as identified on the notice of electronic filing (NEF).

*/s/ Luke T. Cadigan*