UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                                )
SECURITIES AND EXCHANGE COMMISSION              )
                                                )
              Plaintiff,                        )
                                                )
v.                                              )        Civil Action No.
                                                )        1:16-cv-00107-JJM
RHODE ISLAND COMMERCE CORPORATION               )
(F/K/A RHODE ISLAND ECONOMIC                    )
DEVELOPMENT CORPORATION), WELLS FARGO           )        JURY DEMAND
SECURITIES, LLC, PETER M. CANNAVA,              )
KEITH W. STOKES, and JAMES MICHAEL SAUL         )
                                                )
              Defendants.                       )
_____)


**<u>MEMORANDUM OF DEFENDANT PETER M. CANNAVA
IN SUPPORT OF HIS MOTION TO DISMISS COMPLAINT</u>**

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ............................................................................................................. 1

FACTS ............................................................................................................................. 5

STANDARD OF REVIEW ............................................................................................. 12

ARGUMENT:  THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR
       RELIEF AGAINST MR. CANNAVA FOR AIDING AND ABETTING A
       VIOLATION OF THE SECURITIES LAWS ................................................. 15

I.     The Complaint Fails to State a Claim for a Primary Violation of the Federal
       Securities Laws. ................................................................................................ 16

     A.    The Complaint Does Not Adequately Allege a Primary Violation of
          17(a)(2) ................................................................................................. 17

     B.    The Complaint Does Not Adequately Allege a Primary Violation of
          Section 17(a)(3) .................................................................................... 24

     C.    The Complaint Does Not Adequately Allege a Primary Violation of
          15B(c)(1) .............................................................................................. 26

II.    The Complaint Fails to Allege that Mr. Cannava Acted With the Requisite
       Scienter, i.e. Knowledge or Recklessness. ........................................................ 28

     A.    The Complaint fails to allege that Peter Cannava knew or recklessly
          disregarded that the Bond PPM was misleading with respect to 38 Studios'
          risk of insolvency ................................................................................. 30

     B.    The Complaint fails to allege that Peter Cannava knew or recklessly
          disregarded that the Bond PPM was allegedly misleading with respect to
          Wells Fargo's fees ................................................................................ 31

III.   The Complaint Fails to Allege that Mr. Cannava Substantially Assisted a Primary
       Violation. .......................................................................................................... 33

     A.    The Complaint does not adequately allege that Peter Cannava actively
          participated in the alleged primary violations ....................................... 34

     B.    The Complaint does not adequately allege that Peter Cannava violated a
          duty to act ............................................................................................. 35

CONCLUSION .............................................................................................................. 38

i

# TABLE OF AUTHORITIES

Page(s)

CASES

*Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,*
   651 F.Supp. 877 (D. Conn. 1986) ......................................................................14

*Armstrong v. McAlpin,*
   699 F.2d 79 (2d Cir. 1983) .................................................................................36

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...........................................................................................13

*Austin v. Bradley, Barry & Tarlow, P.C.,*
   836 F. Supp. 36 (D. Mass. 1993) .......................................................................37

*Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir. 1990) ............................................18

*Basic, Inc. v. Levinson,*
   485 U.S. 224 (1988) ...........................................................................................21

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .............................................................................13, 29, 35, 38

*Benzon v. Morgan Stanley Distributors, Inc.,*
   420 F.3d 598 (6th Cir. 2005) .............................................................................25

*Carney v. Cambridge Tech. Partners, Inc.,*
   135 F. Supp. 2d 235 (D. Mass. 2001) ................................................................23

*City of Roseville Employees' Ret. Sys. v. Textron, Inc.,*
   810 F. Supp. 2d 434 (D.R.I. 2011) ....................................................................17

*Cleary v. Perfectune, Inc.,*
   700 F.2d 774 (1st Cir. 1983) .............................................................................14

*First Interstate Bank of Denver, N.A. v. Pring,*
   969 F.2d 891 (10th Cir. 1992), *rev'd on other grounds, Cent. Bank of Denver, N.A. v.*
   *First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994) ............................37, 38

*Flannery v. SEC,*
   810 F.3d 1 (1st Cir. 2015) ........................................................................ passim

*Gagliardi v. Sullivan,*
   513 F.3d 301 (1st Cir. 2008) ..........................................................................5, 13

*Gerstle v. Gamble–Skogmo, Inc.,*
   478 F.2d 1281 (2d Cir. 1973)..............................................................................23

*Giragosian v. Ryan,*
   547 F.3d 59 (1st Cir. 2008)...................................................................................5

*Goldman v. Belden,*
   754 F.2d 1059 (2d Cir.1985)................................................................................22

*In re Anthony Fields, CPA,* Securities Act Release No. 9727, Exchange Act Release No.
   74,344, Investment Company Act Release No. 31,461, 2015 WL 728005 (Feb. 20,
   2015) ......................................................................................................................5

*In re Allaire Corp. Sec. Litig.,*
   224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................................14

*In re Alstrom SA Sec. Litig.,*
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................24

*In re First Marblehead Corp. Sec. Litig.,*
   639 F. Supp. 2d 145 (D. Mass. 2009) ..................................................................13

*In re Optionable Sec. Litig.,*
   577 F. Supp. 2d 681 (S.D.N.Y. 2008)..................................................................13

*Lawton v. Nyman,*
   No. 98-288-T, 2002 WL 221621 (D.R.I. Jan. 17, 2002) .......................17, 19, 20, 21

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005).............................................................................24, 25

*McLeod-Lopez v. Algarin,*
   603 F. Supp. 2d 330 (D.P.R. 2009)......................................................................13

*Morgan v. Prudential Grp., Inc.,*
   81 F.R.D. 418 (S.D.N.Y. 1979) ...........................................................................38

*N. American Catholic Educ. Programming Foundation, Inc. v. Cardinale,*
   567 F.3d 8 (1st Cir. 2009).................................................................................14, 31

*Olkey v. Hyperion 1999 Term Trust, Inc.,*
   98 F.3d 2 (2d Cir. 1996)...................................................................................13, 19

*Panter v. Marshall Field & Co.,*
   646 F.2d 271 (7th Cir. 1981) ...............................................................................23

*Schultz v. R.I. Hosp. Trust Nat'l Bank,*
   94 F.3d 721 (1st Cir.1996)....................................................................................34

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)........................................................................34, 35

*SEC v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) ......................................................................16, 36

*SEC v. Durgarian*,
    477 F. Supp. 2d 342 (D. Mass. 2007) ..............................................14, 15, 29, 33

*SEC v. Espuelas*,
    698 F. Supp. 2d 415 (S.D.N.Y. 2010)...........................................................34, 38

*SEC v. Ficken*,
    546 F.3d 45 (1st Cir. 2008) ..................................................................................33

*SEC v. Fife,*
    311 F.3d 1 (1st Cir. 2002) ...........................................................................29, 30

*SEC v. Kelly,*
    817 F. Supp. 2d 340 (S.D.N.Y. 2007).................................................................24

*SEC v. Lucent Technologies, Inc.*,
    No. Civ. 04-2315 (WHW), 2005 WL 1206841 (D.N.J. May 20, 2005)...............33

*SEC v. Milan Grp., Inc.*,
    962 F. Supp. 2d 182 (D.D.C. 2013) ....................................................................15

*SEC v. Monarch Funding Corp.,*
    192 F.3d 295 (2d Cir. 1999)................................................................................24

*SEC v. Mudd*,
    885 F. Supp. 2d 654 (S.D.N.Y. 2012)................................................................34

*SEC v. Patel*,
    No. CIV. 07-CV-39-SM, 2008 WL 782483 (D.N.H. Mar. 24, 2008) ........14, 29, 30

*SEC v. Power,*
    525 F. Supp. 2d 415 (S.D.N.Y. 2007)................................................................38

*SEC v. Prince,*
    942 F. Supp. 2d 108 (D.D.C. 2013) ....................................................................29

*SEC. v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ..............................................................................28

*SEC v. Siebel Sys., Inc.*,
    384 F. Supp. 2d 694 (S.D.N.Y. 2005)................................................................22

*SEC v. Slocum, Gordon & Co.*,
   334 F. Supp. 2d 144 (D.R.I. 2004)......................................................................30

*SEC. v. Stoker*,
   865 F. Supp. 2d 457 (S.D.N.Y. 2012)..............................................................24

*SEC v. Tambone*,
   417 F. Supp. 2d 127 (D. Mass. 2006) ..................................................15, 30, 36

*SEC v. Tambone*,
   597 F.3d 436 (1st Cir. 2010)............................................................................13

*U.S. v. Hitachi America, Ltd.*,
   172 F.3d 1319 (Fed. Cir. 1999).......................................................................34

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) .........................................................................25

**FEDERAL STATUTES**

Securities Act of 1933, 15 U.S.C. §§ 77a et seq. ............................................... passim

Securities Exchange Act of 1934, 15 U.S.C. §§78a et seq .................................. passim

**RULES**

Fed. Civ. P. Rule 9(b) ........................................................................................ passim

Fed. Rule Civ. P. 12(b)(6)...............................................................................1, 12

MSRB Rule G-17, reprinted in MSRB Rule Book 140 (2013) ........................... passim

MSRB Rule G-32, reprinted in MSRB Rule Book 250 (2013) ........................... passim

**OTHER AUTHORITIES**

American Institute of Certified Public Accountants, Inc., Professional Standards AU
   §341.03...............................................................................................................10

*Guidance on Disclosure and Other Sales Practice Obligations to Individuals and Other
   Retail Investors in Municipal Securities* (July 14, 2009), reprinted in MSRB Rule
   Book 164 (2013) .................................................................................................6

MSRB, GLOSSARY OF MUNICIPAL SECURITIES TERMS ......................................9

MSRB Notice 2002-10, *Interpretive Notice Regarding Rule G-17, on Disclosure of
   Material Facts* (March 25, 2002) .......................................................................26

Defendant Peter M. Cannava respectfully submits this memorandum of law in support of his motion to dismiss the Securities and Exchange Commission's ("SEC" or the "Commission") complaint dated March 7, 2016 (the "Complaint").  The SEC's Complaint against Mr. Cannava, for aiding and abetting securities violations, is deficient both factually and legally, and must be dismissed pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  The Complaint does not allege any facts to support a finding that Mr. Cannava acted knowingly or recklessly, as required to allege an aiding and abetting claim.  Moreover, a review of the offering document at the core of the SEC's case reveals that the allegedly omitted information is in fact disclosed in the offering document, and, even if not disclosed, is not material as a matter of law.  *See Flannery v. SEC*, 810 F.3d 1 (1st Cir. 2015).

