# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

_____ :
:
SECURITIES AND EXCHANGE COMMISSION    :    Civil Action No. 1:16-cv-107-M
:
Plaintiff,    :
:
v.    :
:
RHODE ISLAND COMMERCE CORPORATION    :
(F/K/A RHODE ISLAND ECONOMIC    :
DEVELOPMENT CORPORATION), WELLS    :
FARGO SECURITIES, LLC, PETER M. CANNAVA,    :
KEITH W. STOKES, and JAMES MICHAEL SAUL,    :
:
Defendants.    :
_____:

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

SECURITIES AND EXCHANGE
COMMISSION

By its attorneys,

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields (Mass. Bar No. 637438)
Louis A. Randazzo (New York Bar No. 2416485)
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8904 (Shields)
(617) 573-8985 (Randazzo)
(617) 573-4590 (Facsimile)
ShieldsKa@sec.gov; RandazzoL@sec.gov

June 10, 2016

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

FACTS.................................................................................................................2

MOTION TO STRIKE ........................................................................................5

ARGUMENT ON MOTIONS TO DISMISS.......................................................7

    A. The Complaint Satisfies the Applicable Pleading Standards..................7

    B. The Complaint Properly Alleges that the Bond Placement Memo Was
       Misleading Because It Omitted A Major, Existing Risk To Repayment
       of the Bonds.........................................................................................9

    C. The Complaint Alleges that the Bond Placement Memo Was Misleading
       Because It Failed to Disclose Significant Payments to Wells Fargo That
       Were Conditioned Upon the Closing of the Bond Transaction ..............19

    D. The Complaint Articulates a Reasoned Theory that the Funding Gap and
       Fee-Related Omissions Are Material to Reasonable Investors..............21

    E. The Complaint Pleads That Wells Fargo Violated, and Cannava Aided
       And Abetted Violations of, Section 17(a)(3)........................................27

    F. The Complaint Pleads that Wells Fargo Acted Recklessly or Negligently. .29

    G. The Complaint Adequately Pleads that Cannava Aided and Abetted Wells
       Fargo's Violations. ...............................................................................31

      1. The Complaint Pleads that Cannava Acted Knowingly or Recklessly ..........31

      2. Cannava's Substantial Participation in Wells Fargo's Violations is
        Adequately Pled .............................................................................35

    H. The Complaint States a Violation of MSRB Rule G-32. ......................38

CONCLUSION....................................................................................................39

i

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC,* 446 U.S. 680 (1980) .................................................................................. 23

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,* 133 S. Ct. 1184 (2013) ............. 23

*Ardente v. Brunswick Corp.,* 58 F. Supp. 3d 193 (D.R.I. 2014) ........................................ 7

*Basic, Inc. v. Levinson,* 485 U.S. 224 (1988) ............................................................ 21, 23

*Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12 (1st Cir. 1998) ................................. 6

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ...................................................... 8

*Benzon v. Morgan Stanley Distrib., Inc.,* 420 F.3d 598 (6th Cir. 2005) ......................... 19

*City of Roseville Employees' Retirement Sys. v. Textron, Inc.,* 810 F. Supp. 2d 434 (D.R.I. 2011) ................................................................................................. 13

*Dolphin & Bradbury, Inc. v. SEC,* 512 F.3d 634 (D.C. Cir. 2008) ................... 10, 21, 22

*Flannery v. SEC,* 810 F.3d 1 (1st Cir. 2015) ......................................................... 22, 28

*Freeman v. Town of Hudson,* 714 F.3d 29 (1st Cir. 2013) ........................................ 5-6

*Gagliardi v. Sullivan,* 513 F.3d 301 (1st Cir. 2008) .................................................. 7

*Giragosian v. Ryan,* 547 F.3d 59 (1st Cir. 2008) ..................................................... 7

*Greebel v. FTP Software, Inc.,* 194 F.3d 185 (1st Cir. 1999) ................................... 8, 30

*Hanly v. SEC,* 415 F.2d 589 (2d Cir. 1969) ........................................................... 15

*Hill v. Gozani,* 638 F.3d 40 (1st Cir. 2011) ........................................................... 13

*Huddleston v. Herman & MacLean,* 640 F.2d 534 (5th Cir. 1991), *rev'd in part on other grounds,* 459 U.S. 375 (1983) ........................................................................ 11

*In re Anthony Fields,* Sec. Act Rel. 9727, 2013 WL 728005 (Feb. 20, 2015) ............... 28

*In re Boston Scientific Corp. Sec. Litig.,* 686 F.3d 21 (1st Cir. 2012) ......................... 13

*In re First Marblehead Corp. Sec. Litig.,* 639 F. Supp. 145 (D. Mass. 2009) ............... 11

*In re Prudential Secs. Inc. Ltd. P'ships Litig.,* 930 F. Supp. 68 (S.D.N.Y. 1996) ......... 11-12

*In re Stone & Webster Sec. Litig.,* 414 F.3d 187 (1st Cir. 2005) ................................. 23

*In the Matter of City of Miami,* SEC Rel. No. 8213, 2003 WL 1412636 (Mar. 21, 2003) ........... 24

*In the Matter of County of Nevada,* 70 SEC Docket 2535, 1999 WL 982426 (Oct. 29, 1999) .... 10

*JP Morgan Chase Bank v. Winnick,* 406 F. Supp. 2d 247 (S.D.N.Y. 2006) ................................. 36

*Lawton v. Nyman,* No. 98-288-T, 2002 WL 221621 (D.R.I. Jan. 17, 2002), *aff'd in part, remanded in part,* 327 F.3d 30 (1st Cir. 2003) ............................................................. 13

*Lormond v. U.S. Unwired, Inc.,* 565 F.3d 228 (5th Cir. 2009) ................................................. 22

*Maldonado v. Fontanes,* 568 F.3d 263 (1st Cir. 2009) ........................................................... 8

*Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309 (2011) .......................................... 21, 23

*Nisselson v. Lernout,* 469 F.3d 143 (1st Cir. 2006) ................................................................ 7

*North Am. Catholic Educ. Programming Found., Inc. v. Cardinale,* 567 F.3d 8 (1st Cir. 2009) .. 34

*North Bridge Assocs., Inc. v. Boldt,* 274 F.3d 38 (1st Cir. 2001) ........................................... 7

*Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2 (2d Cir. 1996) ..................................... 14

*Pemental v. Sedgwick Claims Mgmt. Sys.,* No. 14-45-M, 2014 WL 2048279 (D.R.I. May 19, 2014) .................................................................................................................. 6

*Rodriguez-Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92 (1st Cir. 2007) ..................................... 8

*Roeder v. Alpha Indus., Inc.,* 814 F.2d 22 (1st Cir. 1987) ..................................................... 13

*Rombach v. Chang,* 355 F.3d 164 (2d Cir. 2004) ................................................................. 11

*SEC v. Apuzzo,* 689 F.3d 204 (2d Cir. 2012) ........................................................................ 35

*SEC v. Dain Rauscher, Inc.,* 254 F.3d 852 (9th Cir. 2001) ........................................... 15, 30, 37

*SEC v. Espuelas,* 698 F. Supp. 2d 415 (S.D.N.Y. 2010) ........................................................ 37

*SEC v. Fitzgerald,* 135 F. Supp. 2d 992 (N.D. Cal. 2001) ...................................................... 27

*SEC v. Gabelli,* 653 F.3d 49 (2d Cir. 2011), rev'd on other grounds, 133 S. Ct. 1216 (2013) 16-18

*SEC v. Goldsworthy,* No. 06-10012, 2008 WL 8901272 (D. Mass. June 11, 2008) ................. 28

*SEC v. Morris,* No. Civ. A. H-04-3096, 2007 WL 614210 (S.D. Tex. Feb. 26, 2007) ............... 30

*SEC v. Papa,* 555 F.3d 31 (1st Cir. 2009) ............................................................................ 8

*SEC v. St. Anselm Expl. Co.,* 936 F. Supp. 2d 1281 (D. Colo. 2013) ..................................... 30

*SEC v. Shanahan,* 646 F.3d 536 (8th Cir. 2011) ........................................................ 30

*SEC v. Stoker,* 865 F. Supp. 2d 457 (S.D.N.Y. 2012) ............................................... 37

*SEC v. Tambone,* 597 F.3d 436 (1st Cir. 2010) .............................................. 7, 15, 22

*SEC v. Tambone,* 550 F.3d 106 (1st Cir. 2008), *rev'd in part on other grounds*, 597 F.3d 436 (1st Cir. 2010) .......................................... 8, 9, 15, 22, 27, 30, 31, 34, 36

*SEC v. Texas Gulf Sulpher Co.,* 401 F.2d 833 (2d Cir. 1968) ................................... 21

*Siemers v. Wells Fargo & Co.,* No. 05-4518, 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) ........ 19

*Simon v. American Power Conversion Corp.,* 945 F. Supp. 416 (D.R.I. 1996) ................... 17

*TAG/ICIB Servs., Inc. v. Pan American Grain Co.,* 215 F.3d 172 (1st Cir. 2000) ............... 7

*The MJK Family LLC v. Corporate Eagle Mgm't Servs.,* No. 09-12613, 2009 WL 4506418 (E.D. Mich. Nov. 30, 2009) ............................................................... 19, 20

*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438 (1976) ..................................... 23, 27

*United States v. Hitachi America, Ltd.,* 172 F.3d 1319 (Fed. Cir. 1999) ...................... 35

*United States v. Peoni,* 100 F.2d 401 (2d Cir. 1938) ......................................... 35-36

**Statutes and Rules**

Fed. R. Civ. P. 9(b) .................................................................... 8, 32, 34

Fed. R. Civ. P. 12(b)(6) ........................................................................ 7

Exchange Act §15B(c)(1), 15 U.S.C. §78o-4 ............................................... 9, 31

Exchange Act §20(e), 15 U.S.C. §78t(e) .................................................. 9, 31

Exchange Act Rule 15c2-12 ................................................................... 39

Exchange Act Rule 10b-5(b) .................................................................. 15

MSRB Rule G-17 ...................................................................... 9, 27, 29, 31

MSRB Rule G-32 ..................................................................... 20, 31, 38, 39

Securities Act §15(b), 15 U.S.C. §77o(b) ................................................ 9, 31

