## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | :   Civil Action No. 1:16-cv-107-M |
| **Plaintiff,** | : |
| | : |
| v. | : |
| | : |
| RHODE ISLAND COMMERCE CORPORATION | :   **JURY TRIAL** |
| (F/K/A RHODE ISLAND ECONOMIC | :   **DEMANDED** |
| DEVELOPMENT CORPORATION), WELLS FARGO | : |
| SECURITIES, LLC, PETER M. CANNAVA, | : |
| KEITH W. STOKES, and JAMES MICHAEL SAUL, | : |
| | : |
| **Defendants.** | : |

## ~~PROPOSED~~ AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants Rhode Island Commerce Corporation (formerly known as Rhode Island Economic Development Corporation) ("EDC"), Wells Fargo Securities, LLC ("Wells Fargo"), Peter M. Cannava ("Cannava"), Keith W. Stokes ("Stokes"), and James Michael Saul ("Saul"):

## PRELIMINARY STATEMENT

1.      This case involves misconduct by the EDC and Wells Fargo relating to an offering of municipal securities. On November 2, 2010, the EDC issued $75,000,000 of taxable revenue bonds to investors in a private placement (the "38 Studios Bonds"). The EDC loaned most of the money it received from selling the 38 Studios Bonds to 38 Studios, LLC ("38 Studios"), a pre-revenue video gaming company headed by a former professional baseball player. The disclosure document provided to the investors who were offered the 38 Studios Bonds was materially misleading. This document failed to disclose that the project being financed by the

Bonds, the development of a video game, could not be completed with the financing the Bonds would provide. The document did not disclose that even with the proceeds of the loan financed by the 38 Studios Bonds, 38 Studios faced a known shortfall in funding. In light of the other disclosures made in the offering document, this omission was significant, and rendered the offering document a misleading half-truth.

2. The offering document was misleading in a second way. It failed to disclose the full amount of compensation that the offering's lead placement agent, Wells Fargo, was receiving as a result of the 38 Studios Bond offering. Wells Fargo's actual compensation from the offering was almost double that which was disclosed, as the result of a side deal that Wells Fargo had with 38 Studios. This undisclosed compensation, which created a potential conflict of interest, was material and should have been disclosed.

3. The offering document's failures were the result of misconduct by both the EDC, the issuer of the 38 Studios Bonds, and by Wells Fargo, the lead placement agent for the 38 Studios Bonds. These entities' failures, in turn, were caused by the knowledge, recklessness or negligence of their employees.

4. Stokes and Saul were executives of the EDC, who were responsible for the EDC's failure to make complete and truthful disclosures in the offering document for the 38 Studios Bonds. As discussed below, at the time of the offering, Rhode Island was experiencing high unemployment and the loan to 38 Studios was intended to increase employment opportunities in the state. While the EDC's Board may have been influenced by the star power of 38 Studios' personnel, or anxious to take action to address the significant unemployment in Rhode Island, Stokes and Saul had the obligation as EDC executives to disclose to investors the

2

known financial truths about 38 Studios' inability to complete the project the Bonds would finance with the funds the Bonds would provide.

5.      Cannava, who was Wells Fargo's lead banker on the 38 Studios Bonds transaction, was responsible for Wells Fargo's failure to ensure that the offering document for the 38 Studios Bonds contained complete and truthful disclosures both about the need for additional funding --beyond the Bonds -- to complete the project being financed, and Wells Fargo's compensation.  Cannava, like Stokes and Saul, knew that 38 Studios would be unable to complete the project the Bonds would finance with the funds the Bonds would provide.

6.      By knowingly, recklessly or negligently engaging in the conduct described in this Complaint, defendants EDC and Wells Fargo violated Sections 17(a)(2) and (a)(3) of the Securities Act of 1933 (the "Securities Act"), which prohibit fraud in the offer or sale of securities.  Defendants Stokes, Saul and Cannava aided and abetted those violations by their respective employers.  In addition, defendant Wells Fargo violated Section 15B(c)(1) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules G-17 and G-32 promulgated by the Municipal Securities Rulemaking Board (the "MSRB").  These provisions proscribe rules for fair dealing and disclosure by municipal securities professionals.  Defendant Cannava aided and abetted Wells Fargo's violations of both the Exchange Act and the MSRB Rules.

7.      Against all defendants, the Commission seeks injunctions against future violations, and civil penalties.  Against defendants EDC, Wells Fargo and Cannava, the Commission also seeks disgorgement of ill-gotten gains and prejudgment interest thereon.  The Commission also seeks injunctions that would prohibit Stokes, Saul and Cannava from participating in the future issuance, underwriting, offer or sale of municipal securities.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to enforcement authority conferred

by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act

[15 U.S.C. §78u(d)].

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331,

Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(b), 77t(d), 77v(a)], and

Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

10.     Defendants have directly or indirectly made use of the means or instrumentalities

of interstate commerce, or of the mails, or the facilities of a national securities exchange in

connection with the acts, practices, transactions, and courses of business alleged in this

Complaint.

11.     Venue in this district is proper under 28 U.S.C. §1391(b), Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)], and Section 27 of the Exchange Act [15 U.S.C. §78aa]

because the events or omissions giving rise to the claim, specifically, the acts, practices,

transactions and courses of business constituting the alleged securities law violation(s), occurred

in substantial part within this district and because at least defendants EDC, Stokes and Saul

reside in this district.

## DEFENDANTS

12.     The Rhode Island Commerce Corporation (formerly known as the Rhode Island

Economic Development Corporation) ("EDC") is a quasi-public Rhode Island corporation

created by the State of Rhode Island to promote the expansion and development of new and

existing businesses in Rhode Island and to encourage the State's economic development. Its

principal place of business is in Providence, Rhode Island. The EDC is the issuer of the 38 Studios Bonds.

13.     Wells Fargo Securities, LLC ("Wells Fargo"), is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. Wells Fargo is registered with the Commission as a broker-dealer and municipal advisor. It is also a municipal securities dealer and municipal securities broker as defined in Sections 3(a)(30) and (31) of the Exchange Act. Wells Fargo was the lead placement agent for the 38 Studios Bonds. During the time period when Wells Fargo was serving as the lead placement agent for the 38 Studios Bonds, Wells Fargo was also engaged by 38 Studios to perform private investment banking services.