## INTRODUCTION

Peter Cannava was a 30 year-old mid-level banker at Wells Fargo when the bank was engaged to sell municipal bonds issued by the Rhode Island Economic Development Corporation ("EDC") to sophisticated institutional investors.  Well before Mr. Cannava became involved in the transaction, Rhode Island's former Governor and former Speaker of the House decided that it was a worthwhile investment to fund a start-up video game company called 38 Studios, LLC ("38 Studios") which was owned by former Boston Red Sox pitcher Curt Schilling.  The state of Rhode Island's (the "State") decision to lend money to 38 Studios had risks – the company did not have any completed products and had literally no revenue, and the gaming industry was notoriously unsteady.  Yet, then-Governor Donald Carcieri ("Governor Carcieri") said that he and the EDC understood the risk involved, and came to the conclusion that it was a risk worth taking.[1]  With that decision made by Governor Carcieri and former Speaker of the House Gordon

---

[1] Rhode Island EDC Meeting of Directors, Public Session Minutes, (July 26, 2010), http://sos.ri.gov/documents/publicinfo/omdocs/minutes/742/2010/19315.pdf.

Fox ("Speaker Fox"), an agreement was struck with 38 Studios to provide a loan to the company in exchange for moving the company from Massachusetts to Rhode Island.  Governor Carcieri and Speaker Fox then pushed through legislation to fund the State's loan by raising money through municipal bonds with a guaranty from the State.  At that point, Wells Fargo and another bank, Barclays Capital ("Barclays"), were engaged to offer the EDC's bonds for sale to accredited institutional investors.

Critically, the EDC's private placement memorandum issued to potential investors (the "Bond PPM") – **the very document that the SEC now claims misled investors** – disclosed in very clear terms the many risks underlying 38 Studios' business, including:

- concerns over the viability of 38 Studios' untested and unknown products,

- the fact that the company had no revenue and therefore no track record,

- the real possibility that 38 Studios would not be able to make its loan payments, and

- that even 38 Studios' auditors issued a "going concern" over whether the company would continue to exist as an operating business in the near future.

The Bond PPM (referenced in detail in the Complaint and attached hereto as <u>Exhibit A</u>) was drafted by attorneys at Pannone Lopes Devereaux & West LLC, representing Barclays and Wells Fargo, with input from many parties, including the EDC, EDC's counsel, 38 Studios and its counsel, Wells Fargo's team that included a senior banker, compliance, credit and legal personnel, Mr. Cannava, a junior banker, and others.  Although these groups all provided input, the Bond PPM was ultimately issued by and signed by the EDC.  The document disclosed in plain English the existence of significant risks in 38 Studios' business.  Nevertheless, the SEC now ignores the fulsome disclosures, arguing that the Bond PPM failed to also include (i) one particular financial projection of 38 Studios' possible future finances and (ii) a reference to a fee

paid by 38 Studios to Wells Fargo's corporate investment banking division (the "Corporate Investment Banking Group") for earlier work performed pursuant to a separate contract.

The Complaint should be dismissed as a matter of law because the SEC's highly conclusory statements that the Bond PPM was misleading are contradicted by the face of the Bond PPM itself, which contains numerous explicit disclosures that make the SEC's claims impossible. Moreover, the SEC fails to state a claim that Mr. Cannava aided or abetted any primary violation of Wells Fargo, because the SEC fails to allege any specific facts of Mr. Cannava's knowledge or recklessness in connection with the allegedly omitted financial projection or the separate fee agreement for corporate investment banking services. This glaring omission with respect to Mr. Cannava is fatal to the claims against him.

In addition to the fact that the sophisticated institutional investors in the bonds were notified of the many risks arising from 38 Studios' pre-revenue and untested status in a risky industry, the plain face of the Bond PPM also contains the material information that a municipal bond investor in this kind of transaction evaluates and considers material when investing: (1) details of the State's backing of the bonds through its moral obligation to meet the payment obligations, and (2) the details of the insurance product guarantying that investors' bond payments will be made. Bond PPM at 34 & Appendix A. It is, therefore, not a coincidence that attached to the Bond PPM is a significant amount of detailed financial information concerning the creditworthiness of the State. *Id*. at Appendix A. In contrast, *no financial information about 38 Studios was included in the Bond PPM* – which provides black and white evidence that investors who chose to enter into the transaction did not find 38 Studios' financial information material, and the inclusion of a particular financial projection would have been immaterial and out of place. Instead, as the SEC is aware, the investors evaluated their investment by analyzing

the creditworthiness of the State and the insurance product issued by Assured Guaranty – not 38 Studios' financial information.[2]

In a disturbing example of regulatory overreach, the SEC brushes aside the clear and significant disclosures of risk provided in the Bond PPM, while also disregarding or misunderstanding what is material to the investors.  Without anything more than conclusory allegations, the SEC now seeks to enjoin Mr. Cannava from forever earning a living in the securities industry for allegedly aiding and abetting his employer's purported negligence (in a transaction performed by dozens of professionals and undertaken at the direction of Governor Carcieri).  The SEC's overreach threatens to destroy the career of a diligent young professional who has a stellar reputation and a young family.  In reality, it is the SEC's Complaint, and not the bond offering document, that is the "misleading half-truth," as the SEC alleges.

The SEC appears to desperately search for a scapegoat to blame for 38 Studios' failure even while it concedes no investor lost a cent.  Mr. Cannava did not play any role in the decision to provide 38 Studios with economic incentives to move to Rhode Island.  Mr. Cannava did not cause 38 Studios to fail.  If one is looking to place blame for the State's troubles beyond Mr. Schilling and his company, it is the state's own former Governor Carcieri and former Speaker Fox, along with the entire board of the EDC, who developed and implemented the economic plan to lend taxpayer money to a former baseball player's start-up company in a highly risky industry. There are responsible parties who can be held accountable for the State's troubles with 38 Studios.  However, there is no need to distort, stretch and gloss over the facts to unfairly cast blame upon a then 30 year-old, mid-level banker who did his job diligently and properly, was

---

[2] This is particularly troubling in light of the First Circuit's recent decision in *Flannery v. SEC*, which held that the lack of investor testimony that an alleged misstatement or omission is material is fatal to the SEC's case.  810 F.3d 1 (1st Cir. 2015).  The SEC recently produced interview notes from its own investigative files which demonstrate that the investors did not find the allegedly omitted information material.  Despite this exculpatory evidence in its own files, the SEC forged ahead with this frivolous case.

part of a larger team of professionals, reasonably relied on counsel, and had no involvement in the decision-making process of the Legislature, the EDC or the EDC's Board.

Based simply on the plain language of the full and truthful disclosures made to the institutional investors in this case, and the lack of any specific factual allegations regarding Mr. Cannava's actions, the SEC failed to plead that Mr. Cannava acted knowingly or recklessly in assisting in the Bond Offering, and therefore the aiding and abetting allegations against Mr. Cannava are not plausible as a matter of law and must be dismissed.

## FACTS[3]

### 38 Studios

38 Studios, LLC was a Delaware limited liability company founded in 2006 by former Boston Red Sox player Curt Schilling, who was the majority shareholder and served as the Chairman of the Company's Board of Directors.  Compl. ¶¶17-18.  In 2010, 38 Studios was a start-up stage video game company with no revenue and no finished games, and it was pursuing multiple funding sources[4] to finance its operations while it continued development of video games using the equity invested by its partners.  Compl. ¶¶17, 38; Bond PPM at 29.

---

[3] The facts in this section are drawn from (i) the Complaint, (ii) documents referenced in the Complaint, and (iii) public records relating to the activities of the Rhode Island government and the transaction at issue.  For purposes of this motion, the Court is not limited solely to the allegations in the Complaint.  *Gagliardi v. Sullivan,* 513 F.3d 301, 305-06 (1st Cir. 2008).  The Court "may augment the facts in the complaint by reference to documents annexed to the complaint or fairly incorporated into it, and matters susceptible to judicial notice." *Id.*; *see also Giragosian v. Ryan,* 547 F.3d 59, 65 (1st Cir. 2008) (appropriate for district court to consider "matters of public record, and other matters susceptible to judicial notice" at motion to dismiss).  Mr. Cannava recites the allegations in the Complaint solely for purposes of this motion, without admission of any such allegations, and reserves the right to deny the allegations in the event this Court denies Mr. Cannava's motion to dismiss.

[4] One avenue 38 Studios pursued was a $25 million equity raise, for which the Wells Fargo Corporate Investment Banking Group was engaged.  The Wells Fargo investment bankers conducted due diligence on 38 Studios in connection with the proposed equity raise and prepared a private placement memorandum in connection with it (the "Equity PPM").  Compl. ¶42.  Wells Fargo's investment bankers went to market with the $25 million equity raise in late May 2010, but 38 Studios ultimately put that effort on hold in June 2010.  *Id.*  The Complaint does not allege that Mr. Cannava, a member of Wells Fargo's separate municipal finance group, worked on the equity raise.

### The EDC and the Loan to 38 Studios

Following a meeting between Mr. Schilling and the Governor, the EDC – of which Governor Carcieri was the Chair – worked with House Speaker Fox and lobbyist Michael Corso to ensure the passage of legislation and funding that would enable the EDC to provide financial incentives to 38 Studios to move to Rhode Island.