Securities Act §17(a)(2), 15 U.S.C. §77q(a)(2) ........................ 8, 15, 21, 23, 29, 31, 37

Securities Act §17(a)(3), 15 U.S.C. §77q(a)(3) ........................ 8, 15, 21, 27-29, 31

**Other Authorities**

*Interpretive Notice Regarding Rule G-17, on Disclosure of Material Facts* (Mar. 20, 2002), reprinted in MSRB RULE BOOK 146 (2012) .............................................................................15, 27

*Interpretive Notice Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012), *available at* http://www.msrb.org/Rules -and-Interpretations/Regulatory-Notices/2012/2012-38.aspx ...............................................27

*Notice Regarding the Disclosure Obligations of Brokers, Dealers, and Municipal Securities Dealers in Connection with New Issue Municipal Securities Under Rule G-32* (Nov. 19, 1998), reprinted in MSRB RULE BOOK 244 (2012) .............................................................................38, 39

SEC, *Municipal Securities Disclosure*, 53 Fed. Reg. 37778, 1988 WL 268440 (Sept. 28, 1988) .15

SEC, *Municipal Securities Disclosure*, 54 Fed. Reg. 28799-01, 1989 WL 281659 (July 10, 1989) ...............................................................................................................................24

**INTRODUCTION**

Plaintiff Securities and Exchange Commission (the "Commission") hereby opposes the motions to dismiss the complaint filed by defendants Wells Fargo Securities, LLC ("Wells Fargo") and Peter Cannava ("Cannava"). The Commission also moves to strike material from Cannava's brief that is not properly considered on a motion to dismiss.

The two defendants' briefs read like emotionally overwrought closing arguments to a jury, but provide no legal justification to dismiss this case for failure to state a claim. Defendants misconstrue the complaint, attempt to inject, as purported litmus tests for the Commission's claims, elements that the Commission need not prove, and claim the status of victims when it was their misconduct that led to flawed offering documents provided to potential investors and the imposition of a tremendous financial burden on the taxpayers of Rhode Island. The complaint adequately establishes the elements of all of the Commission's claims against Wells Fargo and Cannava and accordingly, the motions to dismiss should be denied.

The tenor of defendants' briefs, particularly Cannava's, is hyperbolic and exaggerated. The court's focus in resolving these motions is on the four corners on the Complaint, and whether the facts alleged and all reasonable inferences therefrom, articulate viable legal theories. Cannava also inappropriately attempts to inject his family situation into this analysis and blaming the political atmosphere in which these bonds were issued. Moreover, his refrain that he is only a "mid-level banker" and thus should not be held responsible, rings hollow. The complaint alleges that he was the banker at Wells Fargo responsible for this transaction and details the key facts he knew or was reckless in disregarding. Mid-level bankers, like others with professional duties, should be held liable for the consequences of their actions. The fact that other people approved the issuance of the 38 Studios bonds similarly does not relieve Cannava and Wells Fargo of their duties as the placement agent in this securities offering. Their role was

1

not to approve the issuance of the bonds, but rather to ensure that the disclosures about the bonds were accurate and complete.  They failed to fulfill their duties, and are thus liable under the securities laws.  The fact that investors have, to date, been paid is similarly irrelevant.  The Commission is not seeking damages on behalf of investors.  Instead, it is seeking to enforce compliance with the securities laws, and to hold those professionals who violate them accountable for their actions.

**FACTS**

The following facts are either alleged or reasonably inferred from the allegations within the Commission's Complaint.

On November 2, 2010, the Rhode Island Economic Development Corporation ("EDC") sold $75 million of taxable revenue bonds to Wells Fargo, as a private placement agent (or underwriter), who then sold those bonds to investors in a private placement.  *See* Complaint, ¶¶28, 44, 45.  The proceeds of the offering were used by the EDC to make a loan to 38 Studios LLC ("38 Studios"), a conduit borrower and start-up video gaming company, so that 38 Studios could relocate to the State of Rhode Island and develop an on-line video game called Project Copernicus.  *See id.*, ¶¶17, 20, 23, 28.  The financing was intended to spur economic development and job creation in Rhode Island, and the bond payments were to be funded from 38 Studios' anticipated repayment of the loan with revenues generated from Project Copernicus.  *See id.*, ¶¶22, 25, 30.

Wells Fargo was engaged by 38 Studios in May 2010 to raise money for the company by selling equity.  *See id.*, ¶¶39-40.  In connection with that equity offering, investment bankers at Wells Fargo did an investigation into 38 Studios, its finances, and its financial projections and prepared an Equity Private Placement Memorandum containing detail about the company.  *See id.*, ¶42.  Despite sending that Equity Private Placement Memorandum to about 200 investors

2

and engaging in extensive follow-up activities, the offering was unsuccessful and Wells Fargo

and 38 Studios stopped working on it in favor of seeking financing from the EDC.  *See id.*, ¶¶42-

43.

Before beginning the unsuccessful equity offering, Wells Fargo recognized that it might

be unsuccessful, or that 38 Studios might decide to pursue bond financing through the EDC

rather than equity financing.  *See id.*, ¶¶38-39.  To ensure it would be paid for its services, Wells

Fargo entered into the May 20, 2010 Agreement with 38 Studios that specified that Wells Fargo

would be paid "Alternative Financing Fees" based on milestones related to the 38 Studios Bond

Offering.  *See id.*, ¶40.  All of these fees, totaling $400,000, were directly tied to the issuance of

municipal bonds by the EDC.  *See id.*, *see also* Dkt. No. 22-3 at 3-4.  These fees were also paid

to Wells Fargo out of the proceeds of the 38 Studios bonds.  *See id.*, ¶69.  The May 20

Agreement also obligated 38 Studios to "use its best efforts . . . to engage Wells Fargo Securities

as sole-, lead-, and book-running agent or underwriter" for any EDC bond offering.  *See*

Complaint, ¶41; Dkt. No. 22-3 at 4.  38 Studios' "best efforts" were successful, as the EDC

agreed to retain Wells Fargo as the lead placement agent for the 38 Studios bond offering.  *See*

Complaint, ¶44.[1]

As the lead banker for Wells Fargo on the 38 Studios bond offering, Cannava was

intensely involved in all of Wells Fargo's work on the deal.  *See id.*, ¶¶5, 14, 46.  He had the

authority to sign the contracts and agreements on behalf of Wells Fargo that related to the

---

[1] Wells Fargo contends that the Complaint is inaccurate when it says that Wells Fargo was
"hired" or "retained" by the EDC because it claims that it was hired by *both* the EDC and 38
Studios together.  *See* Wells Br. at 6 n.5; Complaint at ¶44 ("EDC retained Wells Fargo"), ¶72
("placement agent hired by the EDC").  The quoted portion of the May 20 Agreement
demonstrates that the EDC's agreement and approval was essential to the hiring of Wells Fargo
and that 38 Studios was contractually obligated to try to obtain that agreement from the EDC.  38
Studios' involvement in the hiring process does not detract from the required approval of the
EDC.

offering, and reviewed and approved the Bond Placement Memo on behalf of Wells Fargo. *See id.*, ¶46. Cannava not only knew about, but he relied on, the work that his colleagues at Wells Fargo did on the Equity Private Placement Memorandum and offering. *See id.*, ¶47.

38 Studios told Wells Fargo, including Cannava, that it would need at least $75 million to finish Project Copernicus and that it would need additional funds beyond that $75 million to move to Rhode Island and fund its operations. *See id.*, ¶¶5, 48. Wells Fargo and Cannava also knew that 38 Studios would only receive about $50 million in net proceeds from the bond offering. *See id.*, ¶¶54, 57. They were thus clearly aware of the existing funding gap facing 38 Studios, and the consequent need, immediately after the bond issuance, for 38 Studios to raise at least $25 million in additional funds. *See id.*, ¶¶58, 60, 61. This funding gap was immense; 38 Studios was only getting about 2/3 of the money it needed to develop Project Copernicus from the bond financing, leaving a 1/3 gap. *See id.*, ¶58. Wells Fargo also knew that when it had tried to raise $25 million in equity (the same amount of money that 38 Studios was short in the bond financing) earlier in the year, they had been unsuccessful. *See id.*, ¶¶42-43, 60. Yet Wells Fargo and Cannava failed to insist that that this material and non-speculative risk be disclosed to investors via the Bond Placement Memo, the key disclosure document in the offering. *See id.*, ¶¶29, 59, 64.

Wells Fargo also concealed from investors in the bond offering that it was receiving almost as much in fees from 38 Studios as a result of the offering as it was receiving from the placement agent's fee that was disclosed. *See id.*, ¶¶65-66, 68-69. These undisclosed fees were both required to be disclosed by Rule G-32 of the Municipal Securities Rulemaking Board ("MSRB") and were independently material to reasonable potential investors because the undisclosed fees created a potential conflict of interest for Wells Fargo. *See id.*, ¶72. Cannava

was at least reckless in not learning the details of these undisclosed fees and making sure they were disclosed. *See id.*, ¶¶70. While conducting his required due diligence investigation, Cannava should have learned that payment of these fees was intertwined with the stages of the bond offering and should have disclosed them. *See id.*, ¶¶71. Instead, through a pattern of misconduct, Cannava was responsible for misrepresenting to the EDC that these fees did not exist, and for omitting their disclosure to investors. *See id.*, ¶¶67-68, 70.

After the offering, 38 Studios failed to obtain the necessary additional financing. In the Spring of 2012, 38 Studios ran out of money, defaulted on its loan from the EDC and filed for bankruptcy. *See id.*, ¶¶73-75.

## MOTION TO STRIKE

Cannava refers to documents far outside of the Complaint in an attempt to characterize evidence out of context that he hopes will sway the court to a negative view of the Commission's claims. All references to such extraneous materials should be stricken.