14.     Peter M. Cannava ("Cannava"), age 37, is a resident of New York, New York. Cannava is a Vice President employed in Wells Fargo's public finance group. Cannava holds Series 7 and 63 securities licenses issued by the Financial Industry Regulatory Association. Cannava was the lead banker at Wells Fargo working on the 38 Studios Bonds. He had the authority to bind Wells Fargo and to sign contracts relating to the 38 Studios Bonds on behalf of Wells Fargo.

15.     Keith W. Stokes ("Stokes"), age 57, is a resident of Newport, Rhode Island. During 2010 and 2011, Stokes was the EDC's Executive Director, and its highest ranking employee under its Board of Directors.

16.     James Michael Saul ("Saul"), age 60, is a resident of Barrington, Rhode Island. During 2010 and 2011, Saul was the EDC's Deputy Director.

**FACTUAL ALLEGATIONS**

**Background on 38 Studios**

17.     During 2010, 38 Studios, LLC ("38 Studios") was a limited liability company

headquartered in Maynard, Massachusetts. It was in the business of developing video games. At

the time, it was a start-up stage company and had no revenue.

18.     The Chairman of 38 Studios' Board of Directors, and its majority shareholder,

was Curt Schilling, a former professional baseball player. Other creative personnel working with

38 Studios were well-known in the video gaming industry, and the science fiction and comic

book industries.

19.     During 2010, 38 Studios was developing a single-player, role-playing video

game that was scheduled to be released for sale in the fall of 2011. 38 Studios had entered into a

publishing and distribution agreement with a large and well-known video gaming company for

that single-player game, under which the large company would fund the development costs for

that game, and distribute it to the public, in exchange for a significant share of the revenues that

game generated.

20.     During 2010, 38 Studios was also developing a "massively multi-player" online

video game that was code-named Project Copernicus. During 2010, 38 Studios had not entered

into a publishing and distribution agreement under which another entity would fund its

development costs for Copernicus. 38 Studios anticipated that it would need $75 million or more

to complete the development of Copernicus. It was thus seeking financing to fund those

development expenses.

21.     In early 2010, 38 Studios was pursuing two potential options for the financing it

needed:  (i) selling about $25 million in equity through a private placement to venture capital and

6

similar investors, and (ii) obtaining a loan from the EDC that would be funded through the proceeds of bonds issued by the EDC.

**The EDC Issued the 38 Studios Bonds**

22.    The EDC is authorized by Rhode Island state law to issue bonds. The proceeds of those bonds may be lent to businesses to encourage economic development in Rhode Island. When the proceeds of municipal bonds are lent to a private party, those bonds are typically referred to as "conduit bonds" and the private entity receiving the funds is known as the "conduit borrower."

23.    The 38 Studios Bonds were conduit bonds, and 38 Studios was a conduit borrower.

24.    The EDC was governed by a Board of Directors, which had up to thirteen members, including the Chair, who was the Governor of the State of Rhode Island. The Governor, with the advice and consent of the Rhode Island Senate, appointed the other members of the Board.

25.    On June 11, 2010, the Rhode Island General Assembly passed a law authorizing the EDC to provide credit enhancement on its conduit bonds, in the form of a guaranty of the payment of debt service, under a new program, named the Jobs Creation Guaranty Program, in a principal amount of up to $125,000,000 outstanding at any time. That law stated that "Rhode Island continues to suffer from continuing high unemployment and other ill effects from the most recent national recession" and that the EDC bonds were intended "to induce lending to companies growing their employment in Rhode Island."

26. The EDC determined that it would use over half of the authorization allotted to it through the Jobs Creation Guaranty Program to guaranty the payment of debt service on conduit bonds that would fund a loan to 38 Studios.

27. On July 26, 2010, the EDC's Board voted to authorize the issuance of the 38 Studios Bonds and issued a resolution to that effect. Attached to the resolution was a Term Sheet between the EDC and 38 Studios which outlined the terms on which the EDC would loan the Bonds' proceeds to 38 Studios. The Term Sheet was signed by Stokes on behalf of the EDC, and stated that the purpose of the loan was to "provide the necessary financing to relocate 38 Studios to Rhode Island, complete production of [its video game called] Copernicus, and capitalize the company's growth and expansion in Rhode Island." The Term Sheet also stated that the EDC understood that 38 Studios' "capital needs to bring project Copernicus to completion to be approximately $75,000,000."

28. On November 2, 2010, the EDC sold $75,000,000 worth of the 38 Studios Bonds to investors through a private placement (the "38 Studios Offering"). The EDC loaned approximately $50 million of the $75 million in proceeds it received from investors to 38 Studios. The remainder of the $25 million in proceeds from the 38 Studios Offering was used to pay expenses related to the Offering, and to establish both a reserve fund (about $12.7 million) that could be used to make some future payments to investors, and a capitalized interest fund (about $10.6 million) to pay interest on the bonds for their first year.

29. The 38 Studios Bonds were offered to investors through a Private Placement Memorandum dated October 22, 2010 (the "Bond Placement Memo"). The Bond Placement Memo was the key disclosure document that described to potential investors the Bonds that they were being offered. It described the sources and uses of proceeds of the Bonds, the security for

the Bonds, and other terms of the Bonds. It also described the EDC and 38 Studios, including

the 38 Studios project that would be financed with the Bonds' proceeds. The Bond Placement

Memo also described some of the risks of investing in the 38 Studios Bonds, and contained

descriptions of the other entities involved in issuing the Bonds.

30.     The Bond Placement Memo stated that 38 Studios would make loan payments to

the EDC from the revenues it earned from selling its video games. The EDC would then use

those loan payments to make principal and interest payments to bondholders.

31.     The Bond Placement Memo cautioned investors that, in the event of a default by

38 Studios, the principal and interest payments due on the Bonds were not liabilities of the State

of Rhode Island. However, to the extent the EDC had insufficient funds to satisfy its payment

obligations to bondholders, the Governor was obligated to ask the State's General Assembly to

appropriate money as part of its budget to pay the shortfall to the EDC, so that the EDC could

make principal and interest payments to bondholders. The General Assembly was not obligated

to make those appropriations. The State's commitment to provide funds to the EDC was

therefore considered a "moral obligation" of the State. In exchange for its "moral obligation"

guaranty, the State required an up-front fee of $375,000, plus an annual fee equal to 1.5% of the

outstanding principal amount of the bonds.