The Rhode Island Job Creation Guaranty Program was enacted by the state legislature on June 11, 2010, at a time when Rhode Island was suffering from high unemployment rates and access to credit was limited in the aftermath of the financial crisis.  Compl. ¶25; R.I. Public Laws 10-026 (2010-H8158, as amended) and 10-029 (2010-5293 Substitute A) (the "JCGP").  The JCGP authorized the EDC to provide financial incentives to "growth oriented businesses" in the form of loans at rates that would not otherwise be available to these types of companies in the commercial market, in order to induce them to expand or relocate to Rhode Island and grow their employment in the state.  *See* Bond PPM at 3-4, 10-14.

Prior to the EDC Board's vote to approve the JCGP loan to 38 Studios, the Board held a public meeting.  EDC Public Session, July 26, 2010[5], attached hereto as <u>Exhibit B</u>.  At the July 26, 2010 meeting, the Board reported that over the course of several months, the EDC executive staff and two outside consultants, Strategy Analytics and Perimeter Partners, conducted "thorough due diligence" on 38 Studios and a potential investment by the State to bring the Company to Rhode Island.  *Id*.  Michael Saul, the EDC's deputy director, explained at that meeting the positive and negative risks, which included investment in a pre-revenue company, a binary revenue stream from the Company's two video games, the fact that the company was focused on a "hit driven product" and the fact that 60% of the state's JCGP funding would be

---

[5] July 26, 2010 EDC Meeting of Directors Public Session Meeting Minutes, available at
http://sos.ri.gov/documents/publicinfo/omdocs/minutes/742/2010/19315.pdf

invested with one company. *Id.* at 7. Governor Carcieri said that the Board had put a lot of time and work into learning about the videogame industry, and the public record minutes reflect that the Governor agreed that while there was risk in making the investment in 38 Studios, "*it was a risk worth taking.*" *Id.* (emphasis added). When questioned where funds would come from if 38 Studios needs more funding, the minutes reflect that Governor Carcieri responded that "the company could get more investors if nothing else." *Id.* at 8. The Board voted at the public meeting in July 2010 to approve the loan to 38 Studios, to finance the loan with municipal conduit bonds and to adopt a resolution outlining the terms of the transaction (the "Bond Offering"). *Id.*; Compl. ¶27.

A Term Sheet between 38 Studios and the EDC stated that given 38 Studios' pre-revenue status, "the market for these bonds would be limited without credit enhancement" and accordingly, the EDC would "utilize our statutory authority to issue bonds with a capital reserve mechanism by which the General Assembly [of the State of Rhode Island] must consider on an annual basis funding any shortfall of any debt service payments necessary to pay the bondholders, thereby creating for this issue what is commonly called a 'moral obligation' guaranty for the bondholder(s)." Term Sheet incorporated into Authorizing Resolution and adopted by EDC at July 26, 2010 public meeting ("Term Sheet"), attached hereto as <u>Exhibit C</u>, at 2; Compl. ¶27.

At this point, with absolutely no role or input from Mr. Cannava, the core terms of the loan and bond offering were set by Rhode Island state officials. Wells Fargo's municipal bond group was then engaged to privately place the bonds with qualified investors. Compl. ¶43. The Bond PPM requires that the bonds shall only be "offered to 'accredited investors' within the meaning of Rule 501(a) promulgated under the 1933 Act" and provides that "[p]otential

investors are solely responsible for evaluating the merits and the risks of an investment in the 2010 Bonds…" Bond PPM at 34.  Accordingly, each investor in the bonds signed a so-called "Big Boy" letter attesting to the fact that **they did not rely on the Placement Agent to determine what types of material was important, significant, or material, and they understood the risks of investment.**  *See* Bond PPM at 34 & Appendix E.

### The Bond PPM

The EDC's Bond PPM identifies a working group of at least ten organizations involved in structuring the offering of the JCGP conduit bonds (the "Bonds") for the loan to 38 Studios, including:

- EDC (Issuer);
- 38 Studios (Company);
- Bank of New York Mellon Trust Company, M.A. (Trustee)
- Moses & Afonso, Ltd. (Bond Counsel to the Issuer);
- Adler Pollock & Sheehan P.C. (General Counsel to the Issuer);
- Taft & McSally (Disclosure Counsel to the State);
- Wells Fargo (Placement Agent)
- Barclays Capital (Co-Placement Agent)
- Pannone Lopes Devereaux & West LLC (Counsel to the Placement Agents);
- Bernstein, Shur, Sawyer & Nelson, P.A. (Counsel to the Trustee);
- Edwards Angell Palmer & Dodge LLP (Counsel to the Company; and
- FirstSouthwest (Financial Advisor to the Issuer).

Bond PPM at iii.  The Bond PPM was signed on October 22, 2010 by Keith Stokes on behalf of the EDC.  Bond PPM at 35.

The Bonds were secured by a "moral obligation" pledge of the State, which provided that should 38 Studios default and be unable to make its debt service payments, any amount necessary to cover shortfalls in debt service would be included in the governor's annual budget recommendation to the Rhode Island General Assembly, which may, at its discretion, decide to

appropriate such amounts.  *Id*. at 10-14.[6]  Second, as added security, the Bonds were also insured

by Assured Guaranty Municipal Corp. ("Assured Guaranty").  *See* Bond PPM at 8-10.

Accordingly, the audited financial statements, economic information and credit ratings for the

State were attached to the Bond PPM, as was information concerning Assured Guaranty,

allowing investors to assess the creditworthiness of the State and the quality of the insurance

guaranty.  *See* Appendix A, B to Bond PPM.  Reflecting the fact that bond investors in a

municipal bond transaction that is enhanced by a state moral obligation pledge and bond

insurance *do not* evaluate the finances of the underlying business entity receiving the loan, the

Bond PPM *did not* include 38 Studios' financial statements or any financial information about

the Company such as cash flow projections, debts, expenditures or other analysis.  *See generally*

Bond PPM.  This point is critical, as it is not plausible for the SEC to assert that investors found

the financial information of 38 Studios material to their decision, as *no financial information*

regarding 38 Studios was included in the disclosure document.  Essentially, if the SEC's central

point is accurate, the SEC must argue that all of these qualified, institutional investors decided to

act on an investment in which they were provided none of the information that is material to their

decision.[7]

As co-placement agents, Wells Fargo and Barclays were engaged to place the Bonds with

accredited municipal bond investors that fit a specific profile and signed an investor letter (as

previously noted, sometimes called a "Big Boy letter").  Bond PPM at 34.  The Bond Offering

closed on November 2, 2010.

---

[6]*See also* MSRB, GLOSSARY OF MUNICIPAL SECURITIES TERMS, "Moral Obligation Bond" (2015), *available at*
http://www.msrb.org/Glossary/Definition/MORAL-OBLIGATION-BOND.aspx.

[7] This premise is not plausible, and contradicted by the SEC's own interviews of the investors in this case.

**The Comprehensive Disclosures in the Bond PPM**

While the SEC puzzlingly seems to infer otherwise, the Bond PPM does not state anywhere that the proceeds of the Bond Offering would be sufficient to complete the development of one of the two videogames that 38 Studios was developing at the time, called "Project Copernicus." *See generally* Bond PPM.  In fact, the Bond PPM is replete with disclosures and warnings to investors that 38 Studios was a pre-revenue, development stage company that required additional funding to continue its operations, and that there were no assurances that 38 Studios would be successful.  Specifically, the Bond PPM contained the following disclosures on pages 29-32, which described "certain factors that could affect the ability of the Company to pay debt service on the 2010 Bonds:"

- "The Company is a development stage video game and entertainment company with no revenues from product sales, except those projected by the Company over the next several years."  Bond PPM, p. 29.

- "The company is currently considered "pre-revenue" and no guarantee can be made that the Company will meet its Loan Payment obligations under the Agreement or that the Company will continue to be in business now or in the future." *Id.*

- "On July 6, 2010, the Company's auditor, PricewaterhouseCoopers LLP issued a "going concern" opinion in connection with the Company's ability to continue as a going concern.[8]" *Id.*

- "There can be no assurance that the games under development by the Company will be released on schedule, or ever, or that, if released, they will meet with market acceptance." *Id.*

- "Nor is there any assurance that any products of the Company will produce significant revenues or earnings for the Company." *Id.*

- "The success of the Company's business will be significantly dependent upon the skills and continued commitment of the Company's visionaries and of key Company personnel." *Id.*

---

[8]  To be clear, a "going concern" opinion means that the auditor—after evaluating management's plans to mitigate or ameliorate the conditions giving rise to the "going concern" opinion—has concluded that there is substantial doubt that an entity will be able to continue as a going concern in the 12 months following the date of the financial statements being audited.  *See* American Institute of Certified Public Accountants, Inc., Professional Standards AU § 341.03, available at http://www.aicpa.org/Research/Standards/AuditAttest/ DownloadableDocuments/AU-00341.pdf.

- "The video game, interactive media and entertainment industries, particularly the business of producing and distributing proprietary video games, is highly speculative and inherently risky."  Bond PPM, p. 30.

- "There is no guarantee of the economic success of any video game…" *Id.*

- "[T]here is a risk that any project undertaken by the Company will not be commercially successful." *Id.*

- "The interactive entertainment industry is highly competitive." *Id.*

- "Some of the Company's competitors have better access to distribution networks and other markets than the Company." Bond PPM, p. 31.

- "Even after the launch of the Company's games in development, if the relative popularity of video games were to decline, the Company's revenues (which are currently none), results of operations and financial condition likely would decline." *Id.*

- "There can be no assurance that the games under development will be released on schedule (or, indeed, ever released) or that, if released, they will meet with market acceptance." *Id.*

- "Among the risks associated with the Company's products are achievement of product cost and development objectives." *Id.*

## Wells Fargo's Fees

The Bond PPM disclosed that Wells Fargo would receive compensation from the EDC and from 38 Studios in connection with serving as placement agent in the offering.  Specifically, the Bond PPM disclosed:

> The 2010 Bonds are being privately placed by Wells Fargo Securities, LLC ("Wells Fargo") as representative of Wells Fargo and Barclays Capital at an aggregate purchase price for the 2010 Bonds of par less the Placement Agents' fee of $634,065.00.  In addition, Wells Fargo will be paid $50,000 by the Company in connection with their disclosure and due diligence of the Company with respect to this transaction.