Counsel for the Commission began producing discovery materials to the defendants shortly after filing this action. Among the materials the Commission produced were notes the staff took during interviews with some investors in the 38 Studios Bonds. These interviews are not referenced in the Complaint, or incorporated into it. Cannava nonetheless latches onto the Commission's early and expansive production and proceeds to premise a number of his arguments on what he contends to be the proper view of the relevance of these notes. *See* Cannava Br. at 3-4 and n.2, 9 n.7, 23-24 n.10. All such references and arguments should be stricken from Cannava's motion to dismiss. First Circuit law does not permit a defendant opposing a motion to dismiss to rely on documents that are neither appended to nor incorporated into a complaint by virtue of their discussion at length in the Complaint. *See Freeman v. Town*

*of Hudson*, 714 F.3d 29, 36-37 (1st Cir. 2013) (court should not have considered excerpts of deposition testimony when complaint made "passing reference" to that testimony; "mere mention of the depositions in the complaint does not amount to sufficient reference"); *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, (1st Cir. 1998) (when "complaint's factual allegations expressly linked to – and admittedly dependent upon – a document" that document may be considered); *Pemental v. Sedgwick Claims Mgmt. Sys.*, No. 14-45-M, 2014 WL 2048279, *2 (D.R.I. May 19, 2014) (considering document referenced "extensively" in complaint).

The proper time for the court to consider the relevance of these investors' points of view is when there is a fully developed record that places their views into the context of what matters under the law – what a reasonable potential investor presented with the 38 Studios investment opportunity would have considered material – and balanced with the views of the many potential investors who declined to invest in the 38 Studios bonds.  Further, Cannava's counsel does not even attempt to justify their citation to these notes as justifiable on a motion to dismiss, nor could they.  Their conduct is far outside the norm of acceptable advocacy on a motion to dismiss.

In addition to references to the purported views of investors expressed in interview notes, Cannava also cites to other materials not referenced in, or incorporated into, the Complaint, and these references and citations, and all arguments based on them, should also be stricken.  For example, Cannava cites and describes meeting minutes of the EDC's Board of Directors meeting held on July 26, 2010, references opinions held by Rhode Island elected officials, claims the involvement of others at Wells Fargo, and pleads his personal circumstances.  *See* Cannava Br. at 1 n.1, at 2, 4, 6-7 and n.5, Dkt. No. 23-3.  None of these purported facts is contained in, or referenced in, the Complaint, and should not be considered on this motion to dismiss.  The cases Cannava cites as purported support for the inclusion of this extraneous matter do not support his

position.  *See* Cannava Br. at 5 n.3.  *Gagliardi v. Sullivan*, 513 F.3d 301, 305-06 (1st Cir. 2008)

does not consider whether to admit any documents under the cited "judicial notice" exception,

and does not explicate that exception, while the court in *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st

Cir. 2008) applied the "judicial notice" exception and converted the motion to dismiss into one

for summary judgment to consider whether a prior ruling in the state court case based on the

same events as the federal case operated as res judicata.  Furthermore, Cannava's implication

that he will assert the affirmative defense of advice of counsel should not be considered at this

stage because none of the facts necessary to assert that defense appear on the face of the

Complaint.  *See* Cannava Br. at 4-5; *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006).

The Commission does not object to the attachment of, and any references to, the May 20

Agreement (Dkt. No. 22-3), the Bond Placement Memo (Dkt. No. 22-4), the Bond Placement

Agreement (Dkt. No. 22-5), or the July 26, 2010 Term Sheet (Dkt. No. 23-4), as those

documents are referenced in, and adequately incorporated into the Complaint and it is thus

proper to consider them in resolving a motion to dismiss.

## ARGUMENT ON MOTIONS TO DISMISS

**A.     The Complaint Satisfies the Applicable Pleading Standards.**

In considering defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6), the court

must accept as true all factual allegations in the Complaint and must "indulge every reasonable

inference in favor of allowing the lawsuit to proceed."  *See North Bridge Assocs., Inc. v. Boldt,*

274 F.3d 38, 40 (1st Cir. 2001); *TAG/ICIB Servs., Inc. v. Pan American Grain Co.*, 215 F.3d

172, 175 (1st Cir. 2000); *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) ("we accept as true

all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of

the pleader"); *Ardente v. Brunswick Corp.,* 58 F. Supp. 3d 193, 194 (D.R.I. 2014).  Dismissal is

appropriate only if the pleadings fail to support "'a plausible entitlement to relief.'"  *Rodriguez-*

*Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007)).  The assessment of plausibility within the pleadings is "'context-specific,' requiring 'the reviewing court to draw on its judicial experience and common sense.'" *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009).

Because the Commission's claims alleging violations of, and aiding and abetting violations of, Section 17(a)(2) and (a)(3) "allege fraud even though it is not a statutory element of the offense," the allegations supporting those counts must also satisfy the particularity requirement of Fed. R. Civ. P. 9(b).  *SEC v. Tambone,* 550 F.3d 106, 118 (1st Cir. 2008), *rev'd in part on other grounds*, 597 F.3d 436 (1st Cir. 2010).  Counts V through VIII however, do not allege that defendants engaged in, or aided and abetted, fraud, and therefore Rule 9(b) is not applicable to those counts.  Courts in the First Circuit interpret Rule 9(b) to require that the complaint allege the "time, place, and content of the alleged misrepresentations with specificity." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999).  The Commission's allegations satisfy Rule 9(b) because they "state with particularity the circumstances constituting fraud or mistake" and "allege[] generally" "knowledge and other conditions of a person's mind."  Fed. R. Civ. P. 9(b).

Though Cannava suggests that the Commission, when alleging his state of mind, must do more than allege that he knew statements were false, he cites a variety of cases that rely on standards applicable to private litigants, rather than the Commission.  The law in the First Circuit is clear: unlike lawsuits by private parties where there is a heightened requirement to plead a "strong inference" of scienter, "[t]he SEC need only allege scienter generally."  *Tambone*, 550 F.3d at 119; *SEC v. Papa*, 555 F.3d 31, 35 n. 1 (1st Cir. 2009).  To establish that Cannava aided and abetted Wells Fargo's primary violations, as will be discussed in detail in Section G below,

the Commission need not plead or prove scienter at all.  To establish the required state of mind

for the aiding and abetting claims applicable to Cannava, the Commission only need show that

he acted knowingly or recklessly.  *See* Securities Act, §15(b), 15 U.S.C. §77o(b); Exchange Act

§20(e), 15 U.S.C. §78t(e).

In order to prove its claims under Section 17(a)(2) of the Securities Act of 1933, the

Commission must establish that Wells Fargo "(1) directly or indirectly (2) obtained money or

property (3) by means of any untrue statement of material fact or any omission to state a material

fact necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading, such statement having been made (4) with negligence."

*Tambone*, 550 F.3d at 125; 15 U.S.C. §77q(a)(2).

**B.      The Complaint Properly Alleges that the Bond Placement Memo Was Misleading
Because It Omitted A Major, Existing Risk To Repayment of the Bonds.**

Defendants contend that the Commission's claims under Section 17(a)(2), MSRB Rule

G-17, and Exchange Act Section 15B(c)(1) incorporating MRSB Rule G-17, fail because the

Bond Placement Memo was not misleading.  *See* Memorandum of Law in Support of Wells

Fargo Securities LLC's Motion to Dismiss ("Wells Br.") at 8-13; Memorandum of Defendant

Peter Cannava in Support of His Motion to Dismiss Complaint ("Cannava Br.") at 17-21.  The

premise of their argument is that because some potential future financial risks to 38 Studios were

disclosed, the absence of disclosure about the actual, presently-existing funding gap can be

overlooked.  That premise defies logic and is counter to applicable legal precepts, and also flies

in the face of the Complaint's allegations, which are considered true for purposes of this motion.

The Complaint describes how the project being financed by the bonds could not be

completed with the proceeds that the bond offering would provide to 38 Studios.  *See* Complaint,

¶¶3, 5, 27, 29, 48, 54, 57-82, 64.  As the Complaint states, "38 Studios' funding gap was known

at the time the Bond Placement Memo was sent to investors.  It was not speculative.  It was an existing risk that should have been disclosed to potential investors in the offering."  *Id.*, ¶59. Those facts cannot be disputed on this motion to dismiss.

Further, case law is clear that the disclosure of potential and contingent risks to 38 Studios' business, which are described in the Bond Placement Memo, do not obviate the need for disclosure of existing problems.  For example, in *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634 (D.C. Cir. 2008), the District of Columbia Circuit upheld the Commission's finding that the underwriter of a municipal bond offering and the underwriter's principal were both liable for scienter-based fraud when the bond offering documents disclosed that the main tenant of a building to be financed by the bonds might leave in the future -- when the underwriter knew at the time of the bonds' issuance that the tenant actually was planning to leave.  The court agreed with the Commission's reasoning that there was a "critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge the event *will* occur."  *Id.* at 640 (emphasis in original).  Similarly, the Commission has found that when a municipal bond offering is intended to finance a development project, the developer did not have sufficient financing to build the first phase of the development, and the bond offering documents did not disclose that the developer had insufficient funds to complete the first phase of development, the professional responsible for writing the bond offering document was liable for scienter-based fraud.  *See In the Matter of County of Nevada*, 70 SEC Docket 2535, 1999 WL 982426, *18-19 (Oct. 29, 1999) (ALJ Decision).

This basic premise – that disclosure of potential risks does not eliminate the need to disclose existing problems – applies outside of the municipal bond context as well.  "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has

transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).  Liability under the securities laws cannot be avoided by "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72-74 (S.D.N.Y. 1996) (construing the "bespeaks caution" safe harbor in private securities suit and denying summary judgment for defendant in case where offering documents that disclosed an investment's value "could" decline were contradicted by expert information possessed by defendants that showed an expected decline).  As the court went on to explain, "[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Id.* at 72 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983)).

Defendants completely ignore the fact – as pled in the Complaint – that 38 Studios was facing an existing funding gap at the time of the bond issuance (*see* Complaint, ¶¶59-61), and make the erroneous assertion that the future risks disclosed in the Bond Placement Memo constitute disclosure of "that which the complaint alleges it concealed."  *See* Wells Br. at 12; Cannava Br. at 13 (both citing *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 145, 163 (D. Mass. 2009) (discussing scienter element)).  Even the *First Marblehead* case defendants cite recognizes that fraud may be shown where the disclosures at issue "present[] a risk as a contingency after the risk had already materialized." *Id.* at 160.

A careful review of the Bond Placement Memo demonstrates that the disclosures it makes about the riskiness of 38 Studios' business model, and the prospect that 38 Studios may ultimately fail are vastly different from the existing known and undisclosed fact that the bond

proceeds would be insufficient to complete the project the bonds were issued to fund.