32.     The 38 Studios Bonds paid investors significantly higher interest rates than

general obligation bonds issued by the State of Rhode Island at about the same time. Unlike the

"moral obligation" behind the 38 Studios Bonds, Rhode Island's general obligation bonds were

backed by the full faith and credit of the State.

33.     The Bond Placement Memo also stated that the 38 Studios Bonds were insured

by a private insurance company. That means that the insurance company would guarantee that

9

bondholders would be paid principal and interest on the 38 Studios Bonds under the terms of the insurance policy if neither 38 Studios made its loan payments nor the State appropriated the funds needed to make the scheduled payments. In return, the private insurance company received an up-front premium payment of $562,935, which was paid from the proceeds of the 38 Studios Bonds.

**Stokes and Saul Played Key Roles in the EDC's Issuance of the 38 Studios Bonds**

34.     Stokes was the EDC's Executive Director. He was the agency's head, and was the person primarily responsible for communicating with the EDC's Board. He also had the authority to bind the EDC, and was the individual who signed both the Bond Placement Memo, and the Term Sheet with 38 Studios, on behalf of the EDC.

35.     When the EDC was considering whether to make the loan to 38 Studios, and to issue the 38 Studios Bonds, Stokes was heavily involved in both communications to EDC Board members about the potential transaction and in presentations at EDC Board meetings. He participated on behalf of the EDC in meetings related to the potential transaction with representatives from 38 Studios, Wells Fargo, the EDC's financial advisor and consultants, and other members of Rhode Island State government. For the meetings that Stokes did not attend, he was briefed by his staff about what took place at the meetings.

36.     Saul was the EDC's Deputy Director. He has a background in accounting. He reported to Stokes. Saul had primary responsibility at the EDC for overseeing the analysis and reporting on the financial aspects of the potential 38 Studios Bond transaction. He was the EDC's lead representative to the Bond Working Group, the group of people who communicated regularly about the transaction. He also made presentations to the EDC's Board about the terms of the potential 38 Studios transaction, and in particular, led presentations that described 38

Studios' financial projections and the anticipated likelihood that 38 Studios would be able to repay an EDC loan.

37.    Both Stokes and Saul reviewed the Bond Placement Memo for the EDC, and Stokes signed the Bond Placement Memo on behalf of the EDC.

**Wells Fargo's Dual Roles**

38.    Wells Fargo was involved in two ways in trying to obtain financing for 38 Studios. First, its investment banking group was hired by 38 Studios to conduct an equity private placement. Second, its public finance group was hired by the EDC to be the lead placement agent for the 38 Studios Bond Offering. Wells Fargo's work on these two financing options overlapped during the spring of 2010.

39.    In the spring of 2010, 38 Studios and Wells Fargo had discussions about how Wells Fargo could assist the company in obtaining financing. Options discussed at the time included both an equity offering and financing obtained through a Rhode Island bond issuance. 38 Studios was interested in pursuing both sources of potential financing.

40.    On April 16, 2010, Cannava was copied on a memorandum sent to Wells Fargo's Investment Banking Commitment Committee by the head of Wells Fargo's investment banking team on the 38 Studios deal, that outlined the "dual-track process" that Wells was seeking to undertake to raise capital for 38 Studios. The memo described the two tracks as "a $75 to $80 million Municipal Bond flotation, backed by the State of Rhode Island [] with a secondary process around a $20 to $25 million Equity Private Placement." The memo also described the "anticipated fee structure" for Wells Fargo's work. It stated:

> As Wells Fargo will be driving both paths of financing for the company, we are contemplating a combination of progress-related fees and success fees. Our recommendation is as follows:
> - Upfront Retainer: None

- Working Group commencement on Bond Offering (early May) - $25,000
- Ratings Agency Presentation milestone (anticipated by late May/early June) - $50,000
- Beginning of Distribution of Equity Private Placement CIM into the market (late May) - $50,000
- Structuring Fee upon completion of Preliminary Official Statement (bond prospectus, early June) - $125,000
- Bond Underwriting Economics, upon success – normal and customary, with Wells Fargo to receive not less than 70% of aggregate deal economics
- Equity Private Placement agency fees, upon success – 7.0% (with carve-out at lesser fee % for Board and existing investors, TBD).

Cannava thus knew or was reckless in not knowing about the fees that Wells Fargo contemplated receiving as a result of its involvement in both the Bond Offering and the equity offering and those fees' association with milestones in the Bond Offering.

### The Equity Offering

41.     On May 20, 2010, 38 Studios signed an engagement letter (the "May 20 Agreement") with Wells Fargo's investment banking group to raise money for 38 Studios by selling equity.  In recognition of the fact that 38 Studios might elect to proceed with a potential financing through the EDC and cease its attempts to raise equity financing, the May 20 Agreement specified that Wells Fargo would be paid "Alternative Financing Fees" based on certain milestones related to the 38 Studios Bond Offering.  Specifically, 38 Studios agreed to pay Wells Fargo the following fees:

(a) A "RIEDC consulting fee" of $25,000 that was "earned on the day after the first meeting" between the EDC, 38 Studios and Wells Fargo to discuss "the issuance of municipal bonds on behalf of" 38 Studios;

(b) A "structuring fee" of $75,000 that was "earned upon the decision by [38 Studios] at its sole discretion, to actively pursue" a transaction in which the EDC issued bonds on behalf of 38 Studios; and

(c) An "alternative financing option closing fee" of $300,000 "payable upon the closing" of a transaction in which the EDC issued bonds on behalf of 38 Studios.

42.     The May 20 Agreement also obligated 38 Studios to "use its best efforts, . . . to engage Wells Fargo Securities as sole-, lead-, and book-running agent or underwriter" for any contemplated bond transaction involving the EDC.

43.     Pursuant to the May 20 Agreement, Wells Fargo engaged in significant efforts to obtain equity financing for 38 Studios.  Wells Fargo conducted due diligence on 38 Studios and prepared an Equity Private Placement Memorandum ("Equity PPM") which contained extensive detail about the company.  The Equity PPM specified that 38 Studios would need substantial financing beyond the $25 million it was seeking to raise in that round of financing.  Wells Fargo sent that Equity PPM to approximately 200 potential investors, and engaged in follow-up activities in an attempt to interest those prospects in an investment in 38 Studios.

44.     The Equity PPM did not attract any investors, and in June 2010, 38 Studios and Wells Fargo ceased working on the attempted equity financing in favor of pursuing financing through an EDC bond offering.