*See* Bond PPM at 34.  Ultimately, Wells Fargo's municipal bond group received less than the full amount that it disclosed as a possible total fee.  At the closing of the Bond Offering, Wells Fargo's municipal bond group received its share of the placement agents' fee, in the amount of $406,250, as payment for the work performed on the bond transaction, with Barclays receiving

11

the balance.  Wells Fargo's municipal bond group also received the disclosed payment of

$50,000 from 38 Studios in connection with their work on the Bond Offering.  Compl. ¶ 65-66.

Separately, under a different May 2010 contract for services rendered by Wells Fargo's

Corporate Investment Banking Group, 38 Studios made various payments for investment

banking services performed in connection with the contemplated equity raise that was put on

hold by 38 Studios when the JCGP funding was approved.  Compl. ¶ 69.  The Complaint does

not allege that Mr. Cannava was in any way involved with the corporate investment banking

services provided by Wells Fargo to 38 Studios, or that he knew of the existence of a specific

fee agreement between Wells Fargo and 38 Studios for those services.  Nor does the SEC allege

(because it cannot) that Mr. Cannava held the compliance function within Wells Fargo to

determine which fees received by the various departments across the bank must be disclosed

under relevant law.

### 38 Studios' Bankruptcy

38 Studios defaulted on its loan payments to the EDC in the spring of 2012.  Compl. ¶74.

As noted at the outset, despite 38 Studios' failure, not a single investor in the EDC Bonds has

lost a penny, and they continue to receive all payments when due, pursuant to the State's moral

obligation appropriations.  Compl. ¶76.

### <u>STANDARD OF REVIEW</u>

The SEC's Complaint is a series of conclusions and labels without facts, and fails to meet

the basic pleading standard, not to mention the particularity requirement mandated by Fed. Rule

Civ. P. 9(b).  First, to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6),

the factual allegations in a complaint must "possess enough heft" to set forth "a plausible

entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007); *Gagliardi v.*

*Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008).  To make this showing, a complaint may not rely on

bald assertions without supporting facts.  *Twombly*, 550 U.S. at 555 ("labels and conclusions" or

"a formulaic recitation of the elements of a cause of action will not do").  If the factual

allegations in the complaint are too meager, vague, or conclusory to remove the possibility of

relief from the realm of mere conjecture, the complaint is subject to dismissal.  *SEC v. Tambone*,

597 F.3d 436, 442 (1st Cir. 2010).

  In judging the sufficiency of a complaint, courts must "differentiate between well-

pleaded facts, on the one hand," and "bald assertions, periphrastic circumlocutions,

unsubstantiated conclusions…on the other hand."  *McLeod-Lopez v. Algarin*, 603 F. Supp. 2d

330, 336 (D.P.R. 2009) (quoting *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 508 (1st

Cir. 1998) (citations omitted)).  Dismissal is required when the allegations fail to exclude "more

likely explanations" than those alleged in the Complaint.  *Ashcroft v. Iqbal,* 556 U.S. 662, 681

(2009).

  Critical to this particular case, it is well accepted that where the "allegations of securities

fraud conflict with the plain language of the…disclosure documents, the disclosure documents

control, and the court need not accept the allegations as true."  *In re Optionable Sec. Litig.*, 577

F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,

167 F. Supp. 2d 639, 646-7 (S.D.N.Y. 2001)).  Disclosure claims must fail where the defendant

has actually "disclosed that which the Complaint alleges it concealed."  *In re First Marblehead*

*Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 163 (D. Mass. 2009); *see also, e.g., Olkey v. Hyperion*

*1999 Term Trust, Inc.,* 98 F.3d 2, 9 (2d Cir. 1996) (affirming dismissal because "plaintiffs'

claims are contradicted by the disclosure of risk made on the face of each prospectus").

Moreover, because the Complaint "sounds in fraud," the claims against Mr. Cannava are also subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).[9]  *See e.g. Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,* 651 F.Supp. 877, 880 (D. Conn. 1986) ("The particularity requirements of Rule 9(b) apply to allegations of aiding and abetting securities fraud.").  Here, the SEC argues that Mr. Cannava knowingly or recklessly aided and abetted violations of underlying securities fraud claims, therefore the heightened pleading requirement applies.

Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Courts uniformly find "inadequate" the "general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *N. American Catholic Educ. Programming Foundation, Inc. v. Cardinale,* 567 F.3d 8, 13 (1st Cir. 2009) (quoting *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992) (Breyer, J.) (affirming grant of motion to dismiss fraud claims for lack of specific allegations as to fraudulent intent) (superseded by statute on other grounds).  Inferences of scienter drawn from the facts must be "both reasonable and strong." *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 325 (D. Mass. 2002).  In applying the heightened pleading requirements to securities fraud actions, the First Circuit "has been notably strict and rigorous." *SEC v. Tambone,* 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (citing *Greebel v. FTP Software,*

---

[9]  In *SEC v. Patel*, the court held that the "sounds in fraud" doctrine is "the law of this circuit." No. CIV. 07-CV-39-SM, 2008 WL 782483, at *4 (D.N.H. Mar. 24, 2008) (collecting cases) (explaining that where all claims do not contain elements of fraud, entire complaint is subject to Rule 9(b) where plaintiff alleges "a unified course of fraudulent conduct" as the basis of a claim); *see also* 15 U.S.C. § 78t(e) (person who "*knowingly or recklessly* provides substantial assistance to another" in violation of Exchange Act may be liable of aiding and abetting) (emphasis added); *Cleary v. Perfectune, Inc.*, 700 F.2d 774, 779-80 (1st Cir. 1983) (SEC required to demonstrate scienter with respect to its aiding and abetting allegations, even if the primary violation would not require scienter); *SEC v. Durgarian*, 477 F. Supp. 2d 342, 357 (D. Mass. 2007), *aff'd sub nom. SEC v. Papa*, 555 F.3d 31 (1st Cir. 2009) (same).

194 F.3d 185, 198 (1st Cir. 1998)).  For the reasons set forth below, the allegations against Mr.

Cannava fall far short of the pleading requirements.

## ARGUMENT

### THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR RELIEF AGAINST MR. CANNAVA FOR AIDING AND ABETTING A VIOLATION OF THE SECURITIES LAWS

The Complaint includes two claims against Mr. Cannava: (1) Count Four alleges that he

aided and abetted Wells Fargo's fraud in the offer or sale of securities in violation of Sections

17(a)(2) and 17(a)(3) of the Securities Act; and (2) Count Eight alleges that he aided and abetted

Wells Fargo's violations of MSRB Rules G-17 and G-32 in accordance with Section 15B(c)(1)

of the Exchange Act.  The claims against Mr. Cannava are based on the aiding and abetting

statutes recently amended by the Dodd-Frank Act.  *See* 15 U.S.C. §§77o(b); 15 U.S.C. 78(t)(e).

To state a claim for aiding and abetting securities violations, the SEC must allege three

principal elements: 1) a primary violation was committed by Wells Fargo; 2) Mr. Cannava

provided substantial assistance to Wells Fargo; and 3) Mr. Cannava provided such assistance

knowingly or recklessly.  *See* 15 U.S.C. §§77o(b); 15 U.S.C. 78(t)(e); *SEC v. Milan Grp., Inc.*,

962 F. Supp. 2d 182, 192 (D.D.C. 2013), *aff'd in part, vacated in part, remanded,* 595 F. App'x

2 (D.C. Cir. 2015) (citing to Dodd-Frank amendments to Securities Act and Exchange Act); *SEC

v. Durgarian*, 477 F. Supp. 2d at 357 (noting courts recognize three principal requirements,

although the elements have been "variously formulated").

The SEC's failure to properly allege any single element of the three is fatal to its

Complaint against Mr. Cannava.  As an initial point, the SEC did not adequately allege any

actionable misrepresentation or omission, and therefore the Complaint does not state a claim for

any primary violation of the federal securities laws.  Second, even assuming *arguendo* that the

SEC has stated a claim for a primary violation, the Complaint fails to adequately plead that Mr.

Cannava acted knowingly or recklessly, as the SEC fails to allege any specific reckless act of Mr.

Cannava, or even that Mr. Cannava knew of the information that Wells Fargo allegedly omitted.

Third, the SEC fails to allege any particular actions or conduct of Mr. Cannava to show that he

provided substantial assistance to Wells Fargo's alleged primary violation.

## I.   THE COMPLAINT FAILS TO STATE A CLAIM FOR A PRIMARY VIOLATION OF THE FEDERAL SECURITIES LAWS.

The first element of an aiding and abetting claim is a showing that a primary violation of

the securities laws occurred.  As Wells Fargo will undoubtedly argue in this matter, the

Complaint fails to adequately allege a claim for a primary violation of the securities laws by

Wells Fargo.

Wells Fargo's obligation as the co-placement agent in a private offering was "to make an

investigation that would provide [it] with a reasonable basis for a belief that the key

representations in the statements provided to the investors were truthful and complete." *SEC v.*

*Dain Rauscher, Inc.*, 254 F.3d 852, 858 (9th Cir. 2001).  The SEC concedes that this was Wells

Fargo's role.  *See* Compl. ¶44 ("Wells Fargo had an obligation…to conduct an investigation into

the 38 Studios Bond Offering, in order to obtain a reasonable belief in the truthfulness and

completeness of the key representations in the [Bond PPM].").