Defendants focus on the descriptions of risks inherent in 38 Studios' business model and stage of

development at pages 29-31 of the Bond Placement Memo.  They argue that the future risks 38

Studios faced obviate the need to disclose the existing fact that the proceeds of the bond offering

were not enough to fund the project that would generate the revenue to repay the bonds.  *See*

Wells Br. at 11-13, 17; Cannava Br. at 10-11, 18-19.  For example, the following disclosures,

and the others cited by defendants, clearly fall into the category of future and unmaterialized

risks:

- "no guarantee can be made that the Company [38 Studios] will meet it Loan Payment obligations under the Agreement or that the Company will continue to be in business now or in the future." Bond Placement Memo at 29.
- "[t]here can be no assurance that the games under development by the Company will be released on schedule, or ever, or that, if released, they will meet with market acceptance." *Id.*
- "[n]or is there any assurance that any products of the Company will produce significant revenues or earnings for the Company." *Id.*
- "There is no guarantee of the economic success of any video game."  *Id.* at 30.
- "[t]here is a risk that any project undertaken by the Company will not be commercially successful."  *Id.*

These generic and forward-looking statements about the overall riskiness of 38 Studios'

business, and the business of entertainment-focused companies in general, are a far cry from the

specific disclosure of a known problem that is entirely missing from the Bond Placement Memo.

Nowhere does the Bond Placement Memo describe the "Grand Canyon" of the existing funding

gap that 38 Studios was facing, and its immediate need on the closing of the Bond Offering, to

seek at least $25 million in additional funds.  *Prudential Secs.*, 930 F. Supp. at 72; Complaint,

¶¶58-60.

Defendants also argue that they cannot be found liable because they had no duty to

disclose the information about 38 Studios' funding gap and investors are not entitled to the

disclosure of all material information.  *See* Wells Br. at 8-10; Cannava Br. at 16-20.  Defendants

overstate the holdings and import of the cases they cite.  For example, in *Boston Scientific*, the

court recognized that while "companies do not have to disclose immediately all information that

might conceivably affect stock prices" because of the immense burden such an obligation would

impose on the company's officers, it also observed that omissions were actionable "where

affirmative statements are made and the speaker fails to "reveal [ ] those facts that are needed so

that what was revealed would not be so incomplete as to mislead." *In re Boston Scientific Corp.

Sec. Litig*., 686 F.3d 21, 27 (1st Cir. 2012) (citing *Hill v. Gozani,* 638 F.3d 40, 57 (1st Cir.2011)).

The court also recognized that omissions could be actionable if they are material, which in turn

depends on the likelihood that the undisclosed event will occur.  *See id.* at 27, 28-29 (focusing on

whether the alleged omissions were material, not whether an omission per se is actionable); *see

also City of Roseville Employees' Retirement Sys. v. Textron, Inc.*, 810 F. Supp. 2d 434, 443-44

(D.R.I. 2011) (conducting intensely fact-specific inquiry into the relative importance of the

details omitted from the statements that those details were alleged to render misleading); *Lawton

v. Nyman*, No. 98-288-T, 2002 WL 221621, *12-13 (D.R.I. Jan 17, 2002), *aff'd in part,

remanded in part*, 327 F.3d 30 (1st Cir. 2003) (recognizing that some facts, like merger

discussions, are so material that they must be disclosed).  In another case defendants cite, the

court was analyzing whether a pure duty to disclose a material fact was actionable when the

complaint did not plead that the defendant company made any disclosures during the relevant

time period at all.  *See Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25-27 (1st Cir. 1987).  The

court distinguished the scenario presented by the Bond Placement Memo here, by recognizing

that when a company makes a disclosure, "there is a duty to make it complete and accurate" and

that document "must disclose the whole truth." *Id.* at 26; *see also Lawton,* 2002 WL 221621,

*12 (dismissing claim based on failure to characterize company's profits as "record" when disclosure document said that company's financial condition had improved).

Here, the first omission at issue – that the bond proceeds would be insufficient to fund the project that was supposed to pay the bonds – occurred in the context of an affirmative statement, the Bond Placement Memo, which is supposed to disclose all material risks of the investment to investors. *See* Complaint, ¶29. That omission is actionable in context because it constituted concealment of the elephant in the room – that the money 38 Studios was going to receive was not going to be enough to complete the project whose revenues 38 Studios would use to repay the bonds. *See id.*, ¶¶1, 57-61. As one of the cases cited by defendants explains:

> It is undisputed that the prospectuses must be read "as a whole," . . . . It is further undisputed that the "central issue ... is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities][.]" A prospectus will violate federal securities laws if it does not disclose "material objective factual matters," or buries those matters beneath other information, or treats them cavalierly[].

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (citations omitted) (dismissing complaint because prospectuses warned investors of exactly the risk that plaintiffs claimed was not disclosed). Because defendants chose to speak about 38 Studios, its financial situation, and its risks, they were obligated to be honest about those matters, and to present a complete picture of them.

Furthermore, even if the court were to accept defendants' contentions that they had to have some separate duty to speak before their omissions could be actionable (a proposition the Commission disputes), they had such a duty here because of their positions as underwriters of the Bond Offering. Cannava acknowledges that Wells Fargo had a duty as an underwriter to conduct an investigation into the Bond Offering to obtain a reasonable belief in the truthfulness and

14

completeness of the key representations in the Bond Placement Memo.  *See* Cannava Br. at 16.

But he would have the court believe Wells Fargo's duty stopped there.  It did not.  Having

learned during their investigation that the proceeds of the bonds that 38 Studios would receive

were inadequate to fund the project whose revenues would repay the bonds, defendants were

obligated to make sure the offering documents disclosed that key fact.  They did not.  In failing

to do so, they breached their duty to make sure the Bond Placement Memo was accurate and

complete.  *See* SEC, *Municipal Securities Disclosure*, 53 Fed. Reg. 37778, 37787-90 , 1988 WL

268440 (Sept. 28, 1988) (recognizing that an underwriter, who occupies a "vital position in an

offering" makes an implied recommendation about the securities it sells and this

"recommendation itself implies that the underwriter has a reasonable basis for belief in the

truthfulness and completeness of the key representations made in any disclosure documents used

in the offerings"); *Interpretive Notice Regarding Rule G-17, on Disclosure of Material Facts*

(Mar. 20, 2002), reprinted in MSRB RULE BOOK 146, 147 (2012) (Rule G-17 creates

"affirmative disclosure obligations for dealers"  including the obligation to disclose "all material

facts concerning the transaction, including a complete description of the security");[2] *Tambone*,

550 F.3d at 132-34 (discussing underwriters' duties relating to mutual funds);[3] *SEC v. Dain*

*Rauscher, Inc.*, 254 F.3d 852, 857-58 (9th Cir. 2001) (material fact issue existed as to whether

municipal underwriter conducted proper investigation and should be liable for omissions in

municipal bond offering documents); *Hanly v. SEC*, 415 F.2d 589, 597 (2d Cir. 1969) (affirming

---

[2] A copy of this MSRB interpretive guidance is attached as Exhibit A.

[3] Although the *en banc Tambone* opinion disagreed with the panel opinion's conclusion that an underwriter could be held liable under Rule 10b-5(b) for "making" a misstatement by virtue of its implied representation of securities, the *en banc* opinion's focus was on the "making" element of Rule 10b-5(b) which is not at issue here, and did not question the underwriter's duty to investigate and disclose whether offering documents are accurate and complete, or address whether their implied statements would violate Section 17(a)(2) or (3).  *See Tambone*, 597 F.3d at 448-49.

sanctions against broker-dealer for, in part, failing to disclose known or "reasonably ascertainable" information about securities he sold).

Defendants, apparently taking the view that the court should ignore the context in which the funding gap was omitted, contends that  "the SEC must identify specific statements in the Bond PPM that were rendered misleading by the alleged omissions."  Wells Br. at 10; *see also* Cannava Br. at 17-18.  Not only is this an erroneous articulation of the law, but the Complaint does identify two statements in particular that were misleading in context as a result of the funding gap's omission.

First, paragraph 62a of the Complaint pleads:

> The Bond Placement Memo stated that 38 Studios "is a development stage video game and entertainment company with no revenues and is dependent on the proceeds of the 2010 Bonds for future the [sic] development of Project Copernicus$^{TM}$."  This disclosure was misleading because it suggested that the proceeds of the 2010 Bonds would be sufficient to develop Project Copernicus.

Defendants' contention (*see* Wells Br. at 11, Cannava Br. at 19), that the quoted statement from the Bond Placement Memo is literally true, entirely misses the point.  The statement is a half-truth and misleading in context because of what it does not disclose – that even though 38 Studios was admittedly dependent on, and would rely on, the bond proceeds to develop the Project, those proceeds – as Wells Fargo and Cannava knew – were insufficient to allow the company to develop the Project.  That is vastly different from the disclosed future business risk that the games may never be completed or their schedule may be delayed.  *See* Bond Placement Memo at 29.  The statement need not be actually false, as defendants argue it should, in order to support a securities fraud claim.  *Cf.* Cannava Br. at 19 (suggesting that the statement would have to say that bond proceeds are the only funds to be used to develop the project in order to be actionable).  A half-truth is literally true but only tells half of the story that matters.  *See SEC v.*

16

*Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("The law is well-settled [] that so-called 'half-truths'-literally true statements that create a materially misleading impression – will support claims for securities fraud."), *rev'd on other grounds*, 133 S. Ct. 1216 (2013); *see also Simon v. American Power Conversion Corp.*, 945 F. Supp. 416, 429, 432-33 (D.R.I. 1996) (half-truths may support a claim for securities fraud).

Cannava characterizes the complaint as pleading that the Bond Placement Memo was misleading for its failure to disclose a single financial projection. *See* Cannava Br. at 2, 3, 17, 19-23. These arguments should be disregarded because that is not the Complaint's theory. The financial projection that is described in paragraphs 49-51 of the Complaint provides additional support for the allegation that the EDC, Stokes and Saul knew or should have known about the funding gap, but that financial projection is only cumulative to the primary allegation that "[t]hroughout its negotiations with the EDC during 2010, 38 Studios emphasized its need for at least $75 million in order to complete Project Copernicus. 38 Studios also informed the EDC, Wells Fargo, and others involved in discussions about the potential bond issuance, that it would require additional funds, beyond the $75 million that it needed to finish Copernicus, to move to Rhode Island and fund its operations." Complaint, ¶48. This is not a case about the failure to tell investors about a single financial projection. *See* Cannava Br. at 23; Wells Br. at 10 n.10. This is a case about defendants' failure to disclose to investors an existing, and major, funding gap for the project that the bonds financed.