**The Bond Offering**

45.     The EDC retained Wells Fargo as the lead placement agent on the 38 Studios Bond Offering.  A "placement agent" in a private placement like the 38 Studios Bond Offering has a role similar to that of an underwriter in a public bond offering.  Wells Fargo had an obligation under the federal securities laws to conduct an investigation into the 38 Studios Bond

13

Offering, in order to obtain a reasonable belief in the truthfulness and completeness of the key representations in the Bond Placement Memo. This investigation is commonly referred to as "due diligence."

46.     Wells Fargo also found investors for the 38 Studios Bonds and arranged for the bonds to be sold to those investors. One other broker-dealer had a more limited placement agent role than Wells Fargo, and arranged for the sale of some of the 38 Studios Bonds to investors.

47.     Cannava had primary responsibility for Wells Fargo on the 38 Studios Bond Offering. Cannava had the authority to sign contracts and agreements on behalf of Wells Fargo relating to the 38 Studios Bond Offering. He reviewed and signed all of the major agreements relating to Wells Fargo's participation in that offering, including the Bond Placement Agreement, and the Private Placement Agent's Certificate. He also approved the Bond Placement Memo on behalf of Wells Fargo.

48.     Cannava received a copy of the Equity PPM that Wells Fargo had prepared several months earlier for the potential equity financing by at least August 24, 2010, when a member of the Wells Fargo investment banking team emailed it to him. That email informed Cannava that the Equity PPM contained "different financial projections" from those that 38 Studios was relying on in the bond offering, and focused Cannava on the risk factors disclosed in the Equity PPM, which included the disclosure that 38 Studios would need additional financing beyond what it sought to raise through that equity offering.

49.     As part of his work in preparing the Bond Placement Memo, Cannava read the Equity PPM carefully, and relied heavily on it. Cannava also relied on the due diligence that others at Wells Fargo had performed in connection with the potential equity offering to satisfy his obligation to perform due diligence in connection with the 38 Studios Bond Offering.

14

**38 Studios' Funding Gaps**

50.     Throughout its negotiations with the EDC during April through October 2010, 38 Studios emphasized its need for at least $75 million in order to complete Project Copernicus.  38 Studios also informed the EDC, Wells Fargo, and others involved in discussions about the potential bond issuance, including Cannava, that it would require additional funds, beyond the $75 million that it needed to finish Copernicus, to move to Rhode Island and to fund its operations.

51.     To explain its need for $75 million, 38 Studios prepared and sent to the EDC a set of financial projections for the 2010-2015 time period that detailed the company's projected revenues and expenses, and provided an income statement, a cash flow statement and a balance sheet for those periods.  Those financial projections included the assumption that 38 Studios would receive $75 million in net proceeds as the result of an outside debt financing.  If the outside debt financing number were changed to reflect the approximately $50 million that 38 Studios actually received from the EDC's financing, the projections would indicate that 38 Studios would run out of cash by the end of December 2011.

52.     On April 12, 2010, 38 Studios sent a copy of the same financial projections it had provided to the EDC to the head of Wells Fargo's investment banking group, who was working on 38 Studios' behalf on the dual-track fundraising.  On April 13, 2010, the head of Wells Fargo's investment banking group emailed those financial projections to Cannava. Cannava thus had 38 Studios' financial projections throughout the course of his work on the Bond Offering.

53.     Stokes and Saul both received and reviewed 38 Studios' financial projections. Both Stokes and Saul knew that the financial projections assumed that 38 Studios would receive

$75 million in proceeds from the EDC offering. Saul analyzed these financial projections, and presented various scenarios based on these financial projections, to the EDC's Board.

54.     As part of the closing of the 38 Studios Bond Offering, Stokes signed a "Certificate Regarding Financial Projections Required by Section 2.06 A(b)(iv)" of the Loan and Trust Agreement between the EDC and 38 Studios which certified that the financial projections provided to the EDC by 38 Studios in April were authentic and would be relied upon to perform calculations required by the parties' loan agreement. These certified financial projections were the same as those earlier provided to the EDC, Wells Fargo and Cannava, and contained the same erroneous assumption that 38 Studios would obtain $75 million as the result of the EDC financing.

55.     Cannava received several drafts of the Loan and Trust Agreement, including drafts on at least July 19, July 29, August 17 and August 26, 2010. He reviewed those drafts of the Loan and Trust Agreement. Section 2.06 A(b)(iv) in those drafts of the Loan and Trust Agreement utilized the erroneous 38 Studios financial projections as part of the basis for calculating the Deferred Fee that 38 Studios was obligated to pay the EDC. As part of his work on the 38 Studios Bond Offering, Cannava thus should have reviewed 38 Studios' financial projections that were incorporated into, and relied on by, the Loan and Trust Agreement.

56.     In June 2010, Saul wrote a memorandum to Stokes and another member of the EDC's Board that specifically noted, given that the net proceeds of the bond would be less than $75 million, that he needed to revisit 38 Studios' financial projections and assess "the impact closing costs may have [on] the Copernicus development budget." Saul thus knew, or should have known, that when corrected to reflect the approximately $50 million that 38 Studios would receive from the bond issuance, the financial projections would show 38 Studios running out of

money by the end of 2011. Stokes also knew or should have known of this possibility because he was on notice that 38 Studios' financial projections assumed greater than the actual net proceeds from the bond issuance.

57.     When considering whether to make a loan to a company, the EDC typically prepared a credit memorandum that analyzed the creditworthiness of the potential borrower. Saul supervised the EDC analyst who was assigned to analyze 38 Studios' creditworthiness. After that analyst looked at the financial projections provided by 38 Studios, and some other information provided by the company, he expressed significant concerns to Saul, including concerns about whether the assumptions underlying 38 Studios' financial projections were realistic. Shortly after expressing those concerns, the analyst was excluded from further communications about the potential 38 Studios transaction. Neither that analyst, nor anyone else at the EDC, prepared a credit memorandum that analyzed 38 Studios' ability to repay the EDC loan.

58.     By mid-August 2010, at the latest, the EDC and Wells Fargo, including Cannava, knew that 38 Studios would only receive about $50 million in net proceeds from the bond offering. The bond cash flow projections prepared by Cannava, and circulated to the Bond Working Group, detailed the net amounts that 38 Studios would receive and the balance of the proceeds that would be used to fund certain reserves and to pay for expenses associated with the offering. The net proceeds that 38 Studios would receive from the offering had been discussed between the EDC, 38 Studios, and Wells Fargo, including Cannava, for several months before August.