Nothing in the Complaint permits the inference that Wells Fargo committed the primary

violation of acting recklessly or even negligently in fulfilling its duty to make a reasonable

investigation into the key representations in the Bond PPM.  The SEC does not allege in the

Complaint that any fact included in the PPM was false when made.  Instead, the SEC claims that

certain material information was omitted.  Yet, on the face of the PPM, the thorough disclosures

describe the very risks with 38 Studios' business that the SEC now claims were omitted, making

the SEC's claims wholly implausible.  Using hindsight, the SEC attempts to cherry-pick other

information to claim it also should have also been included, but the law does not require that

Wells Fargo include every single piece of information.  *See City of Roseville Employees' Ret.*

*Sys. v. Textron, Inc.,* 810 F. Supp. 2d 434, 443-4 (D.R.I. 2011) (not every available fact must be

included in a disclosure).  Instead, Wells Fargo must, as it did, provide truthful material

information, and not omit anything that would make what is disclosed untruthful.  *Lawton v.*

*Nyman*, No. 98-288-T, 2002 WL 221621, at *12 (D.R.I. Jan. 17, 2002), *aff'd in part, remanded*

*in part,* 327 F.3d 30 (1st Cir. 2003).

### A.  The Complaint Does Not Adequately Allege a Primary Violation of 17(a)(2).

Section 17(a)(2) makes it "unlawful for any person in the offer or sale of any securities ...

to obtain money or property by means of any untrue statement of a material fact or any omission

to state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2).

 This is an "omissions" case, premised on the alleged omission of two very specific

pieces of information that the SEC now claims, in hindsight, should have been included in the

Bond PPM disclosures. The Complaint alleges that the Bond PPM was false and misleading

because it did not include: (1) a copy of a particular 38 Studios financial projection, or an explicit

statement that pursuant to the particular financial projections, 38 Studios would require financing

in addition to the proceeds of the Bond Offering to complete development of one of its

videogames and continue operating (Compl. ¶¶1, 60-64); and (2) disclosure that 38 Studios paid

Wells Fargo's Corporate Investment Banking Group for investment banking services.  (Compl.

¶¶2, 68, 69).

The Complaint fails to state a claim as a matter of law because the SEC fails to allege that

the omission of these two pieces of information rendered any specific statements in the Bond

PPM misleading, and because this allegedly omitted information was not material, and would not

17

have altered the total mix of information available to investors.  *See, e.g., Flannery*, 810 F.3d at

14-15 (no violation without materiality); *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.

1990).

      1.  <u>The Bond PPM's discloses 38 Studios' financial risks.</u>

The PPM does not state, or infer or imply, that the proceeds from the Bond Offering

would be sufficient to meet <u>all</u> of 38 Studios' financial needs.  *See generally* Bond PPM.  Nor

does the Bond PPM include any detailed information regarding the completion of "Project

Copernicus" – there was no budget, or timeline, or any financial details at all.  On the contrary,

the Bond PPM includes numerous comprehensive disclosures that explain 38 Studios' uncertain

financial picture, including the warnings that the auditor issued a "going concern" opinion that

there was substantial doubt the company would be able to continue in the 12 months following

the date of their audit, the games under development might never be released on schedule or

ever, that 38 Studios needed additional funding for future operations, and that 38 Studios was

pre-revenue with no guaranty it will continue in business or able to pay debt service on the

Bonds.  More specifically, it is worth reciting from the PPM once again several of the disclosures

of risks associated with 38 Studios:

      (1) 38 Studios was a development stage video game company with no revenues from product sales;

      (2) there was no guarantee that 38 Studios would meet its loan payment obligations;

      (3) there was no guarantee that 38 Studios would be in business in the future;

      (4) 38 Studios' auditor, PricewaterhouseCoopers LLP, issued a "going concern" opinion in connection with 38 Studios' most recent audited financial statements;

      (5) the "going concern" opinion stated that 38 Studios would need additional financing to fund future operations, and raising substantial doubt about the ability to continue operations;

      (6) the 38 Studios games under development might not be released on schedule;

18

(7) the 38 Studios games under development might not be successful; and

(8) the video game and entertainment industry is incredibly risky and competitive.

*See* Bond PPM at 29-32.  The level of disclosure in the Bond PPM regarding the risks associated with 38 Studios is incompatible with the SEC's conclusory statement that an omission of a single financial projection showing a funding gap misled investors.  *See Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d at 9.

> ### 2.  <u>The alleged omission of a particular financial projection did not render the extensive disclosures in the Bond PPM misleading.</u>

Because the Bond PPM does not contain an untrue statement of material fact, to be actionable, it must "omit[] to state a material fact necessary to make the statements [in the Bond PPM], in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such…omission)…"  *See* 15 U.S.C. § 77l (a)(2).  In other words, "[o]mitting an additional fact is not fraudulent unless the omission makes what *was* stated misleading."  *Lawton v. Nyman*, 2002 WL 221621, at *12.  The SEC points to only two statements in the Bond PPM that were allegedly rendered misleading by the alleged omission of the 38 Studios financial projection, and both arguments are nonsensical.

First, the SEC claims that the "omission" caused the following statement in the PPM to be misleading:  *38 Studios "is a development stage video game and entertainment company with no revenues and is dependent on the proceeds of the 2010 Bonds for future the [sic] development of Project Copernicus."*  Compl. ¶62a (emphasis added).  On its face, however, this statement in the PPM does not say and cannot be reasonably inferred to mean, that the bond proceeds are the *only* funds that 38 Studios would depend upon to develop Project Copernicus.

Second, the SEC claims that the "omission" of the financial projection rendered the following additional statement in the PPM misleading:  *38 Studios' auditor "issued a 'going*

19

concern' opinion in connection with [38 Studios'] most recent audited financial statements stating that the Company will require additional financing to fund future operations and raising substantial doubt about the Company's ability to continue as a going concern." Compl. ¶ 62b (emphasis added). Incredibly, the SEC alleges that this "going concern" statement could be read by a reasonable person to mean that the Bond Offering proceeds would address all of 38 Studios' funding needs. The statement says nothing of the sort, and in fact provides a substantial warning of risk. The SEC's argument is absurd and must be dismissed out of hand, particularly in light of the many other disclosures that identify the risks in 38 Studios' business and its need for additional capital to continue operating.

Courts often dismiss complaints supported by similar cherry-picked, hindsight allegations. For example, in *Lawton v. Nyman*, this Court addressed the converse of the allegations here, where plaintiffs alleged that defendants' failure to disclose material facts regarding the company's improving finances caused the plaintiffs' shares to be redeemed for less than their true value. 2002 WL 221621, at *12. In *Lawton*, the defendants made numerous disclosures about the company, including that the company's financial condition had improved, but plaintiffs objected that specific financial information was not disclosed to show that the company had seen "record profits." *Id*. The *Lawton* Court rejected the defendants' claims, explaining that defendants "were not required to characterize the improvement as one that produced what the plaintiffs describe as 'record profits,'" and found the general disclosures regarding the company's "improvements" were sufficient, holding that "[a]lthough the information that they provided was very general, it was accurate and not misleading." *Id*.

Similarly, the Second Circuit affirmed the dismissal of analogous allegations in *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co.*, where the plaintiff claimed that a prospectus

failed to sufficiently warn of the risks associated with trading in closed-end investment companies. 936 F.2d 759, 763 (2d Cir. 1991). The court "examine[d] the prospectus together with the allegations contained on the face of the complaint" and found that when read in the context of the entire prospectus, the cautionary language in the prospectus expressly warned of the risks about which plaintiffs complained. *Id*. The court further held that the broad disclosures in the prospectus were "literally true" and plaintiffs "must strain to the breaking point" the language in the prospectus in order to support their claim that it was misleading. *Id*. The court also discredited plaintiffs' claims where the statements "contained within the prospectus clearly bespeak caution rather than encouraging optimism." *Id*. (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)). Here, the SEC's complaint that the Bond PPM should have disclosed a single specific financial projection, despite the disclosure of the same risk in a different way, is analogous to the failed allegations in *Lawton* and *Oppenheimer* – and should face a similar outcome.

> 3. The omission of a particular 38 Studios financial projection is not material to the Bond investors as a matter of law.

To be actionable, an alleged omission must also be material. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). As the First Circuit recently affirmed, "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Flannery*, 810 F.3d 1, 19 (quoting *Basic Inc. v. Levinson*, 485 U.S. at 231-32). Indeed, in *Flannery*, the First Circuit overturned the SEC's findings where the SEC failed to submit admissible testimony from an investor stating that the allegedly misrepresented or omitted information was material to the investor's decision to invest. *Id*. at 14. While materiality is often a fact-specific inquiry, "it is appropriate for the Court to rule, as a matter of

law, that…statements do not meet the materiality threshold, and to dismiss the complaint" where the statements at issue are "blatantly unimportant." *SEC v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 704 (S.D.N.Y. 2005) (citations omitted); *see also Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985) (complaint may be dismissed on materiality grounds where the subject information is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance").

This Court should find as a matter of law that the "omission" alleged in the Complaint is not material – indeed it is "blatantly unimportant" – for several reasons. First, the many disclosures contained in the Bond PPM address the very risks about which the SEC complains and put potential investors on notice of 38 Studios' bleak financial condition. This Court ought to find that the allegedly missing financial projection is not material for the simple reason that the same basic category of cautionary information was already provided to these investors, who, like the investors in *Flannery*, were all highly sophisticated and experienced "accredited investors" in the municipal bond space. Bond PPM at 34; *see Flannery*, 810 F.3d at 11.

Second, the Court should find from the face of the PPM that any financial projections of 38 Studios are immaterial because of the structure of the Bonds as detailed in the PPM. *See* Compl. ¶¶ 22-23. The EDC loaned money to 38 Studios, and, in turn, the EDC funded that loan through their issuance of the municipal bonds. Investors in a municipal bond transaction are not investing in a for-profit start-up corporation such as 38 Studios – rather, they are investing in the protection and creditworthiness of the state or municipality. Therefore, the Bond PPM provides a broad overview of 38 Studios' business model, its significant business risks, its sales and marketing strategy, and its personnel. But the Bond PPM does not include copies of *any of 38 Studios' financials* – not a single financial statement, projection, balance sheet, summary of

22

operating costs or expenditures, or otherwise – beyond the broader disclosures that the Company was pre-revenue, had challenges, and needed additional capital to continue as a going concern. The Court can determine from the Bond PPM itself that investors did not consider the financial information of 38 Studios material, simply based upon the fact that they *did invest* in the transaction, despite the fact that the PPM contained no financial details of 38 Studios.