Second, paragraph 62b of the Complaint pleads:

The Bond Placement Memo also stated that, on July 6, 2010, 38 Studios' auditor "issued a 'going concern' opinion in connection with the Company's most recent audited financial statements stating that the Company will require additional financing to fund future operations and raising substantial doubt about the Company's ability to continue as a going concern." This disclosure was misleading because it suggested that the proceeds of the Bond Offering were

sufficient "additional financing to fund future operations" and failed to disclose
that additional financing on top of the Bonds' proceeds would be needed.

The Bond Placement Memo's statement about the auditors' going concern opinion was also a

half-truth.  *See Gabelli*, 653 F.3d at 57.  Defendants contend that it is "irrational" or "absurd" to

conclude that when you tell investors that a company's auditors say it needs more money, and

then you tell investors that the company is getting about $50 million in more money, that

investors will understand that the $50 million constituted the money the company needed.  Wells

Br. at 13; Cannava Br. at 20.  The Commission submits that a rational jury could easily reach

that conclusion, and could also easily conclude that the failure to complete the sentence by

saying that the funds from the offering were insufficient to fund future operations was

misleading.  By raising the issue of the going concern opinion but only telling half the story,

defendants engaged in fraud.  Wells Fargo contends that the disclosure that "no guarantee can be

made . . . that [38 Studios] will continue in business now or in the future" cures this deficient

disclosure.  Wells Br. at 13 (citing Bond Placement Memo at 29).  Not so.  Even if such a generic

disclosure has any weight, it too is misleading because it addresses a future potential without

disclosing a present fact.

        In any event, what conclusion a rational jury might draw from the well-pled facts is not at

issue at this preliminary pleadings stage.  The fact that defendants have their own views about

what reasonable investors would think of these statements is woefully short of a basis for

dismissing the complaint.  *See* Wells Br. at 11-13; Cannava Br. at 22-24.  Defendants are asking

this court to accept their view of what a reasonable bond investor would understand, and draw

inferences in their favor, over the theory that is articulated in the Complaint.  The extent to which

the Bond Placement Memo's omission of the funding gap rendered the rest of its disclosures

materially misleading is exactly the type of question that the jury in this case should decide –

based on the full Bond Placement Memo, and understanding all of the facts about 38 Studios'

funding gap, and industry norms about the need to disclose gaps in funding for the project being

financed by municipal bonds.  In order to dismiss the complaint, this court would have to find

that as a matter of law, no rational investor could find the omission of the funding gap

misleading.  No such finding is unwarranted on these facts.

**C.**     **The Complaint Alleges that the Bond Placement Memo Was Misleading Because It
         Failed to Disclose Significant Payments to Wells Fargo That Were Conditioned Upon
         the Closing of the Bond Transaction.**

The complaint pleads that, in addition to concealing the funding gap 38 Studios faced, the

Bond Placement Memo was misleading because it failed to disclose the full amount of

compensation that Wells Fargo was receiving as a result of the Bond Offering.  *See* Complaint,

¶¶2, 40, 65-72.  Wells Fargo first contends that it had no duty to disclose its compensation from

the Bond Offering.  *See* Wells Br. at 13.  The case it cites for this proposition does not cover

Wells Fargo's conduct here.  In *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 611-12

(6th Cir. 2005), the court found that a prospectus was not misleading when it said that brokers

"may" receive extra compensation for selling certain products instead of that they "do" receive

such compensation.  The court declared the difference to be an immaterial "semantic quibble."

*Id.* at 612.  Moreover, *Benzon* has been criticized by courts addressing circumstances more like

those here, where statements were found to be misleading when they discussed potential events

and concealed actual ones.  *See The MJK Family LLC v. Corporate Eagle Mgm't Servs.,* No. 09-

12613, 2009 WL 4506418, *8-9 (E.D. Mich. Nov. 30, 2009) (discussing omission cases and

distinguishing *Benzon*); *Siemers v. Wells Fargo & Co.*, No. 05-4518, 2006 WL 2355411, *7

(N.D. Cal. Aug. 14, 2006) (finding plaintiff pled securities fraud claim based on nondisclosure of

defendant's receipt of higher compensation for sale of certain funds).

Here, Wells Fargo had a duty, by virtue of MSRB Rule G-32, which is discussed in greater detail in Section H below, to disclose the compensation it received in connection with the Bond Offering.  Even if this court were to conclude that Rule G-32 does not require the disclosure of its compensation, having chosen to disclose a portion of its compensation in the Bond Placement Memo, Wells Fargo must disclose all of its compensation so that investors will understand the truthful extent to which it would benefit from placing the 38 Studios Bonds.  *See MJK Family*, 2009 WL 4506418, *8 (agreeing that incomplete disclosures could give the false impression that disclosed conflicts are all conflicts).

Despite Wells Fargo's argument, the Bond Placement Memo did not inform investors that Wells Fargo would receive $634,065 in placement agent's fees.  *See* Wells Br. at 14. Rather, the Bond Placement Memo said that Wells Fargo and Barclays, the other placement agent on the deal, together would receive that amount.  *See* Bond Placement Memo at 34.  There is no disclosure about the way in which Wells Fargo and Barclays would split those fees, and reasonable investors would assume that Barclays would be entitled to a portion of those fees. Though the Bond Placement Memo states that Wells Fargo was being paid $50,000 by 38 Studios "in connection with their disclosure and due diligence of the Company with respect to this transaction," Wells Fargo failed to disclose the additional $400,000 38 Studios was paying it in connection "with respect to this transaction."  *Id.* at 34.  The magnitude of the payment disclosed ($50,000) was very different from the magnitude of the payment undisclosed ($400,000 plus expenses).  *See* Complaint, ¶69.  In that context, Wells Fargo's failure to disclose the substantial additional fees it was receiving from 38 Studios hid the extent of its conflict of interest in the transaction, and was at best a misleading half-truth.  *See id.*, ¶72.

Wells Fargo also asserts that it matters whether the undisclosed fees were paid to it "as a placement agent" in determining whether the omission of those fees was misleading. *See* Wells Br. at 14-15. The Commission disagrees. The fact that Wells Fargo stood to gain from the bond closing by almost double the amount of money that was disclosed is what makes the Bond Placement Memo misleading. Further, the complaint pleads that the undisclosed fees were earned as a result of meeting milestones with respect to the bond offering, and that Wells Fargo's receipt of those fees were contingent on the bond offering, and practically speaking, could not have been paid unless 38 Studios had received the proceeds of the bond offering. *See* Complaint, ¶40, 69.[4]

**D.    The Complaint Articulates A Reasoned Theory that the Funding Gap and Fee-Related Omissions Are Material to Reasonable Investors.**

A fact is material if a *reasonable* investor would view its disclosure as significantly altering the "total mix" of information in evaluating the merits of an investment. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). A fact is material if it "may affect the desire of investors to buy, sell, or hold the company's securities," or if it "in reasonable and objective contemplation might affect the value of the corporation's stock or securities." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968). Materiality is judged objectively – it asks what a reasonable investor would consider material – and not what any particular actual investors believed, or only the facts that an underwriter personally found to be dispositive. *See Dolphin*, 512 F.3d at 643. As the courts

---

[4] Wells Fargo correctly notes that the Bond Placement Agreement is not referenced by name in the Bond Placement Memo, and would not typically have been distributed to potential investors unless they asked to see it. *See* Wells Br. at 15 n. 11, 12. The Bond Placement Agreement, however, was the contract that necessarily accompanied the obligations described in the Bond Placement Memo that Wells Fargo undertook to sell the 38 Studios Bonds. As discussed further in Section E below, the Complaint's allegations about the Bond Placement Agreement support the Commission's claim under Section 17(a)(3) rather than Section 17(a)(2).

have recognized, "different investors make very different decisions" based on the same facts.  *Id.*

"The omission of a known risk, its probability of materialization, and its anticipated magnitude,

are usually material to any disclosure discussing the prospective result from a future course of

action."  *Lormond v. U.S. Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009).

Though defendants attempt to convince the court that there is a fatal flaw in the

Commission's complaint because it does not plead that any of the actual investors in the 38

Studios Bonds found 38 Studios' financial condition to be material, they are wrong.  *See* Wells

Br. at 16, n. 13, 19; Cannava Br. at 22-24.  They are attempting to insert into this government

enforcement action the element of reliance – which private investors must plead and prove in a

private securities lawsuit.  *See Tambone*, 597 F.3d at 447 n.9.  The Commission, unlike private

plaintiffs who must show that they relied on particular statements by defendants to their

detriment, is not limited to seeking redress only when individual investors claim that they were

misled.  *See id.*[5]  Instead, the agency evaluates, based on industry standards and practices, and its

experience in reviewing securities disclosures, whether a reasonable investor faced with the

disclosures at issue would likely have found them to significantly influence the total mix of

information available to potential investors.  *Cf. Tambone*, 550 F.3d at 119 (describing

Commission's role).

Further, because this case alleges fraud in the offering of securities, under Section 17(a),

a proper materiality analysis should focus on the reactions of all potential investors who received

the offering materials, without giving any special weight to the idiosyncratic views of the

---

[5] Defendants claim that *Flannery v. SEC*, 810 F.3d 1, 14 (1st Cir. 2015) stands for the proposition that the Commission must introduce investor testimony in order to prove materiality. The First Circuit does not pronounce such a new requirement.  Instead, that opinion concluded that the evidence presented at trial in that case supported only a "marginal" finding of materiality, and observed that a witness consultant who advised a number of relevant investors was not himself an investor.  *Id.* at 10, n.4.

investors who made the decision to purchase over the views of all those potential investors who declined. *See Aaron v. SEC*, 446 U.S. 680, 682-83 (1980) (describing charges under Section 17(a)(2) based on defendant's reason to know employees he supervised were lying to prospective investors about the plans of a company whose stock the employees were trying to sell those prospective investors). Also, contrary to Wells Fargo's argument, whether potential investors may be sophisticated does not change the standard of materiality away from the objective standard of a "reasonable investor." *See* Wells Br. at 16, n.13. The Supreme Court has held that there is "no authority in the statute, the legislative history, or [its] previous decisions, for varying the standard of materiality depending on" the recipient of the "withheld or misrepresented information." *See Basic*, 485 U.S. at 240, n.18; *Matrixx*, 131 S. Ct. at 1318, 1321-22 (emphasizing the perspective of the "reasonable investor"); *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013) ("In no event will the individual circumstances of particular class members bear on the [materiality] inquiry.").