59.     Stokes knew that 38 Studios would receive less in proceeds from the 38 Studios Bond Offering than 38 Studios needed to complete Project Copernicus. On July 26, 2010, on

behalf of the EDC, Stokes signed a Term Sheet with 38 Studios which stated that the EDC understood that 38 Studios' "capital needs to bring project Copernicus to completion to be approximately $75,000,000." At about that time, Stokes also knew that 38 Studios was going to receive about $25 million less than it needed, in proceeds from the EDC's bond offering.

60.   Saul also knew that 38 Studios would receive less in proceeds from the 38 Studios Bond Offering than 38 Studios needed to complete Project Copernicus. He knew that 38 Studios had consistently expressed its need for $75 million to complete Project Copernicus. Saul also knew, during the summer of 2010, that 38 Studios would only receive about $50 million in net proceeds from the offering.

61.   Wells Fargo and Cannava knew that 38 Studios would receive less in proceeds from the 38 Studios Bond Offering than 38 Studios needed to complete Project Copernicus. Cannava received the Term Sheet (referenced in paragraphs 27 and 59 above) on July 27, 2010 and read it. He thus knew that 38 Studios needed at least $75 million to complete Project Copernicus. He also knew, by mid-August 2010 at the latest, that 38 Studios would only receive about $50 million in net proceeds from the bond offering because he was the person in charge of calculating the bond cash flow scenarios that quantified how much of the overall bond proceeds would be deposited into the Project Fund for disbursement to 38 Studios.

**The Bond Placement Memo Failed to Disclose 38 Studios' Funding Gaps**

62.   Even though the EDC and Wells Fargo knew that 38 Studios would only receive about $50 million from the Bond Offering when it needed at least $75 million to complete Project Copernicus, the Bond Placement Memo failed to disclose this significant funding gap.

63.    38 Studios' funding gap was known at the time the Bond Placement Memo was sent to investors.  It was not speculative.  It was an existing risk that should have been disclosed to potential investors in the offering.

64.    38 Studios' funding gap meant that 38 Studios would need to raise at least $25 million in new financing within a year of the Bond Offering.  That immediate need for more funding was a material risk, particularly in light of 38 Studios' failure to attract any equity investors when it sought, through Wells Fargo, to raise equity investments earlier in 2010.

65.    The Bond Placement Memo's omission of the fact that 38 Studios would need additional financing in order to complete Project Copernicus was material.  If 38 Studios were not able to obtain additional financing it would face a significant risk of default on its loan payments to the EDC and insolvency.

66.    Cannava knew or was reckless in not knowing that investors would consider 38 Studios' financial viability to be material.  On July 21, 2010, in the context of discussing continuing disclosure obligations that would be required after the bonds' closing, Cannava recommended that 38 Studios, in addition to the EDC, should be required to make continuing disclosures because he recognized that investors would want to have material disclosures about 38 Studios because its revenues were the first source of payment for the bonds.

67.    The Bond Placement Memo also included statements about 38 Studios' financial condition that were rendered misleading by its significant omission that 38 Studios would need financing in addition to the proceeds of the Bond Offering in order to complete Project Copernicus.  In particular:

a.  The Bond Placement Memo stated that 38 Studios "is a development stage video game and entertainment company with no revenues and is dependent on the

19

proceeds of the 2010 Bonds for future the [sic] development of Project Copernicus[TM]."
This disclosure was misleading because it suggested that the proceeds of the 2010 Bonds
would be sufficient to develop Project Copernicus.

> b. The Bond Placement Memo also stated that, on July 6, 2010, 38 Studios'
auditor "issued a 'going concern' opinion in connection with the Company's most recent
audited financial statements stating that the Company will require additional financing to
fund future operations and raising substantial doubt about the Company's ability to
continue as a going concern." This disclosure was misleading because it suggested that
the proceeds of the Bond Offering were sufficient "additional financing to fund future
operations" and failed to disclose that additional financing on top of the Bonds' proceeds
would be needed.

68. Stokes and Saul were responsible for the failure of the Bond Placement Memo to
disclose 38 Studios' funding gap. They both knew about the funding gap and knew or should
have known that it was not disclosed in the Bond Placement Memo.

**Cannava Knew About 38 Studios' Funding Gap**

69. During the investigation that led to the filing of this case, the Commission
subpoenaed Cannava to give testimony under oath. During that testimony, Cannava stated that
he knew during the summer of 2010 that 38 Studios would need more than $75 million to
complete Project Copernicus. Cannava also stated during that testimony that he knew, at some
point in July 2010, that 38 Studios would only receive around $50 million in net proceeds if the
Bond Offering closed. Cannava also stated during that testimony that he knew that 38 Studios
would need financing beyond the Bond Offering to be a "viable ongoing company."

70.     Cannava's involvement in the Bond Offering began in April 2010 when he became involved in internal discussions at Wells Fargo about the dual-track fundraising that Wells Fargo was seeking to do for 38 Studios.  Between about April 8 and April 16, 2010, he was involved in communications that were used to put together the Investment Banking Commitment Committee memo referred to in paragraph 40 above, and he accepted an invitation to participate in the Committee's meeting to consider that memo.

71.     On June 17, 2010, Cannava participated in a discussion with others in the Bond Working Group concerning the structure of the bonds to be offered.  At that meeting, the Working Group discussed the impact that possible bond structures would have on the net proceeds that 38 Studios would receive and thus on 38 Studios' business plan.  At that meeting, it was discussed that reserves and other closing costs could take $15 to $16 million out of the gross proceeds of $75 million, thus leaving only about $60 million for 38 Studios.

72.     Cannava also participated in a meeting at the EDC on June 22, 2010.  At that meeting there was a discussion that if $6 to $8 million of the gross bond proceeds were deposited into reserves such that 38 Studios would only receive net proceeds of about $65 million, 38 Studios would need more money that it would get from the EDC's bond offering.