On the other hand, because it was *material to investors*, the Bond PPM does include detailed financials of the primary obligor, the State of Rhode Island, including audited financial statements, economic information and credit ratings of the State.  *See* Compl. ¶¶ 31-33; Bond PPM at 8-14, and Bond PPM Appendix A & B.  All of this State creditworthiness information, and Assured Guaranty's insurance product, is the material information that investors considered.

Third, the SEC's allegation that it was material to disclose a single financial projection is particularly implausible, because courts have repeatedly found that financial projections (as opposed to financial statements) can be inherently misleading and unreliable.  *See, e.g., Panter v. Marshall Field & Co.,* 646 F.2d 271, 292 (7th Cir.) (no duty to disclose financial projections), *cert. denied,* 454 U.S. 1092 (1981); *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1294 (2d Cir. 1973) (no duty to disclose asset appraisals; no Second Circuit rule on financial projections); *see also Carney v. Cambridge Tech. Partners, Inc.,* 135 F. Supp. 2d 235, 245 (D. Mass. 2001) ("[C]ourts in the First Circuit generally have declined to impose liability for so-called 'forward looking statements' ... because these courts regard such statements as unlikely, as a matter of law, to be material to a reasonable investor.").  Simply put, a company's hopeful projections of what it may do in the future (which are constantly evolving as the variables change), is not the

kind of reliable information that investors find material or important (and it is troubling that the SEC would argue otherwise).[10]

**B. The Complaint Does Not Adequately Allege a Primary Violation of Section 17(a)(3).**

Under Section 17(a)(3), it is unlawful "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3).  To state a claim for a violation of Section 17(a)(3), the SEC must allege: (i) the existence of a scheme or practice that operated as a scheme, (ii) engaged in by Wells Fargo, (iii) with negligence.  *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. Kelly,* 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2007).  The lack of any facts in the Complaint to support this claim are fatal to the SEC's misguided hopes that this can serve as an alternative to its other failing claims.

To state a viable cause of action against Wells Fargo under Section 17(a)(3), the Complaint must allege "the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Kelly,* 817 F. Supp. 2d at 344.  The SEC must "allege that the fraud ... consisted of a scheme or deceptive course of conduct that encompassed more than the making of ... misrepresentations."  *In re Alstrom SA Sec. Litig.,* 406 F. Supp. 2d 433, 476 (S.D.N.Y. 2005); *see also Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 177 (2d Cir. 2005) (affirming dismissal of 10b-5(a) and (c) claims "where the sole basis for such claims [was] alleged misrepresentations or omissions"); *SEC. v. Stoker*, 865 F. Supp. 2d 457, 467 (S.D.N.Y. 2012) (holding that to be found liable under both §17(a)(2) and (3), allegedly deceptive conduct under (a)(3) must go "beyond" the misrepresentations under (a)(2)).

---

[10] The SEC's position is even more disturbing in light of the SEC's own internal interview notes, reflecting the actual investors' statements that the financial projections were not material to them.

Courts consistently affirm dismissal of scheme claims "where the sole basis for such claims [was] alleged misrepresentations or omissions." *See, e.g., Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 177 (2d Cir. 2005); *see also WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.,* 655 F.3d 1039, 1057 (9th Cir. 2011) ("[a] Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim."); *Benzon v. Morgan Stanley Distributors, Inc.,* 420 F.3d 598, 610 (6th Cir. 2005) ("Rules 10b-5(a) and (c) encompass conduct beyond disclosure violations).

The First Circuit recently explained in *Flannery* that "one who *repeatedly* makes or drafts such misstatements over a period of time may well have engaged in a fraudulent 'practice' or 'course of business,' but not every isolated act will qualify."  810 F.3d at 14 (citing *In re Anthony Fields, CPA,* Securities Act Release No. 9727, Exchange Act Release No. 74,344, Investment Company Act Release No. 31,461, 2015 WL 728005, at *10 (Feb. 20, 2015) ("[A]n isolated misstatement unaccompanied by other conduct does not give rise to liability under [Section 17(a)(3) ].").

Here, the SEC's Section 17(a)(3) claim is nothing more than a repackaging of its Section 17(a)(2) negligent omission claim, and should be dismissed.  The Complaint does not allege that Wells Fargo or Mr. Cannava engaged in any fraudulent course of business or performed an inherently deceptive act that is distinct from the alleged omissions.  The Complaint fails to allege the existence of any "scheme."  The Complaint alleges only that the Bond PPM omitted information about 38 Studios' solvency and Wells Fargo's fees.  *See* Compl. ¶¶ 1-2 (alleging the Bond PPM was misleading in two ways – because it omitted information about a so-called shortfall, and "misleading in a second way" because it failed to disclose Wells Fargo's compensation for providing investment banking services under a separate agreement, unrelated

25

to Wells Fargo's role as co-placement agent).  The SEC's claim under Section 17(a)(3) has literally no supporting facts and must be dismissed.

### C.  The Complaint Does Not Adequately Allege a Primary Violation of 15B(c)(1).

The SEC claims that Wells Fargo violated MSRB rules G-17 and G-32, which regulate transactions in municipal securities.  Section 15B(c)(1) of the Exchange Act prohibits any broker, dealer, or municipal securities dealer to "[e]ffect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security in contravention of any rule of the [MSRB]." 15 U.S.C. §78o-4(c)(1).

### 1.   The Complaint fails to state a claim for violation of MSRB Rule G-17.

MSRB Rule G-17, as it was in effect in 2010, provides: "In the conduct of its municipal securities activities, each broker, dealer, and municipal securities dealer shall deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair practice."  MSRB Rule G-17, reprinted in MSRB Rule Book 140 (2013).  A 2002 interpretive notice explained that Rule G-17 encompasses two general principles: (1) it is essentially an antifraud provision; and (2) the rule "imposes a duty to deal fairly."  MSRB Notice 2002-10, *Interpretative Notice Regarding Rule G-17, on Disclosure of Material Facts* (March 25, 2002) (the "2002 Notice").

The duty to deal fairly requires "a municipal securities transaction to disclose to its customer [i.e. investors] all <u>material</u> information <u>about the transaction</u> known by the dealer…" *Guidance on Disclosure and Other Sales Practice Obligations to Individuals and Other Retail Investors in Municipal Securities* (July 14, 2009), reprinted in MSRB Rule Book 164 (2013) (hereinafter, the "July 2009 Guidance") (emphasis added).

The materiality threshold for Rule G-17 is the same as that required by Section 17(a) of the Securities Act.  *See* 2002 Notice (describing material facts as those "facts which a prudent investor should know in order to evaluate the offering before reaching an investment decision")

26

(citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (materiality requires a substantial likelihood that its disclosure would have been considered significant by a reasonable investor).  For the reasons already stated above in Section I.A, the Complaint fails to adequately allege that Wells Fargo did not deal fairly or that Wells Fargo omitted any material facts concerning the Bond Offering.  The financial projection allegedly omitted from the Bond PPM was addressed in the Bond PPM by the other disclosures, and is not material as a matter of law, given the structuring of the state and insurance guaranties of the Bond Offering that investors materially rely upon when entering into a municipal bond transaction.

The SEC also alleges that failure to reference a fee paid by 38 Studios to Wells Fargo for services by its Corporate Investment Banking Group created a conflict of interest.  The SEC is wrong.  The Bond PPM discloses that Wells Fargo was receiving a fee <u>from 38 Studios</u>, in addition to the fee earned from Wells Fargo's work as Bond Placement Agent.  Bond PPM at 34.  Accordingly, the fees related to the work on the Bond Offering were disclosed, meeting the fairness standard required under MSRB Rule G-17.  Moreover, because it was disclosed to all that 38 Studios was paying a fee directly to Wells Fargo, in addition to the fee Wells Fargo earned as the Placement Agent, there can be no plausible claim of a conflict of interest.

      2.   <u>The Complaint fails to state a claim for violation of MSRB Rule G-32.</u>

MSRB Rule G-32, as in effect in 2010, requires, among other things, disclosure of "the amount of any fee received by the broker, dealer, or municipal securities dealer as agent for the issuer in the distribution of securities."  Rule G-32(a)(iii)(A), reprinted in MSRB Rule Book 250 (2013).  Wells Fargo met its obligations under the rule, as the Bond PPM includes all of the fees that Wells Fargo received as an "agent for the issuer" (the EDC).  *See* Bond PPM at 34.  Specifically, the Bond PPM states that Wells Fargo would receive for its work on behalf of the issuer a "Placement Agents' fee of [up to] $634,065.00." *Id*.  The SEC does not allege in its

Complaint that Wells Fargo received any other fees <u>as agent for the issuer</u>, the EDC.  *See* Compl.

¶ 44 ("The EDC retained Wells Fargo…").  The SEC's allegations that another department of

Wells Fargo received fees <u>from 38 Studios</u> (not the issuer) for previously provided corporate

investment banking services is inapposite, because the statute does not require that a fee be

disclosed for work other than as "agent for the issuer."  *See* Compl. ¶¶ 38-43.  Despite the clear

language, the SEC impermissibly seeks to read some additional obligation into the statute where

it does not exist.  Accordingly, because the allegations in the Complaint show that the statute's

requirements were met, the Complaint fails to state a claim for a primary violation of Rule G-32.

## II.  THE COMPLAINT FAILS TO ALLEGE THAT MR. CANNAVA ACTED WITH THE REQUISITE SCIENTER, I.E. KNOWLEDGE OR RECKLESSNESS.

Even if the SEC adequately pled a primary violation of the securities laws, the claims

against Mr. Cannava should be dismissed because the Complaint does not properly allege the

second element of an aiding and abetting claim:  the SEC fails to plead with particularity facts

sufficient to show that Mr. Cannava acted with the requisite scienter.