Moreover, because materiality is a mixed question of fact and law, and depends on "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, [] these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved 'as a matter of law.'" *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (declining to resolve materiality issue on summary judgment); *see also In re Stone & Webster Sec. Litig.*, 414 F.3d 187, 209 (1st Cir. 2005) (on motion to dismiss, "court is thus free to find, as a matter of law, that a statement was not false, or not materially false, only if a jury could not reasonably find falsity or materiality on the evidence presented").

Defendants' contentions that 38 Studios' funding gap issue was "blatantly unimportant" and thus immaterial as a matter of law do not withstand scrutiny. The Bond Placement Memo's failure to disclose 38 Studios' existing funding gap is material because it goes to the heart of 38 Studios' ability to repay the bonds. *See* Complaint, ¶¶30, 61. If 38 Studios did not have enough money to fund the development of its Project Copernicus game, it would not be able to generate the revenues that were intended to repay the bonds. *See id.* Investors were deprived of this key piece of information about the likelihood of repayment from the bonds' primary repayment source. Defendants claim that bond investors would only have cared about the backup methods of payment that would kick in if 38 Studios failed to make its loan payments to the EDC, specifically, the state's moral obligation guarantee and the private bond insurance. While the Commission does not dispute that the existence of these two forms of credit enhancement was also material to investors, "the presence of credit enhancements generally would not be a substitute for material disclosure concerning the primary obligor on municipal bonds" and they do not "foreclose the need for a reasonable investigation of the accuracy and completeness of key representations concerning the primary obligor." SEC, *Municipal Securities Disclosure*, 54 Fed. Reg., 28799-01, 28812, 1989 WL 281659 (July 10, 1989); *In the Matter of City of Miami*, SEC Rel. No. 8213, 2003 WL 1412636, *9 (SEC Opinion Mar. 21, 2003) ("Bond insurance did not give Miami license to misrepresent its financial condition or withhold material information from the marketplace."). Further, while the relative materiality of these payment backups is clearly an affirmative defense that defendants can argue throughout the course of this case, the court does not have before it, on this motion to dismiss, any evidence as to the relative importance to investors of disclosures about the primary obligor as opposed to the availability of backup plans for repayment. *See* Cannava Br. at 9, 22. The court should not, at defendants'

invitation, make any assumptions about how investors would evaluate those disclosures or determine as a matter of law that the failure to disclose existing major problems facing the front-line obligor were immaterial. *See* Wells Br. at 18-19.

Defendants also claim that the Bond Placement Memo's disclosure of the general risks inherent in 38 Studios' business plan somehow cures the omission about the existing funding gap. The Memo's disclosures all pertain to future and contingent risks. But defendant's argument actually supports the opposite conclusion. The fact that the Bond Placement Memo describes 38 Studios' financial posture and some of its future risks demonstrates that defendants thought at the time that 38 Studios' financial condition and the risks it faced was material to prospective investors. Similarly, the absence of 38 Studios' financial statements from the Bond Placement Memo is not "evidence that investors who chose to enter into the transaction did not find 38 Studios' financial information material," as defendants contend. Cannava Br. at 3, 22-23. It is merely reflective of the fact that at the time of the Bond Placement Memo's distribution to investors, 38 Studios was pre-revenue – it wasn't yet making any money. *See* Complaint, ¶17.

The fact that defendants failed to disclose $400,000 they were receiving from 38 Studios as a result of the bond closing was also material because the amount of those fees would have put investors on notice of Wells Fargo's potential conflict of interest and investors would have expected those fees to be disclosed. *See* Complaint, ¶72. Defendants dispute that their concealed fees were material because the dollar amount of those fees is small when compared to the dollar value of the bonds that were sold. *See* Wells Br. at 19-21. This is not a proper quantitative comparison. The cases Wells Fargo cites deal with situations where alleged misstatements related to small percentages of revenue where the revenues themselves were the focus of the claims. *See* Wells Br. at 20. The Commission's claim here is not about a portion of

undisclosed revenue.  Instead, the Commission's claim is that the defendants failed to disclose

the existence of payments that are qualitatively significant because they go to the heart of the

underwriter's financial interest in getting this transaction done.  In context, the proper

quantitative comparison is not between its fees and the amount of the bond issuance, but rather

between the $50,000 Wells said it was getting paid by 38 Studios and the $450,000 it was really

getting paid by 38 Studios, or between the amount Wells Fargo got paid as its share of a

placement agent's fee, $406,250 and the amount of its undisclosed fees, $400,000.  *See*

Complaint at ¶¶65, 66, 69.

Wells Fargo also argues that it could have been paid the full placement agents' discount

of $634,065, but their contention ignores the participation of another placement agent – Barclays.

Wells Fargo offers absolutely no support, nor could they, for the notion that reasonable investors

would assume that Barclays would get none, or even an insignificant portion of the placement

agent's fee.  In reality, Barclays got $227,815 of the placement agent's fee. ¶65.  Wells Fargo

also claims that the Commission admits that $100,000 of the fees were not contingent on the

closing.  While it is true that $100,000 of the fees were not "earned" on the closing, *see*

Complaint, ¶40a, b; ¶69, all $400,000 of the undisclosed fees were contingent on the closing to

the extent that 38 Studios would not have had the money to pay those fees unless the closing had

occurred. ¶69 ("38 Studios made that payment with proceeds it received from the Bond

Offering"), and they all depended on actions relating to the bond transaction.  Because the

magnitude of the undisclosed fees that Wells Fargo received from 38 Studios dwarfed the

amount of the fees it said it was receiving, investors were not given an accurate picture of the

conflict of interest posed by Wells Fargo's payment arrangements with 38 Studios, and this

conflict cannot be dismissed as "blatantly unimportant" to investors.[6]

While defendants argue that the Commission's claim for a violation of MSRB Rule G-17 is inadequately pled, that contention depends entirely on their claim that the information about 38 Studios' funding gap and Wells Fargo's undisclosed fees were not material as a matter of law. *See* Cannava Br. at 26-27.  Because the standard for materiality under Rule G-17 is the same as that under Section 17(a), defendants' challenge to the Rule G-17 claims fail for exactly the same reasons that their materiality challenge to the Section 17(a) claims fails.  *See SEC v. Fitzgerald*, 135 F. Supp. 2d 992, 1027 n.11-12 (N.D. Cal. 2001) ("A violation of section 17(a) is not appreciably distinct from a violation of Rule G-17, so the Court need not consider Rule G-17 separately."); *Interpretive Notice Regarding Rule G-17, on Disclosure of Material Facts* (Mar. 20, 2002), reprinted in MSRB RULE BOOK 146, 147 and n.3 (2012) (applying Supreme Court's materiality standard in *TSC Industries* to Rule G-17) (attached as Ex. A).

**E.    The Complaint Pleads That Wells Fargo Violated, and Cannava Aided and Abetted Violations of, Section 17(a)(3).**

Section 17(a)(3) makes it illegal, "in the offer or sale of any securities," "directly or indirectly . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. §77q(a)(3).  A violation of Section 17(a)(3) may be negligent.  *See Tambone*, 550 F.3d at 123 n.23.  Such a practice or course of business need not be "inherently manipulative or deceptive."  *In re Anthony Fields*,

---

[6] Wells Fargo also contends that interpretive guidance issued by the MSRB two years after the 38 Studios transaction closed suggests that the amount of its fee could not be material because the guidance requires disclosure of the existence of payments rather than the amount of payments.  *See* Wells Br. at 21 n.18.  The relevant portion of the cited guidance, which is attached hereto as Exhibit B, was not in effect at the time of the 38 Studios transaction, and discusses disclosures that underwriters must make to issuers of municipal bonds – not investors.  *See* Ex. B at 22.  Here, when disclosing the amount of its compensation from 38 Studios to the issuer (the EDC) in the Bond Placement Agreement, Wells Fargo made a false statement by misrepresenting that it was getting $50,000 when it was getting $450,000.  *See* Complaint, ¶¶67-68.  This later-issued guidance does not help Wells Fargo's materiality argument.

Sec. Act Rel. 9727, 2015 WL 728005, *10 (Comm'n Opinion Feb. 20, 2015) (discussing Section

17(a)(1)).  Because the ordinary meanings of the terms "practice" and "course of business"

"denote[] routine, customary, or repeated conduct," there is no liability under Section 17(a)(3)

for "a single, isolated misstatement" but there is liability for repeated misstatements over a

period of time.  *Id.; Flannery,* 810 F.3d at 14 ("one who repeatedly makes or drafts such

misstatements over a period of time may well have engaged in a fraudulent 'practice' or 'course

of business' but not every isolated act will qualify.").  The cases Cannava cites that find that

misstatements cannot violate Section 17(a)(3) have never been followed in the First Circuit, and

conflict with *Flannery* and *Fields*.  *See* Cannava Br. at 24-25; *see also SEC v. Goldsworthy*, No.

06-10012, 2008 WL 8901272, *12 (D. Mass. June 11, 2008) (Section 17(a)(3) claims "were

properly predicated upon misstatements and omissions").