73.     Following the June 22 meeting, Cannava prepared preliminary bond cash flow models that calculated the amount of closing costs, reserve funds, and net proceeds that 38 Studios would receive in several different scenarios for structuring the bonds.  Cannava sent preliminary bond cash flows to other members of the Bond Working Group on June 23 (showing net proceeds to 38 Studios of about $67 million).  He also circulated revised bond cash flows to the Bond Working Group, with different structures that were being considered, on numerous dates before the bond closing, including July 28 (showing net proceeds to 38 Studios of about

$67 million), August 4 (showing net proceeds to 38 Studios of between $61 and $67 million), and August 12 (showing net proceeds to 38 Studios of about $51 million).

74.      When Cannava circulated the August 12, 2010 version of the bond cash flows, he noted that the net proceeds that 38 Studios would receive in that scenario were not even enough to fund the draws that 38 Studios was entitled to make under the Term Sheet it had signed with the EDC.

75.      Throughout the summer of 2010, including on July 16 and August 30, Cannava received regular updates from the head of Wells Fargo's investment banking team about 38 Studios' need for additional financing, including the need for additional financing after the Bond Offering closed.  Throughout the summer of 2010, on at least a weekly basis and often more frequently, Cannava also had contacts with the Wells Fargo investment banking team about Wells Fargo's work for 38 Studios.

76.      Cannava was responsible for the failure of the Bond Placement Memo to disclose 38 Studios' funding gap.  Cannava was the person at Wells Fargo responsible for reviewing and approving the Bond Placement Memo on behalf of Wells Fargo.  Between July and October 2010, he reviewed, commented on, and signed off on, numerous drafts of the Bond Placement Memo.  Among other dates, he received drafts of the Bond Placement Memo on July 20, August 27, and September 3.  He signed off, for Wells Fargo, on the draft of the preliminary Bond Placement Memo that went to the printer on September 29, 2010.  He also signed off, for Wells Fargo, on the final version of the Bond Placement Memo that went to the printer on October 28, 2010.  At the time he signed off on the preliminary and final versions of the Bond Placement Memo, Cannava knew about 38 Studios' funding gap, and knew or was reckless in not knowing that it was not disclosed in the Bond Placement Memo.

**The Bond Placement Memo Failed to Disclose Wells Fargo's Extra Fees**

77.     The Bond Placement Memo specified that Wells Fargo and another broker-dealer were acting as placement agents for the 38 Studios Bond Offering and would be compensated through a "placement agents' fee" of $634,065.  Wells Fargo's share of that "placement agents' fee" was $406,250.  The balance of the "placement agents' fee" was paid to the other broker-dealer who acted as a placement agent in the 38 Studios Offering.

78.     The Bond Placement Memo also stated that Wells Fargo would be paid $50,000 by 38 Studios "in connection with their disclosure and due diligence of the Company with respect to this transaction."  No other fees or compensation to Wells Fargo were disclosed in the Bond Placement Memo.

79.     A separate Bond Placement Agreement was entered into between Wells Fargo, the EDC and 38 Studios.  On October 22, 2010, Cannava signed the Bond Placement Agreement on behalf of Wells Fargo.  That agreement stated that the "Placement Agent does not anticipate any remuneration with respect to the 2010 Bonds other than the Placement Agent's discount of $634,065 and the disclosure fee of $50,000."

80.     Wells Fargo's statement about its compensation in the Bond Placement Memo was a misleading half-truth, and its statement in the Bond Placement Agreement about its compensation was false.

81.     In fact, soon after the Bond Offering closed, and pursuant to the May 20 Agreement, 38 Studios paid Wells Fargo an additional $400,000 as a result of meeting milestones with respect to the 38 Studios Bond Offering.  38 Studios also paid Wells Fargo about $23,000 in expenses it had incurred.  38 Studios made that payment with proceeds it received from the Bond Offering.  If the 38 Studios Bond Offering had not closed, Wells Fargo would not

have received $300,000 of that $400,000 fee payment. That extra $400,000 was nearly equal to the disclosed compensation of $406,250 that Wells Fargo received.

82.     Cannava was responsible for Wells Fargo's failure to disclose its additional fees in the Bond Placement Memo and its misstatement about the fees it would receive in the Bond Placement Agreement. He reviewed drafts on the Bond Placement Memo on at least July 20, August 27, and September 3, and approved both the preliminary and final versions of the Bond Placement Memo on behalf of Wells Fargo, on September 29 and October 28, respectively. Cannava also reviewed several drafts of the Bond Placement Agreement, on at least September 29, October 14, and October 21, 2010, and signed the Bond Placement Agreement on behalf of Wells Fargo on October 22, 2010.

83.     Cannava was aware that Wells Fargo's investment bankers were working with 38 Studios to obtain equity financing, that an agreement between 38 Studios and Wells Fargo governed that work, and that 38 Studios had agreed to pay Wells Fargo a fee after the Bond Offering closed.

84.     During the investigation that led to the filing of this case, the Commission subpoenaed Cannava to give testimony under oath. During that testimony, Cannava stated that he knew, by sometime in June 2010, that there was some type of agreement between the investment banking team at Wells Fargo and 38 Studios under which Wells Fargo would be paid fees. Also, in state court litigation concerning the Bond Offering, Cannava testified at a deposition under oath that at the time he signed the Bond Purchase Agreement in October 2010, he knew that Wells Fargo had an engagement letter with 38 Studios to receive fees.

85.     By virtue of being copied on, and involved in communications relating to, the Wells Fargo Investment Banking Commitment Committee memo dated April 16, Cannava was

on notice that Wells Fargo intended to seek fees from 38 Studios that were dependent on milestones in the Bond Offering.  On May 4, 2010, Cannava received an email informing him that a draft engagement letter had been prepared by Wells Fargo and sent to 38 Studios.

86.     On June 29, 2010, Cannava participated in a meeting with representatives of the EDC and its financial adviser where it was disclosed that there was a "separate agreement" between Wells Fargo and 38 Studios on the "private equity side".  Details of that agreement were not disclosed at the meeting, but Cannava was put on notice that such an agreement existed.

87.     Cannava also used substantial portions of the due diligence performed by his investment banking colleagues to satisfy his and Wells Fargo's due diligence obligations relating to the 38 Studios Bond Offering.  By August 24, 2010, at the latest, he was given a copy of the Equity PPM by Wells Fargo's investment banking team, and he used that document in connection with preparing the disclosures in the Bond Placement Memo.  He also had at least weekly calls with the Wells Fargo investment banking team during the summer of 2010 at which matters relating to both the Bond Offering and their other work for 38 Studios were discussed.