In both Counts Four and Eight of the Complaint, the SEC recites the statutory language

and describes Mr. Cannava's state of mind with a conclusory label, alleging that he acted

"knowingly, recklessly or negligently."  Compl. ¶¶ 93, 112.  As a matter of law, the SEC has the

standard partially wrong.  While negligence may be sufficient to establish a <u>primary</u> violation of

Section 17(a)(2) or 17(a)(3) of the Securities Act or Section 15B(c)(1) of the Exchange Act,

more is required to sustain a cause of action for aiding and abetting liability.  *See SEC. v.*

*Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011) ("Negligence ... is never sufficient" to establish

aiding and abetting liability under the securities laws).  The provisions of the Dodd-Frank Act

plainly require that an aider and abettor act "knowingly or recklessly."  15 U.S.C. §§77o(b); 15

U.S.C. 78(t)(e); *see also SEC v. Prince*, 942 F. Supp. 2d 108, 144-45 (D.D.C. 2013) (noting that

28

with Dodd-Frank amendments to Securities Act, the "level of scienter that the SEC must prove

for its aiding and abetting claims is [now] the same as for its claims under Section 10(b) and

Rule 10b–5 of the Exchange Act").

In the First Circuit, "recklessness" means "a highly unreasonable omission, involving not

merely simple, or even inexcusable[ ] negligence, but an extreme departure from the standards of

ordinary care, and which presents a danger of misleading buyers or sellers that is either known to

the defendant or is so obvious the actor must have been aware of it." *SEC v. Fife,* 311 F.3d 1, 9–

10 (1st Cir. 2002) (quoting *Greebel v. FTP Software, Inc.,* 194 F.3d at 198) (internal quotation

marks omitted).  Where a prima facie case of aiding and abetting involves an underlying

requirement of scienter, the particularity requirements of Fed. Civ. P. Rule 9(b) apply to those

allegations of scienter.  *See SEC v. Patel*, No. CIV. 07-CV-39-SM, 2008 WL 782483, at *5.

Under *Twombly,* it is insufficient to state a claim by merely alleging that Mr. Cannava

acted "knowingly or recklessly."  Instead, the SEC must "set forth facts giving rise to a strong

inference" that Mr. Cannava acted with "a mental state embracing intent to deceive, manipulate,

or defraud."  *SEC v. Durgarian*, 477 F. Supp. 2d at 353.  Put another way, the Complaint "must

set forth specific facts that make it reasonable to believe" that Mr. Cannava knew or recklessly

acted with extreme departure from the standards of ordinary care to disregard that the Bond PPM

contained statements that were materially false or misleading.  *SEC v. Patel*, No. CIV. 07-CV-

39-SM, 2008 WL 782483, at *5.

Here, the allegations cannot plausibly support even an inference that Mr. Cannava had "a

general awareness that [his] conduct was part of an overall activity that was improper."  *See

Tambone*, 417 F. Supp. 2d at 136; *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 184

(D.R.I. 2004) (aider and abetter must have "had general awareness that his role was part of an

overall activity that [was] improper").  The SEC does not allege – because it cannot – that Mr.

Cannava had any improper intent whatsoever, that he had any inkling of deception or

manipulation, that he disregarded his duties on the transaction by ignoring policies and

procedures or the advice of counsel, compliance personnel, or his superior.  Indeed, not a single

allegation supports an inference that Mr. Cannava acted in an "extreme departure from the

standards of ordinary care, and which presents a danger of misleading buyers or sellers that is

either known to the defendant or is so obvious the actor must have been aware of it."  *SEC v.*

*Fife,* 311 F.3d at 9–10.

### A. The Complaint fails to allege that Peter Cannava knew or recklessly disregarded that the Bond PPM was misleading with respect to 38 Studios' risk of insolvency.

The SEC's aiding and abetting claims against Mr. Cannava for conduct or inaction

related to 38 Studios' risk of insolvency are based on the same exact alleged facts as the claims

against Wells Fargo for negligent primary violations of Sections 17(a)(2), 17(a)(3) and

15B(c)(1).  In essence, all of the claims are based on the general allegation that Mr. Cannava was

"responsible for Wells Fargo's failure to ensure that the offering document for the 38 Studios

Bonds contained complete and truthful disclosures."  Compl. ¶5.  As noted earlier, glaringly

absent from the Complaint is any allegation that Mr. Cannava had or received the specific

financial projections that are the focal point of the SEC's claims.  In contrast, the SEC is able to

state with particularity that Mr. Stokes and Mr. Saul from the EDC "*both received and reviewed*

*38 Studios' financial projections.  Both Stokes and Saul knew that the financial projections*

*assumed that 38 Studios would receive $75 million in proceeds from the EDC offering.  Saul*

*analyzed these financial projections, and presented various scenarios based on these financial*

*projections, to the EDC's Board*."  Compl. at ¶¶ 49-52 (emphasis added).  The Complaint's most

"specific" allegations against Mr. Cannava are: that he "had primary responsibility for Wells

Fargo on the 38 Studios Bond Offering;" he "knew that 38 Studios needed at least $75 million to complete Project Copernicus;" and that he "knew, by July 2010, that 38 Studios would only receive about $50 million in net proceeds from the bond offering."  These are exactly the type of "general averment[s]" of "knowledge of material falsity" that courts routinely reject.  *See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d at 13 (rejecting allegation not "supported with particulars that suggest scienter").  By failing to allege that Mr. Cannava received the financial projections, the SEC cannot plausibly prove he "knowingly" or "recklessly" failed to disclose it.  Moreover, in light of the PPM disclosures that 38 Studios had no revenues, and would require additional financing to fund future operations, with substantial doubt from its auditor that it would remain in business in the following 12 months, the SEC cannot plausibly show that Mr. Cannava's decision to not also attach the financial projections was a reckless or knowing act.

Finally, where, as here, the alleged omission of the so-called "funding gap" financial projection is not material (see Section I.A.3, *supra*), that also "tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact." *Flannery*, 810 F.3d at 9 ("[q]uestions of materiality and scienter are connected.").  Because the Complaint does not sufficiently allege with any specifics that Mr. Cannava acted knowingly or recklessly, or that he had a general awareness that he was participating in an improper activity, all claims against Mr. Cannava must be dismissed.

**B.  The Complaint fails to allege that Peter Cannava knew or recklessly disregarded that the Bond PPM was allegedly misleading with respect to Wells Fargo's fees.**

Setting aside the conclusory allegations that must be disregarded, the Complaint does not allege underline(facts) that Mr. Cannava was aware of the existence of a fee earned by Wells Fargo's

Corporate Investment Banking Group for its work related to 38 Studios, never mind that he knew

of or recklessly disregarded any impropriety regarding the disclosure of those fees.

The only allegations regarding Mr. Cannava's involvement with Wells Fargo's Corporate

Investment Banking fee are: that Mr. Cannava reviewed and signed all of the "major

agreements" relating to Wells Fargo's participation in the Bond Offering (Compl. ¶46), that he

was "present at a meeting" where the 38 Studios investment banking fees were discussed

(Compl. ¶71), that he relied on due diligence and the Equity PPM prepared by Wells Fargo's

investment banking team (Compl. ¶¶47, 71) and that an agreement between Wells Fargo and 38

Studios for investment banking services "was [] available to Mr. Cannava" in Wells Fargo's files

and as part of the contract summaries in the due diligence files.  Compl. ¶71.  Yet, despite the

SEC's obligation to allege with specificity a knowing or reckless act by Mr. Cannava, the

Complaint **does not** allege:

- that the so-called "major agreements" that Mr. Cannava allegedly signed had any connection to the Corporate Investment Banking Group fee;

- that the Equity PPM potentially reviewed by Mr. Cannava contained any information about the additional fee;

- that Mr. Cannava had knowledge that Wells Fargo received any specific fee for providing the prior investment banking services to 38 Studios;

- that Mr. Cannava reviewed or signed an agreement relating to Wells Fargo's provision of corporate investment banking services to 38 Studios;

- that Mr. Cannava discussed the issue of fees with anyone within Wells Fargo's various departments;

- who attended a so-called "meeting" that allegedly "mentioned" the fees, or when and where that meeting occurred and what was discussed in the meeting;

- that it was Mr. Cannava's responsibility at the financial institution to be aware of Wells Fargo's fees for services other than those performed as placement agent;

- that Mr. Cannava encountered any red flags relating to Wells Fargo's fees;

- that Mr. Cannava failed to follow prescribed compliance procedures at Wells Fargo; or

- that Mr. Cannava would have had any reason whatsoever to believe that work performed by Wells Fargo's investment banking group on a potential equity raise

would have had any impact on the Bond Offering or Wells Fargo's role as placement agent.

Indeed, not a single specific allegation that Mr. Cannava had any knowledge of the corporate investment banking fee is present in the Complaint.

Where the Complaint fails to allege that Mr. Cannava knew of the purportedly undisclosed fee, it also follows that the Complaint fails to allege facts sufficient to state or infer that Mr. Cannava consciously or recklessly decided to withhold information regarding Wells Fargo's fees from investors, or that he had any reason to do so. *See SEC v. Lucent Technologies, Inc.*, No. Civ. 04-2315 (WHW), 2005 WL 1206841, at *6 (D.N.J. May 20, 2005) ("Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures.") (citations omitted).  Particularly where the SEC alleged that Mr. Cannava's employer, Wells Fargo, is liable for failing to properly disclose fees earned for investment banking services based on a negligence theory, it is difficult to conceive how the facts in the Complaint "giv[e] rise to a strong inference" that in failing to disclose the fee Mr. Cannava acted with "a mental state embracing intent to deceive, manipulate, or defraud," (*SEC v. Durgarian*, 477 F. Supp. 2d 342, 353) or that his actions involved an "extreme departure from the standards of ordinary care." *See SEC v. Ficken*, 546 F.3d 45, 47-48 (1st Cir. 2008).  As one court described it, "the proposition that a party may negligently aid and abet a negligent act is to utter a non sequitur." *U.S. v. Hitachi America, Ltd.*, 172 F.3d at 1338.