        The Complaint adequately pleads that defendants engaged in a course of business, over

the period of time they were working with the EDC on the 38 Studios transaction, that would

operate as a fraud or deceit upon potential purchasers of the 38 Studios Bonds.  Specifically, the

Complaint alleges that over the course of summer of 2010, Wells Fargo and Cannava learned

that even with the proceeds of the bonds, 38 Studios was facing a revenue shortfall of at least

one-third of its development costs for Project Copernicus, and as a result, they knew that after

the bond offering closed, 38 Studios would need to seek substantial additional funding.  *See*

Complaint, ¶¶48, 54, 57-60.  Further, because Wells Fargo had conducted an unsuccessful equity

offering earlier in 2010, Wells Fargo clearly understood the substantial risk 38 Studios faced in

attempting to raise the $25 million or more it would need and the insolvency that would result if

it failed.  *See id.*, ¶¶42-43, 60-61.  Despite this knowledge gained in the course of the summer

and fall of 2010, Wells Fargo and Cannava never asked that the funding gap be disclosed, and

approved the Bond Placement Memo despite its omission.  *See id.*, ¶57.  In addition, the

reasonable inference to be drawn from the Complaint is that Wells Fargo and Cannava's motive

to conceal the funding gap, and thus make the offering more palatable to investors, was that a

substantial amount of the compensation they hoped to receive from 38 Studios was dependent

upon a successful closing.  *See id.*, ¶¶40, 69, 72.

Having failed to cover their costs on the unsuccessful 38 Studios equity offering, Wells

Fargo and Cannava had an incentive to ensure that the 38 Studios bond transaction was

completed, and to conceal the extent to which their fees on that failed deal would be covered by

the bond closing.  *See id.*, ¶¶42-43, 69, 72.  In furtherance of that course of business, Wells

Fargo misrepresented to the EDC the amount of compensation it was receiving in the Bond Placement

Agreement, and concealed and misrepresented the full amount of the fees it was receiving in the

Bond Placement Memo (disclosing $50,000 rather than $450,000).  *See id.*, ¶68.  Cannava failed

to do appropriate due diligence to learn about the nature and amount of the fees Wells Fargo

would receive from 38 Studios when he was on notice of the existence and significance of those

fees, and failed to make sure they were properly disclosed.  *See id.*, ¶¶70-71.

While defendants contend that the Complaint alleges only a single misrepresentation in a

single document, as explained above, the Complaint cannot be reduced to that sole contention.

*See* Wells Br. at 8 n.8; Cannava Br. at 24-26.  As a result, the Commission's claims under

Section 17(a)(3) should not be dismissed.

**F.     The Complaint Pleads that Wells Fargo Acted Recklessly or Negligently.**

The Commission agrees that it must plead that Wells Fargo acted recklessly or

negligently in order to state claims under Sections 17(a)(2) and (3), and MSRB Rule G-17.  *See*

Wells Br. at 22.  The Complaint does so.  *See* Complaint, ¶6, 58, 71, 80, 84, 98.  Wells Fargo

asserts that the Complaint fails to specify how it acted recklessly or negligently.  That is simply

not so; the Complaint explains exactly what material information Wells Fargo is alleged to have known -- both relating to 38 Studios' funding gap and the additional fees Wells Fargo was being paid -- and yet failed to disclose in violation of its duty as an underwriter. *See id.* ¶¶3, 5, 39-43, 44, 46-48, 54, 57-60, 64-72. It is Wells Fargo's failure to disclose a known, existing, and highly material risk in the context of approving a variety of other disclosures about uncertain and future risks that make it liable for violating the securities laws. The Complaint's allegations sufficiently plead recklessness and negligence. *See Tambone*, 550 F.3d at 141-42.

It is unclear exactly what more Wells Fargo thinks is required at the pleading stage. Typically, negligence is shown by comparing defendants' conduct to an applicable standard of care, or adducing evidence as to what a "reasonably prudent" person would have done. *Dain Rauscher*, 254 F.3d at 857-58. The failure to describe, at the pleading stage, how a witness would testify about those issues is certainly not required. At the pleading stage, even under Rule 9(b), all the Commission must do is specify the "time, place, and content of the alleged misrepresentations with specificity." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999). It need not plead the evidence it will produce at trial to prove its claims. None of the cases Wells Fargo cites suggest that further pleading is required to defeat a motion to dismiss. *See* Wells Br. at 23 (citing two cases, *Shanahan* and *St. Anselm*, that resolved negligence claims at trial, and one case, *Morris*, that resolved a negligence claim after discovery and a summary judgment ruling).

The Complaint's statement that Wells Fargo "had an obligation under the federal securities laws to conduct an investigation into the 38 Studios Bond Offering" and that that type of investigation is "commonly referred to as 'due diligence'" is not an assertion that Wells Fargo properly conducted that required investigation and was not negligent. Complaint, ¶44; *cf.* Wells

Br. at 23.  To the contrary, the Complaint alleges in detail why Cannava's investigation into

Wells Fargo's undisclosed fees was inadequate, and, under the circumstances, negligent or

reckless.  *See* Complaint, ¶¶71, 72.

**G.     The Complaint Adequately Pleads that Cannava Aided and Abetted Wells Fargo's Violations.**

In order to plead that Cannava aided and abetted Wells Fargo's violations, the

Commission must allege that a primary violation existed and that Cannava was "generally aware

that his role or conduct was part of an overall activity that was improper and . . . [that he]

knowingly and substantially assisted in the primary violation."  *Tambone,* 550 F.3d at 144; 15

U.S.C. §77o(b) ("any person that knowingly or recklessly provides substantial assistance to

another person in violation of a provision of this Act, or of any rule or regulation issued under

this Act, shall be deemed to be in violation of such provision to the same extent as the person to

whom such assistance is provided"); §78t(e) (same, substituting "title" for "Act").  The

Commission agrees that negligence alone does not satisfy the state of mind required for aiding

and abetting liability and that aiding and abetting liability requires knowing or reckless conduct

by Cannava.[7]  The Complaint meets that standard.  *See, e.g.*, Complaint ¶64 (alleging that

Cannava "knew about 38 Studios' funding gap, and knew or should have known that it was not

disclosed in the Bond Placement Memo.").

**1.     The Complaint Pleads that Cannava Acted Knowingly or Recklessly**

The Complaint properly alleges that Cannava aided and abetted Wells Fargo's violations

of Section 17(a)(2) and (a)(3), and of Section 15B(c)(1) and MSRB Rules G-17 and G-32,

---

[7] The Commission recognizes that the Complaint creates an ambiguity as to the applicable standard for aiding and abetting liability, when it alleges that Cannava acted "recklessly or negligently" in failing to disclose Wells Fargo's compensation for the 38 Studios Bond Offering. But, as discussed in Section A above, the appropriate legal standard in the First Circuit requires allegations of knowing or reckless conduct, and the Complaint meets that standard.

notwithstanding Cannava's efforts to distort both the standard for aiding and abetting liability and the pleading requirements of Fed. R. Civ. P. 9(b).

First, the Complaint provides explicit detail about Cannava's central role in the 38 Studios Bond Offering.  Among other things, the complaint alleges that Cannava "had primary responsibility for Wells Fargo on the 38 Studios Bond Offering" and that he "reviewed and signed all of the major agreements relating to … that offering" including but not limited to the Bond Placement Memo.  Complaint, ¶46.  The Complaint also sets forth the key facts with regard to Cannava's knowledge of the funding gap in excess of $25 million that remained after the completion of the Bond Offering.  Specifically, the Complaint further alleges that by mid-August 2010, Wells Fargo knew that 38 Studios (which would implicitly include Cannava, the lead banker on the 38 Studios Bond Offering) "would only receive about $50 million in net proceeds from the bond offering." *Id.*, ¶54.  Cannava, however, knew that $50 million was insufficient to complete Project Copernicus, which would require at least $75 million, and that there was a substantial funding gap that would remain even upon the completion of the bond offering. *See id.*, ¶57.

Second, the Commission alleges that Cannava was also well aware that Wells Fargo was receiving additional (and substantial) fees that were not disclosed in the Bond Placement Memo. Beyond alleging that Cannava played a critical role in the Bond Offering, the Complaint focuses on Cannava's specific knowledge as to the additional compensation to be paid to Wells Fargo by 38 Studios.  Among other things, the Complaint notes that Cannava "was present at a meeting where this arrangement (*e.g.*, the fee to be paid to Wells Fargo by 38 Studios after the bond offering closed) was discussed."  Complaint, ¶71.  The Complaint further alleges that these

details were readily accessible in the due diligence files, which Cannava "should have reviewed in performing due diligence." *Id.*

In sum, the Complaint clearly alleges that Cannava knew or was reckless in not knowing material facts and failed to disclose them, which rendered the picture painted by the Bond Placement Memo misleading.  At this stage, despite Cannava's protestations, the Commission need not set forth all of the evidence that has been collected or may be adduced at trial regarding the claims against him.  While Cannava argues that the complaint must include specific acts or omissions, the Commission's allegations make clear that Cannava had primarily responsibility at Wells Fargo for this transaction, and that he was well aware of the massive funding gap of $25 million – a gap that was not disclosed to investors in the Bond Placement Memo.  *See* Cannava Br. at 32-33.  The Complaint's description of Cannava's role at Wells Fargo -- along with his knowledge of the critical funding shortfall and his failure to completely investigate the additional (undisclosed) fees earned by Wells Fargo – is more than sufficient to allege knowing or reckless conduct by Cannava.

Cannava argues at length about the absence of any information in the Complaint about whether he read certain financial projections.  The fact that the Complaint does not itemize which particular documents Cannava did or did not review (including but not limited to the financial projections) is entirely irrelevant.  Cannava failed to disclose the critical funding gap that would remain in the wake of the 38 Studio's Bond Offering, and the Complaint clearly pleads his knowledge of the funding gap, along with his substantial involvement in the bond transaction.  Based on these allegations, such knowledge is more than plausible, and the Complaint need not provide a roadmap to the Commission's evidence at trial.

While Cannava describes the secondary liability claims against him as "exactly the type of 'general averment[s]' of 'knowledge of material falsity' that courts routinely reject," the single case Cannava cites is wholly inapposite. *See North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.2d 8, 13 (1st Cir. 2009). In *Cardinale*, the First Circuit upheld the dismissal of all claims in a private lawsuit relating to the licensing of the plaintiff's spectrum for use in a wireless data network. *See id.*, at 10-12. In this case involving a "failed business relationship" between the parties, the court found "no information in the complaint to suggest that the defendants feigned their original expressed intention to use the … spectrum." *Id.* at 13. Rather, the First Circuit noted that the complaint alleges that defendants "never intended to follow its business plan" but that the allegation "is not itself supported with particulars that suggest scienter[.]" *Id.* By contrast, the Commission's allegations against Cannava make plain that as the principal banker on the 38 Studios Bond Offering, he both knew about the existence of the funding gap and, crucially, that the Bond PPM failed to disclose it. Moreover, unlike *Cardinale*, the Commission need not plead that Cannava acted with scienter, and the heightened standards applicable to private plaintiffs pleading scienter-based claims do not apply to the Commission. *See Tambone*, 550 F.3d at 119.