88.     The May 20 Agreement was available to Cannava, both from Wells Fargo's files, and from his investment banking team colleagues with whom he was in frequent contact.  On August 30, 2010, in response to a due diligence questionnaire sent by Wells Fargo's counsel to 38 Studios, 38 Studios also prepared a list summarizing its contracts, including the May 20 Agreement, whose purpose was described as "Investment Banker Engagement Letter for private financing and/or bond financing."  Cannava was informed in late August or early September that such contract list was available to him as part of the due diligence file that was compiled for purposes of the 38 Studios Bond Offering.

89.     Cannava should have reviewed the contracts list and the May 20 Agreement as part of performing due diligence on the section of the Bond PPM that described 38 Studios' "Commitments, Contingencies and Outstanding Debt Obligations."

90.     On October 22, 2010, the same day that he signed the Bond Placement Agreement on behalf of Wells Fargo, Cannava sent an email to others at Wells Fargo acknowledging that it had been hard to find buyers for the 38 Studios Bonds, in part because "everyone struggled with the pre-revenue video game component" of the deal. In that email, he also stated that the investment banking side of Wells Fargo "received fees" as part of the deal. This statement demonstrates Cannava's knowledge that Wells Fargo was receiving fees other than those disclosed in the Bond Placement Agreement.

91.     On October 27, 2010, Cannava was sent a draft of a Wells Fargo "closed deal alert" relating to the 38 Studios deal that estimated Wells Fargo's fees from the transaction at $1.5 million. That number was later revised to $.9 million in later versions of the "closed deal alert" that Cannava received. Thus, one day before he signed off on the final version of the Bond Placement Memo (October 28, 2010), Cannava was aware that Wells Fargo was earning more from the 38 Studios Bond Offering than was disclosed in the Bond Placement Memo and the Bond Placement Agreement.

92.     Cannava knew about the existence of the May 20 Agreement and thus knew or was reckless in not knowing that Wells Fargo was receiving substantial additional compensation with respect to the 38 Studios Bonds, and he acted knowingly or recklessly in failing to disclose that additional compensation.

93.     Wells Fargo's and Cannava's failure to disclose the additional compensation that Wells Fargo was receiving in connection with the 38 Studios Bond Offering was material. The

undisclosed compensation was nearly equal to the disclosed compensation.  Underwriters in municipal securities offerings are required by MSRB Rules to disclose the compensation they receive.  Further, the fact that Wells Fargo was receiving compensation in this transaction both as a result of its role as a placement agent hired by the EDC and as a result of its work as an agent for 38 Studios created a potential conflict of interest that should have been disclosed to potential investors.

**38 Studios' Default**

94.      After obtaining the net proceeds from the 38 Studios Bonds, 38 Studios attempted to obtain the additional financing it would need to complete Project Copernicus.  It was unable to do so.

95.      In the spring of 2012, 38 Studios defaulted on its loan payments to the EDC.

96.      38 Studios filed a petition for liquidation in the United States Bankruptcy Court for the District of Delaware in June 2012.  That bankruptcy proceeding is pending.

97.      Bondholders were paid the interest due on the 38 Studios Bonds through November 2012 from the Capitalized Interest Fund.  To date, bondholders have been paid principal and interest on the 38 Studios Bonds when those payments were due from both the Capital Reserve Fund and as a result of decisions made by the Rhode Island General Assembly to appropriate funds to make those payments.

98.      At the time of 38 Studios' default, the outstanding principal and interest on the 38 Studios Bonds, excluding amounts previously reserved, was approximately $90 million.

**FIRST CLAIM FOR RELIEF (against the EDC and Wells Fargo)**
**Fraud in the Offer or Sale of Securities in**
**Violation of Section 17(a)(2) of the Securities Act**

99.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-98 above as if set forth fully herein.

100.    The 38 Studios Bonds are "securities" under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

101.    By engaging in the conduct described above, the EDC and Wells Fargo, directly and indirectly, acting knowingly, recklessly, or negligently in the offer or sale of securities by use of the mails or the means or instruments of transportation or communication in interstate commerce have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

102.    By engaging in the conduct described above, the EDC and Wells Fargo have violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)].

**SECOND CLAIM FOR RELIEF (against the EDC and Wells Fargo)**
**Fraud in the Offer or Sale of Securities in**
**Violation of Section 17(a)(3) of the Securities Act**

103.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-98 above as if set forth fully herein.

104.    The 38 Studios Bonds are "securities" under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

105.    By engaging in the conduct described above, the EDC and Wells Fargo, directly and indirectly, acting knowingly, recklessly, or negligently in the offer or sale of securities by

use of the mails or the means or instruments of transportation or communication in interstate

commerce have engaged in transactions, acts, practices or courses of business which operated or

would have operated as a fraud or deceit upon purchasers of securities.

106.  By engaging in the conduct described above, the EDC and Wells Fargo have

violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15

U.S.C. §77q(a)(3)].

### THIRD CLAIM FOR RELIEF (against Stokes and Saul)
### Aiding and Abetting Fraud in the Offer or Sale of Securities in
### Violation of Sections 17(a)(2) and (a)(3) of the Securities Act

107.  The Commission repeats and incorporates by reference the allegations in

paragraphs 1-98 above as if set forth fully herein.

108.  By engaging in the conduct described above, the EDC, directly and indirectly,

acting knowingly, recklessly, or negligently in the offer or sale of securities by use of the mails

or the means or instruments of transportation or communication in interstate commerce: (a) have

obtained money or property by means of untrue statements of material fact or omissions to state

material facts necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or (b) have engaged in transactions, acts, practices

or courses of business which operated or would have operated as a fraud or deceit upon

purchasers of securities.

109.  Stokes knowingly or recklessly provided substantial assistance to the EDC's

violations of Section 17(a)(2) and (a)(3) of the Securities Act by, among other things, signing the

Bond Placement Memo and failing to ensure that it disclosed that 38 Studios would require

additional financing to complete Project Copernicus.

110.    Saul knowingly or recklessly provided substantial assistance to the EDC's violations of Section 17(a)(2) and (a)(3) of the Securities Act by, among other things, reviewing the Bond Placement Memo and failing to ensure that it disclosed that 38 Studios would require additional financing to complete Project Copernicus.

111.    By engaging in the conduct described above, Stokes and Saul each aided and abetted violations of Section 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §77q(a)(2), (3)].