### III.   THE COMPLAINT FAILS TO ALLEGE THAT MR. CANNAVA SUBSTANTIALLY ASSISTED A PRIMARY VIOLATION.

In addition to the SEC's failure to allege conduct to show Mr. Cannava had the requisite scienter, the claims against Mr. Cannava must be dismissed because the Complaint does not

include sufficient facts to support the third element required for aiding and abetting liability –
that Mr. Cannava "substantially assisted" Wells Fargo's alleged primary violations.

### A. The Complaint does not adequately allege that Peter Cannava actively participated in the alleged primary violations.

To allege substantial assistance, the Complaint "must at least demonstrate some measure
of active participation" in the alleged primary violation. *See Schultz v. R.I. Hosp. Trust Nat'l
Bank,* 94 F.3d 721, 730 (1st Cir.1996) (citations omitted); *SEC v. Mudd*, 885 F. Supp. 2d 654,
670–71 (S.D.N.Y. 2012) (quoting *Apuzzo*, 689 F.3d 204, 212 n.8 (2d Cir. 2012)) (defendant must
"consciously assist[] the commission of the specific [violation] in some active way"). "A
defendant provides substantial assistance only if she affirmatively assists, helps conceal, or by
virtue of failing to act when required to do so enables the fraud to proceed." *SEC v. Espuelas*,
698 F. Supp. 2d 415, 433 (S.D.N.Y. 2010) (quoting *JP Morgan Chase Bank v. Winnick,* 406
F.Supp.2d 247, 256 (S.D.N.Y.2005)). In other words, the Complaint must demonstrate that
Mr. Cannava "'in some sort associate[d] himself with the venture, that he participate[d] in it as
something that he wishe[d] to bring about, [and] that he [sought] by his action to make it
succeed.'" *SEC v. Apuzzo*, 689 F.3d at 206 (alterations in original) (quoting *United States v.
Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.)).

The SEC's aiding and abetting claims against Mr. Cannava are based on the same alleged
facts behind the claims against Wells Fargo for negligent primary violations of Sections 17(a)(2),
17(a)(3) and 15B(c)(1). The SEC argues in broad generalizations that Mr. Cannava was
"responsible for Wells Fargo's failure to ensure that the offering document for the 38 Studios
Bonds contained complete and truthful disclosures." Compl. ¶5. But it is insufficient to simply
plead their conclusion that Mr. Cannava "had primary responsibility" for Wells Fargo and/or that
he "reviewed and approved" the Bond PPM on behalf of Wells Fargo. These vague, conclusory

labels are not supported by any specific facts regarding Mr. Cannava's alleged substantial assistance with a violation, therefore, the SEC's allegations fall short of the requirement that a claim not be a mere formulaic recitation of the elements.  *See Twombly,* 550 U.S. at 557. Further, the SEC's broad allegations against Mr. Cannava are not even close to meeting the level of particularity required by Rule 9(b) to state a claim where it sounds in fraud.

Most importantly, the SEC does not allege in the Complaint that Mr. Cannava had or received the financial projection document upon which the SEC bases the bulk of its claims. Yet, as noted above, the SEC knows how to make such a specific allegation, and does so with respect to Mr. Stokes' and Mr. Saul's specific receipt and analysis of the 38 Studios financial projections.  Compl. at ¶¶ 49-52.  Nothing in the SEC's allegations comes close to stating that Mr. Cannava had in his possession or worked with the subject financial projections document. Nor does the SEC allege that Mr. Cannava took any particular step to assist Wells Fargo in allegedly failing to disclose the Corporate Investment Banking fee.

With the lack of specific acts alleged against Mr. Cannava, the SEC entirely fails to allege that Mr. Cannava "consciously assisted" the violation, "participated in it as in something that he wished to bring about" and that he sought  "by his action to make it succeed."  *See Apuzzo*, 689 F.3d 204, 212 (internal quotations omitted).  As a result, the claims against Mr. Cannava must be dismissed.

### B.  The Complaint does not adequately allege that Peter Cannava violated a duty to act.

Because  the Complaint fails to allege that Mr. Cannava actively participated in Wells Fargo's alleged violations, the "substantial assistance" element of aiding and abetting liability will not be met unless the SEC  adequately alleges that Mr. Cannava "recklessly violate[ed] an independent duty to act."  *See Tambone*, 417 F. Supp. 2d at 136-37; *see Militano*, 773 F. Supp. at

35

595 ("inaction can provide a basis for [aiding and abetting] liability, in the absence of a duty to act, only when designed intentionally to aid the primary fraud") (quoting *Nat'l Union Fire Ins. v. Turtur*, 892 F.2d 199, 206-07 (2d Cir. 1989) (internal quotation marks omitted); *see also Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) ("[i]naction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or was in conscious and reckless violation of a duty to act").

As one of the two placement agents, Wells Fargo's duty was "to make an investigation that would provide [it] with a reasonable basis for a belief that the key representations in the statements provided to the investors were truthful and complete." *SEC v. Dain Rauscher, Inc.*, 254 F.3d at 858; Compl. ¶ 44. Here, the SEC does not allege that Mr. Cannava had or reviewed the financial projection document, such that it cannot be said that Mr. Cannava lacked a reasonable basis to believe that the Bond PPM's disclosure concerning 38 Studios solvency was truthful and complete. Nor does the SEC allege that Mr. Cannava considered the document and unreasonably disregarded it.

With respect to the SEC's allegation concerning the disclosure of a fee, the Complaint does not sufficiently allege that Mr. Cannava knew that Wells Fargo's Corporate Investment Banking Group earned any particular fee from 38 Studios for its separate investment banking services (putting aside the fact that Mr. Cannava had no duty to ensure disclosure of those fees). Because Mr. Cannava did not know the amount or other specifics of a fee received by another division within the bank, he could not have disclosed it, or known that it would be pertinent to disclose, and given the detailed fees that are disclosed in the Bond PPM, it was not unreasonable to believe that the fee disclosure was truthful and complete. Once again, the Complaint contains

36

no factual assertions of Mr. Cannava's knowledge that calls into question that fact.[11]   Nor does

the separate fee create a conflict of interest, of which Mr. Cannava knew or was reckless

towards, because the fact that 38 Studios was paying a fee to Wells Fargo was already disclosed.

Finally, in determining whether an aiding and abetting defendant's alleged silence or

inaction "was accompanied by a conscious intent to assist the primary violation," courts query

whether the "defendant has thrown in his lot with the primary violators."  *Austin v. Bradley,*

*Barry & Tarlow, P.C.*, 836 F. Supp. 36, 39-40 (D. Mass. 1993) (quoting *DiLeo v. Ernst &*

*Young,* 901 F.2d 624, 629 (7th Cir. 1990).  In cases involving non-disclosure, this analysis must

be "particularly exacting," and courts must consider the "crucial" factor of "whether the alleged

aider-and-abettor benefitted from such silence." *Id*. (*First Interstate Bank of Denver, N.A. v.*

*Pring*, 969 F.2d 891 (10th Cir. 1992), *rev'd on other grounds, Cent. Bank of Denver, N.A. v.*

*First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)).

Here, there is absolutely no allegation that Mr. Cannava benefitted from any "silence."

*Cf. First Interstate Bank v. Pring,* 969 F.2d at 900 (alleged aider and abettor's silence indicated

conscious intent to aid the primary violation where aider and abettor had "substantial personal

stake" in success of allegedly fraudulent bond issue).  Indeed, the SEC does not allege that Mr.

Cannava received any particular remuneration from his employer as a result of the bonds'

placement with the investors.

In sum, the conclusory and vague allegations of aiding and abetting leveled against Mr.

Cannava cannot satisfy the requisite standard to allege a claim sounding in fraud pursuant to Fed.

---

[11] As discussed in Section C, supra, the investment banking fees earned by Wells Fargo, separate and apart from the municipal bond team's role as co-placement agent, were not required to be disclosed under G-17 or G-32, because they were not earned by Wells Fargo from its representation of the Issuer in the Bond Offering.  Thus, even if the SEC had alleged Mr. Cannava's knowledge of the amount of the fee, Mr. Cannava could not have acted knowingly or recklessly in following what G-17 and G-32 require.

Rule Civ. P. 9(b), as they lack sufficient detail to state a plausible claim that he "affirmatively assist[ed]," "conceal[ed]," or otherwise "fail[ed] to act when required to do so." *See Espuelas,* 698 F. Supp. 2d at 433; *see also Morgan v. Prudential Grp., Inc.,* 81 F.R.D. 418, 425 (S.D.N.Y. 1979) ("unadorned allegation that a defendant 'participated' in the preparation of false and misleading . . . documents is at most a conclusory allegation" that does not satisfy Rule 9(b)); *see also SEC v. Power,* 525 F. Supp. 2d 415, 422 (S.D.N.Y. 2007) ("mere awareness and approval" of the alleged primary violations is "insufficient to make out a claim for substantial assistance"). The Complaint fails to raise the allegation of substantial assistance "above the speculative level." *See Twombly,* 550 U.S. at 556.

## CONCLUSION

For each of the reasons stated herein, the claims against Mr. Cannava should be dismissed in their entirety.

Respectfully submitted,

**PETER M. CANNAVA**

By his attorneys,

*/s/ Brian T. Kelly*
*/s/Charles A. Tamuleviz (by BTK with permission)*
Brian T. Kelly *(pro hac vice)*
bkelly@nixonpeabody.com
Stephen M. LaRose *(pro hac vice)*
slarose@nixonpeabody.com
Kathleen Ceglarski Burns (*pro hac vice*)
kburns@nixonpeabody.com
Charles A. Tamuleviz (#6115)
ctamuleviz@nixonpeabody.com
NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903
Tel.: (401) 454-1000
Dated:  May 9, 2016                        Fax: (401) 454-1030

## **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system on May 9, 2016, and is available for viewing or downloading from the ECF system. This document was electronically served on the registered Participants as identified on the Notice of Electronic Filing (NEF).

*/s/Charles A. Tamuleviz (by BTK with permission)*