As reflected by Cannava's frequent – and improper – references to extraneous matters outside of the four corners of the Commission's Complaint, Cannava's motion is best understood as an attack on what he views as the Commission's evidence. For example, Cannava provides a laundry list of the additional items that he claims should have been in the Complaint. *See* Cannava Br. at 32 (delineating what the complaint "does not allege"). However, Rule 9(b) does not require a complaint to be a compendium of evidence, and this court should reject Cannava's request to raise the standard of 9(b) to one that would require prescience as to what facts will be

unearthed through civil discovery, or one that would require explicit summaries of witness testimony already obtained.

Accordingly, the Complaint states with sufficient particularity that in light of Cannava's role at Wells Fargo, his resultant knowledge of the crucial funding gap and his failure to fully investigate and disclose the undisclosed fees to be earned by the bank, when he had the obligation to do so, Cannava was an aider and abettor who acted with at least *recklessness* with regard to the primary violations alleged in the complaint.  Cannava's reliance on *United States v. Hitachi America, Ltd.,* 172 F.3d 1319, 1337 (Fed. Cir. 1999) is misplaced because the Commission has explicitly alleged that Cannava acted at least recklessly, not just negligently, in aiding and abetting Wells Fargo's primary violations.

### 2.  Cannava's Substantial Participation in Wells Fargo's Violations is Adequately Pled.

The Complaint against Cannava states in precise language that he was the lead banker at Wells Fargo who was primarily responsible for the 38 Studios Bond Offering.  Complaint, ¶46. Moreover, the Complaint lays out in explicit detail that Cannava was the person who reviewed the Bond Placement Memo on behalf of Wells Fargo and that he knew (in the case of the funding gap) or should have known (in the case of the undisclosed fees) about the material information that was missing from that document.  These allegations are neither vague nor conclusory. Rather, the Complaint makes plain that Cannava was the most central figure at Wells Fargo in connection with this high-profile bond offering.

In order to prove that Cannava provided "substantial assistance," the Commission must demonstrate that he "in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed."  *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *United States v. Peoni*, 100

F.2d 401, 402 (2d Cir. 1938)). "A defendant's silence or inaction may satisfy the 'knowing and substantial assistance' standard if such silence or inaction was consciously intended to further the principal violation." *Tambone*, 550 F.3d at 144 (defendants' "failure to correct the misleading disclosures in the prospectuses, given their duties as underwriters" substantially assisted primary violations). Here, as the complaint alleges, Cannava was "Wells Fargo's lead banker on the 38 Studios Bonds transaction" and "knew that 38 Studios would be unable to complete the project the Bonds would finance with the funds the Bonds would provide." Complaint, ¶5. Wells Fargo then went forward with the bond offering, in concert with the other defendants, notwithstanding Cannava's knowledge that the offering failed to provide even the minimum level of funding that 38 Studios needed to succeed. *See id.*, ¶¶57-60.

The Commission's allegations clearly and concretely allege substantial participation by Cannava. In arguing that the Complaint does not allege "steps" taken by Cannava in furtherance of the fraud, Cannava fails to recognize what is entirely clear on the face of the complaint – it was Cannava's *inaction* in the face of potential harm to the investing public that constituted the violation of the securities laws. Cannava need not have taken affirmative steps in furtherance of the fraud to be liable for aiding and abetting. He need only have failed to take action "when required to do so … [which] enable[d] the fraud to proceed." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2006); *Tambone*, 550 F.3d at 144-45. Here, Cannava failed to do sufficient due diligence, which would have readily shown that Wells Fargo's fees were substantially greater than those in the disclosure. *See* Complaint, ¶71. He also knew full well of the massive funding shortfall that would remain after the 38 Studios Bond Offering, and failed to insist on disclosure of the funding gap that caused the violations pled in the Complaint. *See id.*, ¶64.

36

Accordingly, Cannava failed to act in violation of his duty as an underwriter, which constitutes substantial participation for purposes of aiding and abetting liability. "Inaction can be enough 'if it was designed intentionally to aid the primary fraud or it was in conscious or reckless violation of a duty to act.'" *SEC v. Espuelas*, 698 F. Supp. 2d 415, 432 (S.D.N.Y. 2010) (internal citations omitted) (finding substantial assistance by senior vice-president who failed to report the circumstances of certain transactions, where omission was intentionally designed to facilitate reporting of nonexistent revenue); *see also Dain Rauscher, Inc.*, 254 F.3d at 857-58 (securities professional recommending securities have a duty to disclose material information regarding the securities to their customers as well as a duty to investigate to develop a reasonable belief that representations made about those securities were true and complete). Contrary to his suggestion, Cannava need not personally benefit, in some financial measure, from his failure to act. *See* Cannava Br. at 37. Instead, it is sufficient to allege that his employer benefitted financially from the closing of the bond offering. *See SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012) (under Section 17(a)(2), it is sufficient to allege that defendant "obtained money or property for his employer while acting as its agent").

At bottom, Cannava's argument that he did not substantially participate in the primary violations is perplexing – because if the lead banker for Wells Fargo with authority to bind the bank did not "substantially participate," who did? Cannava offers no answers, just the oft-repeated mantra that the Commission's allegations are vague and conclusory. But corporations like Wells Fargo can only act through individuals, and Cannava was the person at Wells Fargo in charge of the transaction, one of a limited number of participants in this high-profile transaction. *See* Complaint, ¶5. Quite simply, Cannava's participation was substantial, because he had binding authority to act for a necessary participant in the 38 Studios Bond Offering.

37

**H.       The Complaint States a Violation of MSRB Rule G-32.**

MSRB Rule G-32 requires that a "broker, dealer, or municipal securities dealer that sells

any offered municipal securities to a customer . . . shall provide or send to the customer, by no

later than the settlement of such transaction" either a copy of the official statement or a notice

informing the customer how to obtain the official statement and disclose "(1) the underwriting

spread, if any, (2) the amount of any fee received by the broker, dealer or municipal securities

dealer as agent for the issuer in the distribution of the securities; and (3) the initial offering price

for each maturity in the offering, including maturities that are not reoffered[.]"  MSRB Rule G-

32(a)(iii)(A).   The purpose of Rule G-32 is to "ensure that a customer who purchases new issue

municipal securities is provided with all available information relevant to his or her investment

decision by settlement of the transaction." *Notice Regarding the Disclosure Obligations of*

*Brokers, Dealer and Municipal Securities Dealers in Connection with New Issue Municipal*

*Securities Under Rule G-32* (Nov. 19. 1998), reprinted in MSRB RULE BOOK 244, 245 (2012)

("*Notice Regarding Disclosure Obligations*").[8]

Defendants contend that they did not violate Rule G-32 as a matter of law because Wells

Fargo did not receive the undisclosed fees "as agent for the issuer" or from the issuer.  Wells Br.

at 24, Cannava Br. at 27.  MSRB Rule G-32 should not be construed as narrowly as defendants

contend.  The Complaint's theory is that Wells Fargo would not have gotten paid $400,000 in

undisclosed compensation from 38 Studios *but for* its actions as the underwriter in the closing of

the 38 Studios bond transaction.  *See* Complaint, ¶¶69, 72, 101.  The $400,000 in undisclosed

fees were directly related to the bond offering in that they were to be paid based on the

---

[8] A copy of Rule G-32 and its interpretive guidance from the MSRB RULE BOOK (2012) is
attached hereto as Exhibit C.

accomplishment of milestones related to the bond offering. *See id.*, ¶40. Thus, had Wells Fargo

not acted as placement agent and closed the 38 Studios bond transaction, it would not have

received significant additional compensation. The Commission's view of Rule G-32 is that fees

earned *because of* the broker's actions in closing the transaction and distributing securities need

to be disclosed under MSRB Rule G-32.

Wells Fargo makes the additional contention that it was not the agent of the EDC and

denies that it had any duty to disclose the fees it earned as a placement agent. *See* Wells Br. at

24 n.20. As support it cites a portion of the *Notice Regarding Disclosure Obligations* that does

not support its proposition; instead it simply states that if there are no fees required to be

disclosed, that fact need not be stated separately. *See Notice Regarding Disclosure Obligations,*

at 248 n.15. Moreover, placement agents like Wells Fargo in this transaction fall within the

statutory definition of underwriters who are required to make the disclosures required by Rule G-

32. *See* Dkt. 22-5 at 24 (Bond Placement Agreement, in which Wells Fargo agrees to "pay the

purchase price of the 2010 Bonds by wire transfer payable in federal funds to the order of the

Issuer" with a view to selling those bonds to customers); Exchange Act Rule 15c2-12 (defining

an underwriter as "any person who has purchased from an issuer of municipal securities with a

view to, or offers or sells for an issuer of municipal securities in connection with, the offering of

any municipal security). Because Wells Fargo was an underwriter of the 38 Studios offering, it

was obligated to make the disclosures required by Rule G-32. The Commission's Rule G-32

claim should not be dismissed.

## CONCLUSION

The Commission respectfully requests that the court strike those portions of Cannava's

brief that refer to documents extraneous to the Complaint in blatant attempts to sway the court

through the use of improper arguments.  The Commission also requests that the court deny defendants' motions to dismiss and convene a scheduling conference to discuss the discovery schedule for this action.

June 10, 2016                                Respectfully submitted,

                                             **SECURITIES AND EXCHANGE**
                                             **COMMISSION**

                                             By its attorneys,

                                             /s/ Kathleen Burdette Shields
                                             Kathleen Burdette Shields (Mass. Bar No. 637438)
                                             Louis A. Randazzo (New York Bar No. 2416485)
                                             33 Arch Street, 24th Floor
                                             Boston, MA  02110
                                             (617) 573-8904 (Shields)
                                             (617) 573-8985 (Randazzo)
                                             (617) 573-4590 (Facsimile)
                                             ShieldsKa@sec.gov; RandazzoL@sec.gov


                              Certificate of Service

       I hereby certify that this document filed through the ECF system on June 10, 2016, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                             /s/ Kathleen Burdette Shields
                                             Kathleen Burdette Shields