### FOURTH CLAIM FOR RELIEF (against Cannava)
### Aiding and Abetting Fraud in the Offer or Sale of Securities in
### Violation of Sections 17(a)(2) and (a)(3) of the Securities Act

112.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-98 above as if set forth fully herein.

113.    By engaging in the conduct described above, Wells Fargo, directly and indirectly, acting knowingly, recklessly, or negligently in the offer or sale of securities by use of the mails or the means or instruments of transportation or communication in interstate commerce: (a) have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) have engaged in transactions, acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities.

114.    Cannava knowingly or recklessly provided substantial assistance to Wells Fargo's violations of Section 17(a)(2) and (a)(3) of the Securities Act by, among other things, reviewing and approving the Bond Placement Memo on behalf of Wells Fargo, and signing the Bond Placement Agreement on behalf of Wells Fargo.

115.     By engaging in the conduct described above, Cannava aided and abetted violations of Section 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §77q(a)(2), (3)].

## FIFTH CLAIM FOR RELIEF (against Wells Fargo)
### Violation of MSRB Rule G-17

116.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-98 above as if set forth fully herein.

117.     Wells Fargo is a broker-dealer, municipal securities broker and a municipal securities dealer.

118.     Pursuant to Section 15B(b)(2) of the Exchange Act [15 U.S.C. §78o-4(b)(2)], the MSRB proposes and adopts rule governing the conduct of brokers and dealers and municipal securities dealers in connection with municipal securities.  Pursuant to Section 21(d)(1) of the Exchange Act  [15 U.S.C. §78u(d)(1)], the Commission is charged with enforcing the MSRB rules.

119.     By engaging in the conduct described above, Wells Fargo has, directly and indirectly, in the conduct of its municipal securities activities, failed to deal fairly with all persons, and has engaged in a deceptive, dishonest or unfair practice, in violation of Rule G-17 promulgated by the MSRB.

## SIXTH CLAIM FOR RELIEF (against Wells Fargo)
### Violation of MSRB Rule G-32

120.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-98 above as if set forth fully herein.

121.     Wells Fargo is a broker-dealer, municipal securities broker and a municipal securities dealer.

122.     By engaging in the conduct described above, Wells Fargo has sold municipal

securities to a customer on a negotiated basis without providing disclosures, in the official

statement or otherwise, concerning the amount of any fee received by Wells Fargo as agent for

the issuer in the distribution of the securities, in violation of Rule G-32(a)(iii) promulgated by the

MSRB.

**SEVENTH CLAIM FOR RELIEF (against Wells Fargo)**
**Violation of Section 15B(c)(1) of the Exchange Act**

123.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-98 above as if set forth fully herein.

124.     Wells Fargo is a broker-dealer, municipal securities broker and a municipal

securities dealer.

125.     The 38 Studios Bonds are "securities" under Section 3(a)(10) of the Exchange

Act [15 U.S.C. §78c(a)(10)].

126.     By engaging in the conduct described above, Wells Fargo has, directly and

indirectly, by use of the mails or the means or instrumentalities of interstate commerce, effected

a transaction in, or induced or attempted to induce the purchase or sale of, a municipal security in

contravention of the rules promulgated by the MSRB, in particular Rules G-17 and G-32.

127.     By engaging in the conduct described above, Wells Fargo has violated, and

unless restrained and enjoined, will continue to violate, Section 15B(c) of the Exchange Act [15

U.S.C. §78o-4].

**EIGHTH CLAIM FOR RELIEF (against Cannava)**
**Aiding and Abetting Wells Fargo's Violations of MSRB Rules G-17 and G-32**
**and Section 15B(c)(1) of the Exchange Act**

128.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-98 above as if set forth fully herein.

32

129.     Wells Fargo is a broker-dealer, municipal securities broker and a municipal securities dealer.

130.     The 38 Studios Bonds are "securities" under Section 3(a)(10) of the Exchange Act [15 U.S.C. §78c(a)(10)].

131.     By engaging in the conduct described above, Wells Fargo has, directly and indirectly, by use of the mails or the means or instrumentalities of interstate commerce, effected a transaction in, or induced or attempted to induce the purchase or sale of, a municipal security in contravention of the rules promulgated by the MSRB, in particular Rules G-17 and G-32.

132.     By engaging in the conduct described above, Wells Fargo has violated, and unless restrained and enjoined, will continue to violate, Section 15B(c) of the Exchange Act [15 U.S.C. §78o-4].

133.     Cannava knowingly or recklessly provided substantial assistance to Wells Fargo's violations of MSRB Rules G-17 and G-32 and its violation of Section 15(B)(c) of the Exchange Act [15 U.S.C. §78o-4].

134.     By engaging in the conduct described above, Cannava aided and abetted Wells Fargo's violations of MSRB Rules G-17 and G-32 and its violation of Section 15(B)(c) of the Exchange Act [15 U.S.C. §78o-4].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining defendants EDC and Wells Fargo and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or

otherwise, including facsimile transmission or overnight delivery service, from future violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)];

      B.     Enter a permanent injunction restraining defendants Cannava, Stokes and Saul and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from aiding and abetting future violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)];

      C.     Enter a permanent injunction restraining defendant Wells Fargo and its agents, servants, employees and attorneys and all persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from future violations of Section 15B(c) of the Exchange Act [15 U.S.C. §77o-4], and MSRB Rules G-17 and G-32;

      D.     Enter a permanent injunction restraining defendant Cannava and his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from aiding and abetting future violations of Section 15B(c) of the Exchange Act [15 U.S.C. §77o-4], and MSRB Rules G-17 and G-32;

      E.     Order defendants EDC, Wells Fargo and Cannava to disgorge their ill-gotten gains, plus prejudgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court.

      F.     Order all defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

G.    Enter permanent injunctions restraining defendants Cannava, Stokes and Saul from participating in an offering of municipal securities, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any municipal security, provided however, that such injunctions shall not prevent them from purchasing or selling municipal securities for their own personal accounts.

H.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

I.    Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields (Mass. Bar No. 637438)
Rua M. Kelly (Mass. Bar No. 643351)
Louis A. Randazzo (New York Bar No. 2416485)
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8904 (Shields)
(617) 573-8941 (Kelly)
(617) 573-8985 (Randazzo)
(617) 573-4590 (Facsimile)
ShieldsKa@sec.gov; KellyRu@sec.gov;
RandazzoL@sec.gov

Dated: August ___, 2016